**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| IN RE WILLIS TOWERS WATSON PLC PROXY LITIGATION | Civ. A. No. 1:17-cv-01338-AJT-JFA<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF THE TW/WILLIS
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**HUNTON ANDREWS KURTH LLP**
951 East Byrd Street
Richmond, Virginia 23219-4074
Tel: (804) 788-8201
Fax: (804) 788-8218

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Counsel for the TW/Willis Defendants*

Dated: April 13, 2018

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ..............................................................................................4

    A.    The Parties ..............................................................................................4

    B.    The Merger Negotiations Leading Up To The Announcement Of The Merger .....................................................................................................5

    C.    The September 2015 Meeting.................................................................7

    D.    The Filing Of The Proxy And Public Debate Over The Merger ...........8

    E.    The Renegotiation Of The Merger Consideration, Filing Of The Proxy Supplement, And Stockholder Vote .......................................................9

    F.    The Closing Of The Merger And The Subsequent Negotiation Of Mr. Haley's Employment Agreement.........................................................10

ARGUMENT ..............................................................................................................11

I.      PLAINTIFF FAILS TO ADEQUATELY PLEAD A FALSE OR MISLEADING STATEMENT OR OMISSION.................................................................12

    A.    The Omission Of The Alleged September "Agreement" Did Not Render The Proxy Materials Misleading................................................13

    B.    Omitting That Mr. Haley Allegedly Negotiated For The "Minimum" Additional Consideration Needed Did Not Render The Proxy Materials Misleading............................................................................................17

    C.    The Omission Of VA's Alleged Involvement Did Not Render Any Statement Misleading.........................................................................19

II.    PLAINTIFF FAILS TO ADEQUATELY PLEAD THAT ANY OF THE ALLEGED "OMISSIONS" WERE MATERIAL ...........................................19

    A.    Mr. Haley's Discussions With Mr. Ubben and VA Are Immaterial As A Matter of Law .................................................................................20

    B.    Facts Concerning The Price Renegotiation Were Fully And Fairly Disclosed..............................................................................................23

    C.    The Omission Of Mr. Ubben's and VA's "Involvement" In Merger-Related Negotiations Is Immaterial As A Matter Of Law ...................24

III.   THE COMPLAINT FAILS TO PLEAD FACTS DEMONSTRATING A STRONG INFERENCE OF SCIENTER .......................................................26

i

IV.     PLAINTIFF'S CLAIMS ARE TIME-BARRED...............................................................27

        A.     Any Reasonably Diligent Plaintiff Would Have Discovered The Facts Underlying The Alleged Violations As Soon As The Proxy Was Filed In 2015.....................................................................................................................27

        B.     Established Principles Of Agency Law Impute Plaintiff's Counsel's Knowledge Of The Alleged Actionable Conduct To Its Clients ...........................29

V.     PLAINTIFF FAILS TO PLEAD A CLAIM UNDER SECTION 20(a) ...........................30

CONCLUSION.................................................................................................................................30

**TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                          <u>Page(s)</u>

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...........................................................................................................11

*Assad v. DigitalGlobe, Inc.,*
    No. 17-cv-01097, 2017 WL 3129700 (D. Col. July 21, 2017)..............................................22

*Bryan v. Land (In re Land),*
    215 B.R. 398 (B.A.P. 8th Cir. 1997).....................................................................................29

*Burt v. Maasberg,*
    No. ELH-12-0464, 2013 WL 1314160 (D. Md. Mar. 31, 2013) ...........................................27

*C&J Energy Servs., Inc. v. City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr.,*
    107 A.3d 1049 (Del. 2014) ....................................................................................................14

*In re Cogent, Inc. S'holder Litig.,*
    7 A.3d 487 (Del. Ch. 2010)....................................................................................................24

*Cozzarelli v. Inspire Pharm. Inc.,*
    549 F.3d 618 (4th Cir. 2008) .................................................................................................26

*In re Ebix, Inc. Stockholder Litig.,*
    C.A. No. 8526-VCN, 2016 WL 208402 (Del. Ch. Jan. 15, 2016).........................................23

*In re Family Dollar Stores, Inc. Stockholder Litig.,*
    C.A. No. 9985-CB, 2014 WL 7246436 (Del. Ch. Dec. 19, 2014).........................................23

*Gasner v. Cty. of Dinwiddie,*
    162 F.R.D. 280 (E.D. Va. 1995) ..............................................................................................4

*Globis P'rs, L.P. v. Plumtree Software, Inc.,*
    No. 1577-VCP, 2007 WL 4292024 (Del. Ch. Nov. 30, 2007) ........................................22, 25

*Goodman v. Praxair,*
    494 F.3d 458 (4th Cir. 2007) .................................................................................................28

*Greenhouse v. MCG Capital Corp.,*
    392 F.3d 650 (4th Cir. 2004) .................................................................................................21

*Hayes v. Crown Cent. Petroleum Corp.,*
    78 F. App'x 857 (4th Cir. 2003) ................................................................................2, 12, 15, 18

*In re JP Morgan Chase Sec. Litig.,*
    363 F. Supp. 2d 595 (S.D.N.Y. 2005).....................................................................................26

*Landsberger v. Martek Biosciences Corp.*,
    No. CCB-09-3389, 2010 WL 3038947 (D. Md. July 30, 2010)............................................29

*Link v. Wabash R.R. Co.*,
    370 U.S. 626 (1962)..........................................................................................................29

*Loudon v. Archer-Daniels-Midland Co.*,
    700 A.2d 135 (Del. 1997) ................................................................................................24

*Malon v. Franklin Fin. Corp.*,
    No. 3:14CV671–HEH, 2014 WL 6791611 (E.D. Va. Dec. 2, 2014) ...................11, 12, 19, 22

*Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*,
    576 F.3d 172 (4th Cir. 2009) ...........................................................................................30

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...........................................................................26

*Nationwide Life Ins. Co. v. Attaway*,
    254 F.2d 30 (4th Cir. 1958) .............................................................................................29

*Okla. Firefighters Pension & Ret. Sys. v. K12, Inc.*,
    66 F. Supp. 3d 711 (E.D. Va. 2014) ................................................................................15

*In re Om Gp., Inc. Stockholders Litig.*,
    C.A. No. 11216-VCS, 2016 WL 5929951 (Del. Ch. Oct. 12, 2016)....................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)................................................................................................16, 18

*In re OPENLANE, Inc., S'holders Litig.*,
    C.A. No. 6849-VCN, 2011 WL 4599662 (Del. Ch. Sept. 30, 2011)....................................16

*Phillips v. LCI Int'l. Inc.*,
    190 F.3d 609 (4th Cir. 1999) ..........................................................................................22

*Police & Fire Ret. Sys. of Detroit v. Safenet, Inc.*,
    645 F. Supp. 2d 210 (S.D.N.Y. 2009)..............................................................................26

*Ridler v. Hutchinson Tech. Inc.*,
    216 F. Supp. 3d 982 (D. Minn. 2016)...............................................................................18

*In re Rouse Props. Inc. Fiduciary Litig.*,
    No. 12194-VCS, 2018 WL 1226015 (Del. Ch. Mar. 9, 2018)..............................................14

*In re Sauer-Danfoss Inc. S'holder Litig.*,
    65 A.3d 1116, 1131 (Del. Ch. 2011)................................................................................24

*Seinfeld v. Gray*,
    404 F.3d 645 (2d Cir. 2005) ............................................................................12

*Smith v. Ayer*,
    101 U.S. 320 (1879) ........................................................................................29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................26

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ..............................................................3, 4, 20, 22, 25

*Witthohn v. Fed. Ins. Co.*,
    164 F. App'x 395 (4th Cir. 2006) ....................................................................4

**Statutes, Rules & Regulations**

15 U.S.C. § 78i(f) ...................................................................................................27

15 U.S.C. § 78u-4(b) ...........................................................................1, 2, 12, 14, 26

Fed. R. Civ. P. 9(b) ............................................................................................1, 26

Fed. R. Civ. P. 12(b)(6) .....................................................................................1, 30

17 C.F.R. § 240.14a-9 ......................................................................................2, 11, 12

Defendants Willis Towers Watson plc ("WTW"), Towers Watson & Co. ("TW"), Willis Group Holdings plc (n/k/a Willis Towers Watson plc) ("Willis"), John J. Haley, and Dominic Casserley (collectively, the "TW/Willis Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint (the "Complaint" or "Compl.") pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) (the "PSLRA").

## PRELIMINARY STATEMENT

Plaintiff asserts putative class action claims on behalf of former TW stockholders under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") for allegedly false and misleading statements in the proxy materials filed in connection with the 2016 merger of Willis and TW (the "Merger").[1]  Specifically, although the Merger closed more than two years ago, Plaintiff now claims that the Merger proxy materials failed to disclose a supposed "secret agreement" concerning Defendant John Haley's post-Merger compensation as CEO of the combined entity.  Plaintiff's Complaint should be dismissed because the public record on which Plaintiff relies conclusively establishes that there was no such secret agreement.

Remarkably, this action represents the third attack on the Merger notwithstanding the strong returns TW stockholders have enjoyed over the past two years since the date of the Merger.  First, former TW stockholders, prior to the stockholder vote on the Merger, brought putative class action claims for breach of fiduciary duty against the members of the TW board of directors in Delaware Chancery Court.  Next, certain former TW stockholders, represented by the same law firm as Plaintiff here (Bernstein Litowitz Berger & Grossmann LLP ("BLBG")), commenced a proceeding seeking statutory appraisal of their shares in Delaware Chancery

---

[1] In connection with the Merger, TW was merged with and into WTW Delaware Holding LLC, an indirect, wholly-owned subsidiary of WTW.  TW no longer exists as a separate entity.

Court.  And now -- more than two years after the Merger -- Plaintiff brings the instant action.

The problem for Plaintiff, however, is that the PSLRA dispenses with notice pleading and requires complaints to meet strict pleading requirements to withstand a motion to dismiss.  To state a claim under Section 14(a) where, as here, the claim is predicated on alleged omissions in a proxy statement, the plaintiff must show *both* that the omission rendered the proxy statement false or misleading *and* that it was material.  *Hayes v. Crown Cent. Petroleum Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (citing 17 C.F.R. § 240.14a-9).  Moreover, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id*. (citing 15 U.S.C. § 78u-4(b)(1)).  Plaintiff's Complaint fails to meet this standard and should be dismissed for several reasons.

*First*, the lynchpin of the Complaint is that, prior to the TW stockholder vote on the Merger, TW's CEO, Mr. Haley, allegedly entered into an undisclosed agreement with a Willis stockholder, Defendant ValueAct Capital Management, L.P. ("VA"), that would provide him with a "massive compensation package" if the Merger were consummated.  Compl. ¶ 6. However, while the Complaint repeatedly alleges the existence of a secret contract,[2] that allegation has *no* basis in fact (and, thus, has not been pled with the requisite particularity).  In fact, numerous public documents and sources incorporated by reference into the Complaint indicate that *the exact opposite is true*:  Mr. Haley's compensation agreement was not negotiated or agreed upon, much less approved by the new company's board, until *after* the vote on the Merger.  Indeed, because Mr. Haley's compensation required approval by the new company's

---

[2] *See* Compl. ¶¶ 5-6, 12, 18, 79, 80, 85-87, 89, 98, 99-101, 104, 106, 123, 147-50, 153, 162-64, 168, 170, 173, 175, 178, 180-81, 184, 186, 188, 190, 193-94, 199, 206, 208, 216.

board, VA, a 10% Willis stockholder at the time of the alleged secret agreement, had no ability to enter into an agreement of any type on behalf of the combined company.  *See infra*, Point I.A.

*Second*, even if there was a secret agreement (and there was not), the omission of that supposed "fact" would not have rendered *any* of the statements in the proxy materials false or misleading.  The same is true for the other alleged omissions in the proxy materials:  neither the allegation that Mr. Haley only sought the "minimum" additional consideration needed for TW stockholders to approve the Merger, nor the alleged involvement of VA in the negotiations, render any of the statements in the proxy materials misleading.  Rather, all of the statements identified by Plaintiff would have remained accurate even if Plaintiff's allegations regarding these omissions were true.  *See infra*, Point I.

*Third*, although Plaintiff repeatedly alleges that the alleged omissions were "material," Plaintiff has failed to plead (and cannot plead) that any of the allegedly omitted facts would have "significantly altered the 'total mix' of information made available" to TW stockholders in deciding whether to approve the Merger.  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  In this regard, the Complaint simply ignores that the key facts regarding Mr. Haley's alleged conflict were already disclosed in the 244-page proxy statement (the "Proxy") and the 29-page proxy supplement (the "Proxy Supplement," and together with the Proxy and TW's other public filings in support of the Merger, the "Proxy Materials"), including that Mr. Haley (1) would be the CEO of the post-Merger combined company; and (2) had been one of the primary negotiators of the Merger, including the consideration TW stockholders would receive.  Similarly, the Proxy Supplement described in detail the renegotiation of the Merger consideration, rendering immaterial Plaintiff's conclusory allegation that the Proxy Materials failed to disclose that Mr. Haley negotiated for the "minimum" additional consideration needed

to secure stockholder approval.  Stockholders were also informed that VA was involved in the Merger, had signed a voting agreement to support the Merger, and had issued its own press releases advocating for the Merger.  In the face of these disclosures, none of the alleged omissions are "material" because none of them would have "assumed actual significance" to TW stockholders.  *TSC*, 426 U.S. at 449.  *See infra*, Point II.

*Fourth*, the Complaint "sounds in fraud," and Plaintiff fails to plead particularized facts giving rise to a "strong inference" that any Defendant acted with scienter.  *See infra*, Point III.

*Fifth*, the Complaint should be dismissed because it was brought more than two years after the Proxy was disseminated and, thus, well beyond the applicable one-year statute of limitations.  While the Complaint attempts to plead around this defect (a tacit acknowledgment of its lateness), the core facts asserted in the Complaint were available to reasonably diligent stockholders and known to Plaintiff and its counsel much earlier.  *See infra*, Point IV.

*Finally*, because the Complaint fails to state an underlying violation of the Exchange Act, Plaintiff's "control person" claim under Section 20(a) must be dismissed.  *See infra*, Point V.

## STATEMENT OF FACTS[3]

### A.   The Parties

Plaintiff purports to be a former TW stockholder and alleges that it owned 328,385 shares of TW stock as of October 1, 2015, the record date for the Merger.  Compl. ¶ 25.

---

[3] The factual background set forth below is drawn from the Complaint, documents integral to Plaintiff's claims that are incorporated by reference in the Complaint, including documents filed publicly in a prior litigation relating to the Merger in Delaware Chancery Court, captioned *In re Appraisal of Towers Watson & Co.*, C.A. No. 12064-CB (Del. Ch.) (the "Appraisal Action"), and filings with the Securities and Exchange Commission (the "SEC") of which this Court may take judicial notice.  *See Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396–97 (4th Cir. 2006) ("[A] court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed."); *Gasner v. Cty. of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995) (on a motion to dismiss, defendant may also attach "official public records pertinent to the plaintiffs' claims").

Defendant TW, prior to the Merger, was a publicly-traded professional services firm with its headquarters in Arlington, Virginia. *Id.* ¶ 27. Defendant Haley served as TW's CEO and Chairman from 2010 through the closing of the Merger, when he became the CEO of the merged entity, Defendant WTW. *Id.* ¶ 30.

Defendant Willis, prior to the Merger, was a publicly-traded global advisory, brokering, and solutions company incorporated in Ireland and with its principal executive offices in London, United Kingdom. *Id.* ¶ 28. Defendant Dominic Casserley served as CEO of Willis from 2013 until the closing of the Merger. *Id.* ¶ 31. In connection with the consummation of the Merger, Willis changed its name to WTW. *See* Rule 7.1 Disclosure Statement (ECF No. 29).

Defendant VA is a manager of investment funds based in San Francisco, California, which, through its investment funds, held approximately 10% of Willis's stock at the time of the Merger. Compl. ¶ 29; Ex. A, Proxy, at 6 (cited throughout the Complaint).[4] Defendant Jeffrey W. Ubben is VA's CEO and served on the Willis board of directors through the closing of the Merger. Compl. ¶ 32.

**B.   The Merger Negotiations Leading Up To The Announcement Of The Merger**

In late January 2015, Mr. Casserley first proposed to Mr. Haley that TW and Willis combine businesses. *Id.* ¶ 35. After this initial approach, Mr. Haley briefed Linda Rabbitt, TW's lead independent director, about his discussions with Mr. Casserley concerning a potential transaction. *Id.* ¶ 38. However, it was not until March 19, 2015 that the parties took the initial step of signing a non-disclosure agreement. *Id.* ¶ 50.

Because the two companies were similar in size and market capitalization, the parties agreed that the transaction would be a "merger of equals," meaning that neither company was

---

[4] References to "Ex. __" are to the exhibits attached to the Declaration of Johnathon E. Schronce, filed contemporaneously herewith.

truly "acquiring" the other.  *Id*. ¶ 2.  As a result, the transaction required negotiating several fundamental issues beyond price, including who would lead the combined company, who would sit on the combined company's board, how to structure the Merger, and whether one company was entitled to a "premium" over its public trading price.  *See, e.g.*, *id*. ¶¶ 39, 54, 58-78.

With respect to leadership, independent directors on the TW Board first suggested that Mr. Haley lead the combined company given his successful track record with prior "merger of equals" transactions.  Ex. A, Proxy, at 73-74.  On May 19, 2015, Willis agreed and the decision that Mr. Haley would lead the combined company was finalized.  Compl. ¶ 57.  The parties also ultimately agreed that Willis's 12-member board would remain the same size post-Merger, but would be comprised of six directors from each company.  Ex. A, Proxy, at 113.

In terms of price and structure of the Merger, Mr. Haley initially proposed that the equity ownership of the combined company be based on TW's and Willis's respective market capitalization.  Compl. ¶ 54.  To that end, TW initially proposed a structure in which its stockholders would receive 49% of the combined company and a $500 million cash dividend (approximately $7.20 per share), with Willis owning the remaining 51%.  *Id*. ¶ 59.  Willis countered by proposing a structure in which Willis stockholders would receive 50.1% of the combined company, and TW stockholders would receive 49.9% of the combined company, with no cash dividend.  *Id*. ¶ 61.  Ultimately, after Mr. Haley emphasized the importance of a cash dividend, the parties agreed that Willis stockholders would own 50.1% of the combined company and TW stockholders would own 49.9% of the combined company and receive a cash dividend of $337 million (approximately $4.87 per share).  *Id*. ¶ 63; Ex. A, Proxy, at 75.

As a condition to entering into the Merger Agreement, TW required that VA enter into a voting agreement in support of the Merger, and VA did so.  Compl. ¶¶ 64-67; Ex. A, Proxy,

Annex A, Agreement and Plan of Merger, dated as of June 29, 2015, at A-5.

On June 29, 2015, the TW Board held a special meeting to discuss the Merger.  Ex. A, Proxy, at 80.  TW's financial advisor, Bank of America Merrill Lynch, reviewed with the Board its financial analysis of the Merger consideration and provided an opinion that the Merger consideration was fair to TW stockholders.  *Id*.  The TW Board unanimously determined that it was in the best interests of TW and its stockholders to enter into the Merger Agreement.  *Id*.  TW and Willis jointly announced the Merger the next day.  *Id*.

### C.      The September 2015 Meeting

Although it was agreed by all parties on May 19, 2015 that Mr. Haley would become CEO of the combined company, Plaintiff does not allege that any negotiations concerning his compensation took place prior to the June 2015 signing of the Merger Agreement.  Instead, Plaintiff alleges that, on September 10, 2015, nearly three months after the deal was signed, Mr. Haley met and had a conversation with Mr. Ubben and an employee of VA concerning Mr. Haley's potential compensation.  *See* Compl. ¶ 80; *see also* Ex. B, Towers Watson Compensation Review, dated Sept. 2015 (cited at Compl. ¶ 81).  Although Plaintiff attempts to spin this discussion as a clandestine meeting at which a compensation agreement was struck in return for Mr. Haley's support for the Merger, the sole contemporaneous source for that allegation indicates that the purpose of the meeting was to explain VA's general compensation philosophy for companies in which it invests.  *See* Ex. C, Email from J. Ubben to J. Haley, dated Sept. 14, 2015 (cited at Compl. ¶ 84).  And although the Complaint repeatedly states that Mr. Haley "secured" a "massive compensation package" at this meeting pursuant to which he allegedly could earn as much as $165 million over three years, *see* n.2, *supra*, there is absolutely *no* factual support for that allegation.  Putting aside the erroneous and nonsensical assumption that VA, as a 10% Willis stockholder, had any authority to agree to any deal with Mr. Haley, Mr.

Haley's compensation agreement was not actually negotiated and agreed upon until *after* TW stockholders approved the Merger.  *See infra*, Statement of Facts, Section F.

### D.     The Filing Of The Proxy And Public Debate Over The Merger

On October 13, 2015, TW and Willis jointly filed the Proxy.  Compl. ¶ 6.  Stockholder and analyst reactions to the announcement of the Merger were mixed.  *Compare* Ex. D, Email from Vanguard to J. Ubben, dated Nov. 14, 2015 (referenced at Compl. ¶ 137), *with* Compl. ¶¶ 90-93.  The most vocal dissenter was Driehaus Capital Management ("Driehaus"), a hedge fund that held a "short" interest in Willis's stock -- meaning, it was betting that Willis's stock price would decline in the future.  Ex. E, TW Investor Presentation Update, dated Nov. 3, 2015 (cited at Compl. ¶ 112); Ex. F, Driehaus Press Release, dated Sept. 14, 2015 (disclosing short position in Willis) (cited at Compl. ¶ 90).  Upon the announcement of the Merger, Willis's stock price increased and Driehaus began aggressively lobbying for TW stockholders to reject the transaction.  *See* Compl. ¶¶ 71, 89-93.

One of the topics Driehaus alluded to in its public statements was Mr. Haley's personal interest in the proposed Merger.  Driehaus alleged that an earlier TW merger had "allow[ed] Towers to best peers in one respect:  CEO John J. Haley's compensation has grown faster than any of his peers since 2010."  Ex. G, Driehaus, Letter to TW Shareholders, dated Oct. 22, 2015 (cited at Compl. ¶ 105).  TW responded by pointing out that Driehaus had misread TW's SEC filings and that Driehaus's statement was "demonstrably false."  Ex. E, TW Investor Presentation Update, at 7.  While the Complaint misrepresents this statement as a denial "that there was any conflict of interest with regard to Haley's compensation" in connection with the Merger, Compl. ¶¶ 8, 11, TW merely noted that Driehaus's allegations about TW's *historical* compensation practices were incorrect.

Although Driehaus was a vocal dissident against the transaction, influential proxy

advisory firm ISS's November 2015 recommendation that TW stockholders reject the deal was the real potential obstacle to the Merger.  *See id.* ¶¶ 113-14, 116.  And although Plaintiff alleges that Defendants knew the Merger was a bad deal for TW *from the start*, the factual sources Plaintiff relies on tell a different story:  representatives of VA were "stunned" by the "awful news" when ISS recommended that TW stockholders turn down the deal.  *Id.* ¶ 116.

Concerned that TW would attempt to renegotiate the deal to extract more value from Willis, VA and Willis issued press releases and reached out to TW investors to try to convince them to vote for the transaction.  Ex. H, Press Release, ValueAct Capital Voices Strong Disagreement with ISS Voting Recommendations for Towers Watson Stockholders, dated Nov. 10, 2015 (cited at Compl. ¶ 128); Compl. ¶¶ 128, 135-37.  Bound by the Merger Agreement, which required TW to use "reasonable best efforts" to achieve stockholder approval of the Merger on the terms originally agreed upon (Ex. A, Proxy, at 136; Merger Ag. § 5.5(c), at A-50), TW worked with Willis to issue press releases, presentations, and SEC filings encouraging its stockholders to approve the transaction.  Compl. ¶¶ 135, 139-40.

### E.  The Renegotiation Of The Merger Consideration, Filing Of The Proxy Supplement, And Stockholder Vote

Notwithstanding TW's contractual duty to use reasonable best efforts to secure approval of the Merger, privately, Mr. Haley repeatedly urged Willis to increase the Merger consideration. Ex. I, Proxy Supplement, at 3-5 (cited throughout Complaint).  After discussion with other TW directors, Mr. Haley first asked Willis to raise the amount of the cash dividend to $10.00 per share (from $4.87 per share) and renegotiate the exchange ratio.  *Id.* at 3.  Willis adamantly refused to renegotiate:  it had no interest in receiving less merger consideration for its stockholders if there was any chance TW stockholders would approve the deal.  *Id.* at 3-5.  VA criticized Mr. Haley for negotiating too hard for TW stockholders, noting that Mr. Haley "should

be on the phone all weekend trying to get more votes rather than focusing on renegotiating the deal," and Willis reminded Mr. Haley of TW's contractual duty to seek stockholder approval on the terms originally agreed upon.  Ex. J, Email from R. Birtwell to J. Ubben, dated Nov. 14, 2015 (cited at Compl. ¶ 136); Ex. I, Proxy Supplement, at 3.

Despite Mr. Haley's repeated requests that Willis raise the Merger consideration or make a counter-proposal, it was not until TW adjourned the stockholder vote on the Merger that Willis engaged in any price renegotiations.  Ex. I, Proxy Supplement, at 4.  At that point, Mr. Haley and TW's proxy solicitors told Willis that TW stockholders would not approve the deal unless the cash dividend was "significantly increased."  *Id*.  Mr. Casserley responded by proposing that TW stockholders receive a cash dividend of $9.74 per share, and Mr. Haley then stated that "he believed an increase in the pre-merger special dividend to at least $10.00 per share would be necessary."  *Id*.  The TW Board, with the advice of its legal and financial advisors, later directed Mr. Haley to formally propose that the cash dividend be increased to $10.00 per share.  *Id*. at 5. Willis ultimately agreed to this price increase, and upon receiving an opinion from TW's financial advisor that the revised Merger consideration was fair from a financial point of view to TW stockholders, the TW Board unanimously voted to approve amendments to the Merger Agreement implementing the change.  *Id*.

On November 20, 2015, the changes to the Merger Agreement were announced, and the stockholder vote on the Merger was rescheduled for December 11, 2015.  Compl. ¶¶ 145, 152. TW stockholders ultimately approved the Merger.  *Id*. ¶ 152.

**F.    The Closing Of The Merger And The Subsequent Negotiation Of Mr. Haley's Employment Agreement**

It was not until after the December stockholder vote had been secured that the parties began to negotiate Mr.  Haley's compensation package.  *See id*. ¶ 86.  On January 4, 2016, the

Merger closed.  *Id.* ¶ 152.  Thereafter, the WTW Board and its Compensation Committee began working on a proposed compensation package for Mr. Haley.  The four-person Compensation Committee was chaired by Wendy Lane, the former Chairman of Willis's Compensation Committee.  Ex. K, WTW Form 8-K (Jan. 5, 2016).  Mr. Ubben joined the Committee for the first time following the Merger.  *Id.*

To assist with drafting, structuring, and negotiating Mr. Haley's compensation package, the newly-formed Compensation Committee retained a compensation consultant, Semler Brossy Consulting Group LLC.  Ex. L, WTW 2016 Proxy Statement, at 51 (Apr. 27, 2017).  Negotiations continued into February, when Semler circulated a proposal to members of the Compensation Committee, WTW's human resources personnel, Mr. Haley, and VA employees. Ex. M, Email from J. Borneman, dated Feb. 9, 2016, made public in the Appraisal Action on July 3, 2017.  This proposal prompted further discussions between Mr. Haley and WTW, *id.*, and it was not until March 1, 2016 that an agreement was reached regarding Mr. Haley's compensation.  Ex. N, WTW Form 8-K (Mar. 1, 2016).  WTW's stockholders subsequently approved Mr. Haley's compensation package.  Compl. ¶ 160.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[L]abels and conclusions" or "'naked assertion[s]' devoid of 'further factual enhancement'" do not suffice.  *Id.*

Count I of the Complaint alleges that Defendants, other than Mr. Ubben and VA, violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder.  Compl. ¶¶ 228-35.  "Section 14(a) of the Exchange Act makes unlawful the solicitation of a proxy . . . in contravention of the rules and regulations prescribed by the SEC."  *Malon v. Franklin Fin. Corp.*, No. 3:14CV671–

11

HEH, 2014 WL 6791611, at *6 n.7 (E.D. Va. Dec. 2, 2014).  "To prevail in a private cause of action asserting a violation of Rule 14a-9, a plaintiff must show that (1) the proxy statement contained a material misrepresentation or omission; (2) that caused the plaintiff injury; and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction."  *Id.* at *6 (quoting *Hayes*, 78 F. App'x at 861).  In pleading alleged misstatements, the PSLRA further requires that the plaintiff "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).

## I.   PLAINTIFF FAILS TO ADEQUATELY PLEAD A FALSE OR MISLEADING STATEMENT OR OMISSION

Where, as here, a plaintiff's Section 14(a) claim is predicated upon an alleged omission, it is not enough for the plaintiff to allege that the omission was material.  Rather, an "[o]mission of information from a proxy statement is actionable [only] if either '[1] the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or [2] the omission makes other statements in the proxy statement materially false or misleading.'"  *Seinfeld v. Gray*, 404 F.3d 645, 650 (2d Cir. 2005).  The Complaint does not identify any federal statute or regulation that requires disclosure of any of the allegedly omitted facts.  Thus, to state a claim, Plaintiff must plead particularized facts demonstrating that the omitted information was necessary in order to make *other* disclosures in the Proxy Materials "*not* false or misleading."  *Malon*, 2014 WL 6791611, at *6 n.7 (quoting 17 C.F.R. § 240.14a-9) (emphasis added).

The Complaint identifies three alleged omissions.  First, Plaintiff alleges that the Proxy Materials failed to disclose that Mr. Haley met with Mr. Ubben and a VA employee in September 2015 and agreed on Mr. Haley's compensation as CEO of the post-Merger entity.  *See*, *e.g.*, Compl. ¶¶ 5, 80.  Second, Plaintiff alleges that the Proxy Materials failed to disclose that, in renegotiating the terms of the Merger, Mr. Haley sought the minimum compensation the

TW Board believed was required for TW stockholders to approve the Merger.  *See, e.g., id.* at ¶¶ 12-13, 18.  Third, the Complaint alleges that the Proxy Materials failed to disclose Mr. Ubben's and VA's involvement in the Merger negotiations.  *Id.* at ¶¶ 181, 194.  Plaintiff's Section 14(a) claim fails because (1) each of the alleged "omissions" has not been pled with particularity and, regardless, (2) none of them rendered any statement in the Proxy Materials false or misleading.

### A.    The Omission Of The Alleged September "Agreement" Did Not Render The Proxy Materials Misleading

The crux of Plaintiff's Section 14(a) claim is that the Proxy Materials omitted that Mr. Haley met with Mr. Ubben and a VA employee in September 2015 and allegedly "negotiated and agreed upon Haley's compensation package as CEO of the combined entity, valued at up to $165 million over the next three years."  Compl. ¶ 194.  However, this conclusory allegation lacks the requisite particularity because it is belied by both publicly available information and other facts alleged in the Complaint, including that: (i) the purpose of the September 2015 meeting was to discuss VA's general compensation philosophy for companies in which it invests, *see* Ex. C, Email from J. Ubben to J. Haley, dated Sept. 14, 2015 (cited at Compl. ¶ 84); (ii) in December 2015 -- *after* TW's stockholders had already voted to approve the Merger -- the terms of Mr. Haley's compensation as CEO of WTW were being negotiated and had not been finalized; (iii) in January 2016 -- *after* the Merger had closed -- Semler was retained by WTW to assist with drafting, structuring, and negotiating Mr. Haley's compensation; (iv) throughout February 2016, the parties discussed and debated the merits of different structures for Mr. Haley's compensation agreement; (v) the parties did not finalize and sign Mr. Haley's employment agreement until March 2016; and (vi) the terms of Mr. Haley's employment agreement differed significantly

13

from what VA discussed in September 2015. *See supra*, Statement of Facts, Section F; Compl. ¶ 153.[5]

Moreover, no "agreement" could have been reached between Mr. Ubben and Mr. Haley regarding Mr. Haley's compensation as CEO of the new company in September 2015 because Mr. Ubben lacked authority to negotiate and agree to such a deal on behalf of the board of the post-Merger entity (WTW) that did not yet exist. *See* Ireland Companies Act of 2014 § 155 (providing that the "remuneration of the directors" shall be determined "by the board of directors"); *see also C&J Energy Servs., Inc. v. City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr.*, 107 A.3d 1049, 1064 (Del. 2014) (noting that pre-merger employment negotiations are not binding on post-merger board).[6]

Importantly, even if there was a "secret agreement" reached during the September meeting (and the Complaint, again, is devoid of particularized allegations that there was), Plaintiff fails sufficiently to allege why its omission would have rendered any of the disclosures misleading. *See* 15 U.S.C. 78u-4(b)(1) (complaint must identify "the reason or reasons why"

---

[5] Unlike Mr. Haley's actual employment agreement, which includes a base salary, cash incentives, and a two-tiered, performance-based equity component, the VA presentation solely focused on the amount of equity compensation Mr. Haley could achieve if WTW met certain shareholder return milestones. *Compare* Ex. L, WTW 2016 Proxy Statement, at 34, *with* Ex. B, Towers Watson Compensation Review (cited at Compl. ¶ 81). And even with respect to equity compensation, the potential payout Mr. Haley would receive for achieving milestones in the VA presentation differed from Mr. Haley's eventual employment agreement. *Compare* Ex. B, Towers Watson Compensation Review (cited at Compl. ¶ 81) (300% maximum payout for achieving shareholder return milestones), *with* Ex. L, WTW 2016 Proxy Statement, at 34 (350% maximum payout for achieving shareholder return milestones).

[6] Plaintiff insinuates that Mr. Haley knew that Mr. Ubben would be a member of the post-Merger compensation committee because Mr. Haley had previously discussed with Mr. Casserley the composition of the post-Merger board. Compl. ¶ 85. This allegation is entirely conclusory because the Complaint does not allege that there had been *any* discussions regarding post-Merger board *committees* and, in any event, a single member of a multi-member compensation committee has no ability to dictate compensation. *See In re Rouse Props. Inc. Fiduciary Litig.*, No. 12194-VCS, 2018 WL 1226015, at *14 (Del. Ch. Mar. 9, 2018).

14

alleged omission rendered statement misleading); *see also Hayes*, 78 F. App'x at 862 (same). Plaintiff alleges that the omission of the purported "secret agreement" rendered misleading the Proxy Materials' disclosures that TW's Board was aware of potential conflicts and considered them when evaluating and recommending the Merger. *See* Compl. ¶¶ 168, 170, 173, 175, 178. However, the TW Board was well aware that Mr. Haley had a potential conflict of interest. As disclosed in the Proxy, it was determined in May 2015 that Mr. Haley would be CEO of the combined entity if a merger were consummated. *Id*. ¶ 57. And the Proxy disclosed explicitly that the TW Board considered, among other things, that TW's "directors and executive officers may have interests in the Merger that are different from, or in addition to, those of . . . [TW's] stockholders," including "*the continued employment of certain executive officers of . . . [TW] by the combined company*." *Id.* ¶ 169 (emphasis added).

In addition, Plaintiff alleges that this omission rendered false and misleading disclosures that the Merger was the result of a "thorough, independent board process" and an "extensive evaluation and negotiation by an engaged, independent board." *Id.* ¶¶ 186, 189, 192, 205-06. But even if a "secret agreement" was reached, that says nothing about whether the Merger was the result of a "thorough, independent board process" or an "extensive evaluation and negotiation by an engaged, independent board." Indeed, statements that the process was "thorough," that the board was "engaged," and that the evaluation of the transaction was "extensive," are classic statements of optimism and opinion that are either non-actionable or subject to a higher pleading burden. *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. K12, Inc.*, 66 F. Supp. 3d 711, 715-22 (E.D. Va. 2014) (analyzing statements using adjectives such as "strong," "sophisticated," "serious[]," and "on track" as opinions and non-actionable puffery).

To the extent these statements are statements of opinion (as opposed to non-actionable statements of optimism), Plaintiff must (1) plead particularized facts that call into question whether the speaker actually held the stated opinion; or (2) "identify particular (and material) omitted facts 'going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326-32 (2015). "[W]hether an omission makes an expression of opinion misleading always depends on context," and meeting the standard under *Omnicare* "is no small task for an investor." *Id.* at 1330, 1332.

The Complaint does not come close to meeting the *Omnicare* standard, as it is devoid of *any* allegation -- much less any *particularized* allegation -- demonstrating that any of the Defendants subjectively believed these statements to be untrue or lacked a basis to form the opinions. Moreover, the concededly majority-independent TW Board met no fewer than eight times over the course of a sale process that spanned several months, received multiple presentations from its financial advisor, and rejected multiple proposals from Willis before agreeing to the Merger.  *See* Ex. A, Proxy, at 70-80.  These are the actions of an engaged board, and the involvement of Mr. Haley, even if conflicted, does not change that fact and did not taint the sale process.  *See In re OPENLANE, Inc., S'holders Litig.*, C.A. No. 6849-VCN, 2011 WL 4599662, at *5 (Del. Ch. Sept. 30, 2011) ("Even if [the CEO] were conflicted [by an interest in future employment], his efforts in negotiating the Merger Agreement and dealing with other potential acquirers do not taint the process.  The Board was aware of [the issue] and was fully committed to the process.").

**B.    Omitting That Mr. Haley Allegedly Negotiated For The "Minimum" Additional Consideration Needed Did Not Render The Proxy Materials Misleading**

Plaintiff next argues that the Proxy Materials failed to disclose that, in renegotiating the terms of the Merger, Mr. Haley "negotiated for the minimum additional consideration for shareholders."  Compl. ¶¶ 192, 193, 196, 198, 199, 202, 204, 206, 210, 212, 214, 216.  This alleged "omission" is fatally flawed in its premise.  Although the Merger Agreement required Mr. Haley to seek approval of the Merger on the terms originally agreed upon, he repeatedly attempted to get a better deal for TW's stockholders.  And when Willis finally agreed to improve its offer, Mr. Haley rejected the initial counter-offer.  *See supra*, Statement of Facts, Section E.  The context of these negotiations is important:  Mr. Haley had low leverage because of the covenants in the Merger Agreement, yet he pushed Willis to agree to a cash dividend that was *significantly higher than TW's initial offer in May.  See id.* ¶ 59 (initial offer included $500 million aggregate cash dividend, equivalent to $7.20 per share).[7]

Ignoring all of these facts, Plaintiff merely alleges that because Mr. Haley *told Willis* that the dividend needed to be increased to at least $10.00 per share to have a reasonable expectation of stockholder approval, Mr. Haley "sought only to obtain the minimum dividend increase that was necessary to push the merger through."  *Id.* ¶¶ 124-25.  But telling his counter-party in a negotiation that $10.00 is the lowest he could accept certainly does not establish that Mr. Haley actually *believed* that $10.00 was the lowest price stockholders would accept.

In any event, even if Mr. Haley had negotiated for the minimum additional consideration he and the TW Board determined was necessary in order to gain stockholder approval of the Merger, the omission of that information did not render any disclosure false or misleading.

---

[7] In addition to a greater cash dividend, TW stockholders received 0.9% more of the combined company than TW originally proposed.

According to Plaintiff, this alleged omission rendered misleading statements that the TW Board believed the revised transaction was "fair," "compelling," and "favorable" to TW stockholders. *Id.* ¶¶ 198, 202, 206, 210, 212.  But again, whether the transaction was "fair," "compelling," and "favorable" to TW stockholders is a matter of opinion, *see Hayes*, 78 F. App'x at 864 (treating statement that merger was "fair" to stockholders as an opinion), and the Complaint contains no particularized facts demonstrating that any TW director believed the renegotiated consideration was unfair, not compelling, or unfavorable to stockholders.  That the TW Board recommended the *original* Merger with a significantly lower cash dividend, and that TW's financial advisor gave a formal opinion that the *lower original* Merger consideration was fair to TW stockholders, indicate precisely the opposite.  *See* Compl. ¶¶ 176-77; Ex. A, Proxy, at 93-94, 97-106; *see also Ridler v. Hutchinson Tech. Inc.*, 216 F. Supp. 3d 982, 990-91 (D. Minn. 2016) (dismissing claim that proxy's disclosure that merger was "fair" was misleading because complaint did not demonstrate defendants "knew the merger was unfair").

Plaintiff also alleges that this omission rendered misleading disclosures that the terms of the revised deal (i) were the product of "significant negotiation," (ii) represented Willis's "best and final offer," and (iii) allowed TW stockholders to "realize increased near-term value while maintaining the full long-term benefits of the transaction."  Compl. ¶¶ 192, 196-97, 204, 206, 210-212, 214.  But Plaintiff alleges no particularized facts disputing that Willis initially refused to change the terms of the original Merger Agreement, *id.* ¶ 203, meaning, by definition, that the revised terms were the product of renegotiation.   And whether that renegotiation was "significant" is another statement of opinion, subject to the same *Omnicare* standard that Plaintiff cannot meet.   Nor has Plaintiff alleged particularized facts supporting its conclusory allegation that Willis was prepared to offer more than a $10.00 per share dividend.  Lastly, it is

incontrovertible that the revised terms offered more near-term value to TW stockholders than the previous proposal -- because $10.00 is greater than $4.87.

### C.    The Omission Of VA's Alleged Involvement Did Not Render Any Statement Misleading

Finally, Plaintiff alleges that the Proxy Materials "entirely omitted [VA's] lead role" in the negotiation of the Merger.  Compl. ¶ 19.  According to Plaintiff, this alleged omission rendered false the Proxy Supplement's disclosure that "Haley and Casserley negotiated the amended merger terms, when Haley negotiated the deal terms directly with Ubben."  *Id.* ¶¶ 194, 196.  This argument fails because it ignores, as disclosed in the Proxy Supplement and unrefuted by Plaintiff, that after learning that TW's stockholders were poised to reject the original terms, Mr. Haley negotiated the final terms with Mr. Casserley, including repeatedly requesting that Willis raise the Merger consideration.  Mr. Casserley eventually proposed to Mr. Haley that the dividend be raised to $9.74 per share, and Mr. Haley told Mr. Casserley that an increase to at least $10.00 per share would be necessary.  *See supra*, Statement of Facts, Section E. Accordingly, it was not at all false or misleading to disclose that Messrs. Haley and Casserley negotiated the amended Merger terms.  It is a fact.

## II.    PLAINTIFF FAILS TO ADEQUATELY PLEAD THAT ANY OF THE ALLEGED "OMISSIONS" WERE MATERIAL

Plaintiff's Section 14(a) claim also fails for the independent reason that all of the alleged omissions are immaterial as a matter of law.  In assessing whether an alleged omission is material, "it is important . . . to tease out information critical to an informed decision by a stockholder from that which would simply be nice to know."  *Malon*, 2014 WL 6791611, at *6. "Mere relevance is insufficient to trigger a duty to disclose."  *Id.* at *10. Rather, a misrepresentation or omission is material only if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having

significantly altered the total mix of information made available." *Id.* at \*6 (quoting *TSC*, 426 U.S. at 449).  An omitted fact is material only if it "would have assumed *actual significance* in the deliberations of the reasonable shareholder." *TSC*, 426 U.S. at 449 (emphasis added).  That cannot be said here with respect to any of the alleged omissions, and the Complaint should be dismissed on this basis too.

### A.     Mr. Haley's Discussions With Mr. Ubben And VA Are Immaterial As A Matter Of Law

Even if Mr. Haley and Mr. Ubben had reached an agreement in September 2015 on Mr. Haley's compensation as CEO of the combined entity, the omission of that "fact" would not have been material because TW's stockholders already knew Mr. Haley had a potential conflict.  The Proxy disclosed *specifically* and *repeatedly* that Mr. Haley would be CEO of the combined entity, Ex. A, Proxy, at 74, 82, 113, 135; that the TW Board had insisted that Mr. Haley lead the combined company, *id.* at 74; and that the Merger Agreement required Willis to take all actions to ensure Mr. Haley would be CEO of the combined entity, *id.* at 135.  Most importantly, in a section of the Proxy titled "Risks Related to the Transaction," the Proxy *specifically* disclosed that Mr. Haley's future employment as CEO was a potential conflict of interest.  *See id.* at 34-37.  In this regard, the Proxy explained that the directors and officers of TW who negotiated the Merger "may have interests in the Merger that are different from, or in addition to those of . . . [TW]'s stockholders," including "*the continued employment of certain executive officers of . . . [TW] by the combined company*."  *Id.* at 36-37 (emphasis added).  The same disclosure further noted that "the treatment in the Merger of stock options, restricted stock units, bonus awards, severance arrangements and other rights" held by TW directors and officers could be a further source of conflict, and that TW stockholders "should be aware of these interests," including the "continued employment" of executives, in considering how to vote.  *Id.*

In addition, the public sources Plaintiff cites for many of its allegations disclosed to stockholders prior to the vote that Mr. Haley had a potential conflict of interest due to his future role as CEO of the combined company.   Driehaus publicly questioned whether TW management's incentives were "aligned" with TW's stockholders, and explained that (1) "CEOs who head companies with larger market capitalizations tend to be paid more than CEOs of smaller peers," (2) the combined market capitalization of TW and Willis would be nearly double TW's then-current market capitalization, and (3) "Haley would head the larger combined company."  Ex. O, Driehaus, Press Release (dated Oct. 7, 2015) (cited at Compl. ¶ 96).  And ISS, which Plaintiff concedes is extremely influential among investors, thoroughly discussed Driehaus's allegations that the Merger harbored "Misaligned Management Incentives" because Mr. "Haley's incentive to approve the merger with Willis [was] predicated on the belief that as the CEO of the combined entity, he would receive a substantial increase in compensation."  Ex. P, ISS Report, at 4 (Nov. 5, 2015) (cited at Compl. ¶¶ 113-16).  Further, proxy advisory firm Glass Lewis specifically directed stockholders to take note that "Haley is expected to serve as CEO of the surviving entity after the transaction."  Ex. Q, Glass Lewis Report, Towers Watson & Co. (Nov. 5, 2015) (cited at Compl. ¶ 89).  And certain TW stockholders even filed suit to enjoin the Merger based on the Proxy's failure to disclose Mr. Haley's alleged compensation-related discussions.  *See* Ex. R, Am. Compl., *In re Towers Watson & Co. Stockholders Litig.*, C.A. No. 11270-CB (Del. Ch. 2015) at ¶ 58 (alleging that "Haley was a conflicted director, as he was fully aware that he would be leading the much larger combined company. . .").  In sum, it is indisputable that TW's stockholders were well aware that Mr. Haley's future role as CEO of the combined company was a potential conflict.  *See Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656-57 (4th Cir. 2004) ("It is important to note that a 'reasonable investor' is neither an

21

ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing.").

Against this backdrop, disclosure of Mr. Haley's discussion with Mr. Ubben would not have "significantly altered the total mix of information made available" to TW stockholders. *See Globis P'rs, L.P. v. Plumtree Software, Inc.*, No. 1577-VCP, 2007 WL 4292024, at *10-12 (Del. Ch. Nov. 30, 2007) (holding that information that merely corroborates or expands upon already disclosed information is immaterial as a matter of law);[8] *see also Phillips v. LCI Int'l. Inc.*, 190 F.3d 609, 615 (4th Cir. 1999) ("[T]he Supreme Court has repeatedly cautioned that allegedly fraudulent corporate statements must be examined in context and in light of the 'total mix' of information made available to investors.").

Indeed, courts have consistently held that disclosure must only provide sufficient information for stockholders to determine the existence of a conflict. *See Malon*, 2014 WL 6791611, at *8 (no disclosure violation where proxy was "sufficient to allow a reasonable stockholder to assess the potential conflicts of interest that could impact the financial advisor's opinion" but did "not provide the level of detail Plaintiff believes to be appropriate"); *Assad v. DigitalGlobe, Inc.*, No. 17-cv-01097, 2017 WL 3129700, at *7 (D. Colo. July 21, 2017) (finding that "material facts underlying the potential conflict" were disclosed where proxy disclosed that three members of target's board would join board of merged entity, but did not disclose specific communications regarding those board seats); *In re Om Grp., Inc. Stockholders Litig.*, C.A. No. 11216-VCS, 2016 WL 5929951, at *15 (Del. Ch. Oct. 12, 2016) ("not every fact tending

---

[8] Delaware courts routinely consider merger proxy disclosure claims. "The test of materiality under [Delaware] law is the same as that employed by the Supreme Court of the United States under the federal securities laws." *Highland Capital, Inc. v. Longview Fibre Co.*, 1990 WL 3973, at *2 (Del. Ch. Jan. 22, 1990) (citing *TSC*). Thus, decisions applying Delaware law are persuasive in evaluating whether alleged omissions in a proxy are material. *See, e.g., Malon*, 2014 WL 6791611, at *3, *6-8, *10 (relying on Delaware law).

remotely to suggest that a board member's interest might differ in some respect from that of the stockholders amounts to a material omission"); *In re Family Dollar Stores, Inc. Stockholder Litig.*, C.A. No. 9985-CB, 2014 WL 7246436, at *19-20 (Del. Ch. Dec. 19, 2014) (directors had no obligation to disclose when acquirer first offered post-merger board seat when the proxy disclosed that, during negotiations, acquirer had informed director that it wanted him to join board).

Moreover, had the Proxy Materials contained the disclosure that Plaintiff alleges should have been made -- that Mr. Haley had "secured a massive compensation package" -- such disclosure would have been inaccurate. As discussed above, Mr. Ubben had neither the ability nor the authority to bind the post-Merger entity. Only the post-Merger board could authorize Mr. Haley's compensation. Accordingly, even if an "agreement" had been reached between Mr. Ubben and Mr. Haley, it would have been pure speculation as to whether the post-Merger board would have adopted the terms of the alleged agreement or renegotiated the terms itself. *See* Compl. ¶ 153 (acknowledging that the terms of Mr. Haley's compensation were ultimately different than those allegedly "agreed" upon by Mr. Ubben and Mr. Haley). As a result, the Proxy Materials were not required to contain any further disclosure. *In re Ebix, Inc. Stockholder Litig.*, C.A. No. 8526-VCN, 2016 WL 208402, at *23 (Del. Ch. Jan. 15, 2016) (failure to disclose CEO's 2014 compensation in the context of a say-on-pay vote was not materially deficient because CEO had not yet received 100% of his 2014 compensation at the time and therefore disclosure of the compensation amount may have been "difficult to interpret, misleading, or subject to subsequent modification").

### B.   Facts Concerning The Price Renegotiation Were Fully And Fairly Disclosed

Plaintiff also alleges that the Proxy Materials should have disclosed that Mr. Haley "negotiated for the minimum additional consideration for shareholders." Compl. ¶¶ 123-25, 147,

149, 192, 193, 196, 198, 199, 202, 204, 206, 210, 212, 214, 216.  This alleged omission cannot

be material because it is a mischaracterization of what actually occurred.  As discussed above,

and unrefuted by Plaintiff, once it became clear that TW stockholders would not approve the deal

with a special dividend of $4.87 per share, Messrs. Haley and Casserley engaged in back-and-

forth negotiations which culminated in Willis accepting the TW Board's proposal of a $10.00 per

share cash dividend.  *See supra*, Statement of Facts, Section E.  Defendants were not required to

disclose that Mr. Haley believed he could extract more value from the negotiation because,

besides being speculative and factually untrue, it would be tantamount to "self-flagellation."  *See*

*Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997) ("The directors' duty of

disclosure does not oblige them to characterize their conduct in such a way as to admit

wrongdoing. . . .  '[A] board is not required to engage in 'self-flagellation. . . .'") (citation

omitted).  Nor was the Supplemental Proxy required to disclose *why* the TW Board determined

to request $10 per share.  *See In re Sauer-Danfoss Inc. S'holder Litig.*, 65 A.3d 1116, 1131 (Del.

Ch. 2011) ("[a]sking 'why' does not state a meritorious disclosure claim").

### C.     The Omission Of Mr. Ubben's And VA's "Involvement" In Merger-Related Negotiations Is Immaterial As A Matter Of Law

Plaintiff also claims that the Proxy Supplement should have provided more detail

concerning Mr. Ubben's and VA's "involvement" in the Merger negotiations.  Compl. ¶¶ 194,

196.  Putting aside that it is not clear from the Complaint what fact was supposedly rendered

false or misleading by this alleged omission, the allegation is nothing more than a "tell me more"

disclosure claim that is immaterial as a matter of law.  *See In re Cogent, Inc. S'holder Litig.*, 7

A.3d 487, 511 (Del. Ch. 2010) ("While it is always possible to request just one more piece of

information", an omission is immaterial unless it "would 'significantly alter[] the 'total mix' of

the information made available'").  As made clear by the Proxy, the Proxy Supplement, and

24

other contemporaneous sources relied upon by Plaintiff in the Complaint, Mr. Ubben's/VA's participation and support of the Merger were well known.  Stockholders knew that Mr. Ubben was on the Willis Board and was also the CEO of VA.  Ex. A, Proxy, at 182.  And VA's voting agreement was disclosed no less than six times in the Proxy, *id.*, at 2, 6, 20, 80, 95, 124; was disclosed in the press release announcing the Merger, *see* Ex. S, TW Form 8-K (June 29, 2015) (cited at Compl. ¶ 71); and was disclosed in the Merger Agreement itself.  Ex. A, Proxy, Merger Ag. § 5.5(c), at A-50.  Indeed, the voting agreement was publicly filed.  Ex. S, Exhibit 10.1 to Form 8-K (June 29, 2015).  Further, as the Bloomberg article referenced in the Complaint makes clear, VA "ha[d] championed the deal since it was announced."  Ex. T, *ValueAct's Ubben Sees Willis-Towers Deal Closing 2015*, BLOOMBERG LAW (Oct. 27, 2015) (cited at Compl. ¶ 10).

Given these disclosures, additional details concerning VA's "involvement" in the Merger negotiations could not have "assumed actual significance in the deliberations of the reasonable [TW] shareholder."  *TSC*, 426 U.S. at 449.[9]  A company is not required to "give its shareholders a 'play-by-play' description of merger negotiations," *Globis*, 2007 WL 4292024, at *14, and, accordingly, Defendants had no obligation to detail every conversation involving the Merger negotiations, whether or not they included Mr. Ubben.

---

[9] The alleged omission of VA's purported "ghostwriting" of certain TW and/or Willis press releases is likewise immaterial.  *See, e.g.*, Compl. ¶¶ 122, 194, 196.  It is standard practice for dozens of people to be involved in drafting several-hundred-page long proxy statements, solicitations, and press releases.  Companies routinely consult outside advisors, public relations firms, employees, directors, and major stockholders when drafting statements in support of a merger.  The only important fact is that the person making the statement is ultimately responsible for whatever has been said, and Plaintiff has not challenged any of the statements made by TW or Willis to which VA supposedly contributed.

## III.    THE COMPLAINT FAILS TO PLEAD FACTS DEMONSTRATING A STRONG INFERENCE OF SCIENTER

Even if the Complaint sufficiently alleged that the Proxy Materials were materially false by omission (and it does not), Plaintiff's Section 14(a) claim would still fail because the Complaint does not "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" -- scienter.  15 U.S.C. § 78u-4(b).  Although the requisite state of mind under Section 14(a) is typically negligence, scienter is required where, as here, the Complaint "sounds in fraud."  *See* Compl. ¶¶ 4-6, 89, 101-02 (alleging that Mr. Haley "secretly negotiated" the employment "agreement," failed to disclose his "massive conflict" to the TW Board, and pushed the deal through); *Police & Fire Ret. Sys. of Detroit v. Safenet, Inc.*, 645 F. Supp. 2d 210, 239-40 (S.D.N.Y. 2009) (holding that PSLRA's requirements for pleading scienter apply to Section 14(a) claim that sounds in fraud); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) (same).[10]  Plaintiff's attempt to escape this heightened pleading standard with a boilerplate assertion that "Lead Plaintiff's claims are based on negligence," Compl. at 1, fails because "a conclusory disclaimer cannot alter the substance of plaintiffs' allegations, which sound in fraud."  *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 629-30 (4th Cir. 2008).

In determining whether a complaint gives rise to a "strong inference" of scienter, the Court must weigh inferences urged by Plaintiff against "any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  A claim will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts

---

[10] *But see, e.g.*, *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1266 (N.D. Cal. 2000) ("Requiring that a non-fraud claim be stated with particularity under Rule 9(b) does not import a scienter requirement into the pleading[].").

alleged." *Id.* at 324. Here, the Complaint expressly "disclaims any allegations of . . . scienter" (Compl. at 2), and otherwise is devoid of particularized factual allegations supporting an inference that any Defendant intentionally caused the Proxy Materials to omit information which rendered the disclosures materially false or misleading. *See, supra*, Points I & II. Rather, the more compelling inference to be drawn from the Complaint is that -- in light of the extensive disclosures related to Mr. Haley's interest as the future CEO -- the TW/Willis Defendants believed the disclosures to be sufficient, and certainly not materially misleading by omission. Thus, Plaintiff has failed to adequately plead scienter, providing yet another basis for dismissal.

## IV.     PLAINTIFF'S CLAIMS ARE TIME-BARRED

Claims under Section 14(a) are subject to a one-year statute of limitations. *See Burt v. Maasberg*, No. ELH-12-0464, 2013 WL 1314160, at *30 (D. Md. Mar. 31, 2013) (citing 15 U.S.C. § 78i(f)). The limitation period begins to run once the plaintiff discovers, or a reasonably diligent plaintiff would have discovered, the facts underlying the alleged violation. *Id.* Plaintiff and its counsel were on notice of the facts underlying the alleged violations here as early as September 2015, more than two years prior to the filing of the original complaint in this action on November 21, 2017. Therefore, this action is time-barred.

### A.     Any Reasonably Diligent Plaintiff Would Have Discovered The Facts Underlying The Alleged Violations As Soon As The Proxy Was Filed In 2015

Although Paragraphs 215 and 216 of the Complaint attempt to preempt the application of the one-year statute of limitations applicable to claims under Section 14(a) (a tacit acknowledgment that this action was filed too late), Plaintiff was aware of all of the necessary facts to have brought this case within a year of the filing of the Proxy. In fact, the same core factual allegations underlying the claims here were made public by BLBG more than a year prior to the filing of this action. For example, on September 26, 2016, BLBG asserted in an affidavit

27

filed in New York state court that Mr. Ubben "*was highly involved in the merger*, including, but not limited to, *the negotiations of Mr. Haley's executive compensation*." Ex. U ¶ 18 (emphasis added). The same public filing made clear that these supposed "facts" were not disclosed at the time of the stockholder vote: "Petitioners are *unaware of any public record disclosing* that Mr. Ubben was involved in negotiating Mr. Haley's executive compensation in connection with the merger." *Id.* ¶ 19 (emphasis added). Similarly, on September 27, 2016, BLBG stated in public filings in the Appraisal Action that "Petitioners are unaware of any public record disclosing that Mr. Ubben was involved in negotiating Mr. Haley's executive compensation in connection with the Merger." *See* Ex. V ¶ 11. Then, on October 18, 2016, the appraisal petitioners made a nearly identical assertion regarding Mr. Ubben's supposed involvement in Mr. Haley's employment negotiations. Ex. W at 4 n.6.

In addition to these public statements having been available to any reasonably diligent stockholder, claims similar to those asserted in the instant action were raised *even earlier* in *September 2015* in the fiduciary duty action filed in the Delaware Court of Chancery. *See* Ex. R, Am. Compl., *In re Towers Watson & Co. Stockholders Litig.*, C.A. No. 11270-CB, ¶ 58 (Del. Ch. 2015) (alleging that "Haley was a conflicted director, as he was fully aware that he would be leading the much larger combined company. As the CEO of a combined company that would be approximately twice as large as [TW], Haley would likely receive a major increase in compensation. But the Proxy *fails to disclose whether Haley ever discussed compensation issues* with the boards of [TW] or Willis") (emphasis added), ¶ 98 (similar).

When a claim is clearly filed outside of the statute of limitations, and the plaintiff merely "seeks to forestall its dismissal by alleging the facts of discovery," dismissal is appropriate. *Goodman v. Praxair*, 494 F.3d 458, 466 (4th Cir. 2007). By as early as September

2015, but certainly no later than BLBG's September 2016 filings identifying Mr. Ubben as allegedly having been "highly involved in . . . the negotiations of Mr. Haley's executive compensation," the claims asserted in this action were known to reasonably diligent stockholders. At that point, the limitations period began to run.  *See Landsberger v. Martek Biosciences Corp.*, No. CIV. CCB-09-3389, 2010 WL 3038947, at *4 (D. Md. July 30, 2010) (determining claim was time-barred where a "reasonably diligent plaintiff would have known of the facts forming the basis for the present claims," in part, because similar allegations had been "made public in a class action" filed within the applicable statute of limitations).  The original plaintiff in this case, also represented by BLBG, filed the original complaint on November 21, 2017, *two years* after the 2015 stockholder plaintiff raised similar issues and *more than one year* after BLBG publicly disclosed the information upon which its claims are premised.  Plaintiff's claims are therefore time-barred and must be dismissed.

**B.      Established Principles Of Agency Law Impute Plaintiff's Counsel's Knowledge Of The Alleged Actionable Conduct To Its Clients**

Plaintiff's counsel (BLBG) knew of the facts underlying the alleged disclosure violations in this case through their prosecution of the Appraisal Action.  Because such knowledge pre-dated the filing of this action by more than a year, the Complaint must be dismissed as time-barred on this basis as well.

"Each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'"  *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 (1962) (quoting *Smith v. Ayer*, 101 U.S. 320, 326 (1879)).  An agent's knowledge gained *prior* to the principal-agent relationship is imputed to the principal when "that knowledge can reasonably be said to be present in the mind of the agent while acting for the principal, or where [the agent] had acquired it so recently as to raise the presumption that [the

29

agent] still retained it in mind."  *Nationwide Life Ins. Co. v. Attaway*, 254 F.2d 30, 36 (4th Cir. 1958) (quoting 2 Am. Jur. 294); *see also Bryan v. Land (In re Land)*, 215 B.R. 398, 404 (B.A.P. 8th Cir. 1997) (imputing attorney's knowledge gained prior to attorney-client relationship to client and barring client from filing untimely motions).

Plaintiff's counsel in this case clearly had, and continue to have, their prior representation of the appraisal petitioners in mind while acting as agents of Plaintiff.  The overview of alleged Exchange Act violations in the Complaint contains no less than 29 references to documents *drafted by Plaintiff's counsel* during the Appraisal Action, *based on knowledge Plaintiff's counsel gained long before the documents were made public*.  *See* Compl. ¶¶ 11-13, 18, 20-21, 24-28, 35-38, 40-45.  Plaintiff's counsel simply cannot ignore the fact that the information "later revealed by internal documents" (*id*. ¶ 25) was in fact disclosed to them long before.  Notably, it is undoubtedly the information obtained by counsel, not by Plaintiff or any other client, that is the impetus behind the claims here.  Because Plaintiff's counsel became privy to the information underlying the claims in this case as early as September 2015, the Complaint should be dismissed as time-barred.

## V.     PLAINTIFF FAILS TO PLEAD A CLAIM UNDER SECTION 20(a)

Because Plaintiff has failed to adequately plead an underlying violation of the Exchange Act, its "control person" claim under Section 20(a) also fails.  *See, e.g.*, *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 192 (4th Cir. 2009) ("Because the complaint fails to withstand a Rule 12(b)(6) motion with respect to the predicate violation . . . it also fails with respect to the § 20(a) claims.").

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety and with prejudice.

Dated:  April 13, 2018
         Alexandria, Virginia

Respectfully submitted,

/s/ Eric H. Feiler
Edward J. Fuhr (Va. Bar No. 28082)
Eric H. Feiler (Va. Bar No. 44048)
Johnathon E. Schronce (Va. Bar No. 80903)
**HUNTON ANDREWS KURTH LLP**
951 East Byrd Street
Richmond, Virginia 23219-4074
Tel: (804) 788-8201
Fax: (804) 788-8218
efuhr@huntonAK.com
efeiler@huntonAK.com
jschronce@huntonAK.com


John Neuwirth (*pro hac vice*)
Joshua Amsel (*pro hac vice*)
Amanda K. Pooler (*pro hac vice forthcoming*)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax: (212) 310-8007
john.neuwirth@weil.com
josh.amsel@weil.com
amanda.pooler@weil.com

*Counsel for the TW/Willis Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 13th day of April, 2018, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

/s/ Eric H. Feiler
Edward J. Fuhr (Va. Bar No. 28082)
Eric H. Feiler (Va. Bar No. 44048)
Johnathon E. Schronce (Va. Bar No. 80903)
**HUNTON ANDREWS KURTH LLP**
951 East Byrd Street
Richmond, Virginia 23219-4074
Tel: (804) 788-8201
Fax: (804) 788-8218
efuhr@huntonAK.com
efeiler@huntonAK.com
jschronce@huntonAK.com

*Co-Counsel for the TW/Willis Defendants*