**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| IN RE WILLIS TOWERS WATSON PLC PROXY LITIGATION | Master File No. 1:17-cv-1338-AJT-JFA<br><br>CLASS ACTION |

**LEAD PLAINTIFF THE REGENTS OF THE UNIVERSITY OF CALIFORNIA'S
MEMORANDUM OF LAW IN OPPOSITION TO THE TW/WILLIS DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

Susan R. Podolsky (Va. Bar No. 27891)
**LAW OFFICES OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (571) 366-1702
Facsimile:  (703) 647-6009

*Local Counsel for Lead Plaintiff The Regents of the
University of California*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

Salvatore J. Graziano (*pro hac vice*)
John Rizio-Hamilton (*pro hac vice*)
Rebecca E. Boon (*pro hac vice*)
Julia K. Tebor (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444

*Counsel for Lead Plaintiff The Regents of the
University of California, and Lead Counsel for the
Class*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 3

    I.    As Towers And Willis Decide To Merge, Haley Sells Over 50% Of His
        Stock ................................................................................................................ 3

    II.   Investors Immediately Criticize The Deal For Towers Shareholders .................... 4

    III.  Haley Negotiates With ValueAct A Massive Undisclosed Compensation
        Package ............................................................................................................ 4

    IV.  The Proxy Omits Haley's Massive Compensation Package ................................... 5

    V.   Haley Renegotiates The Merger To Get "Minimum" Additional
        Consideration ................................................................................................... 6

    VI.  ValueAct Squashes "Dissidents" And "Ghostwrites" Press Releases ................... 6

    VII. Defendants' Updated Proxy Continues To Omit Highly Material Facts ............... 7

    VIII. The Merger Closes, Haley Gets His Compensation Award, And ValueAct
        Sells Out ........................................................................................................... 7

ARGUMENT ....................................................................................................... 8

    I.    THE COMPLAINT ADEQUATELY ALLEGES SECTION 14(a)
        CLAIMS ........................................................................................................... 8

        A.    Pleading Standards And Elements Of A Section 14(a) Claim .................... 8

        B.    Section 10(b) Pleading Standards Do Not Apply To Section 14(a)
            Claims ..................................................................................................... 9

        C.    Defendants Made Actionable Omissions And Misstatements ................... 10

            1.    Defendants Failed To Disclose Haley's Compensation
                 Arrangement ................................................................................. 10

            2.    The Proxy Contained Multiple Misleading Statements
                 Concerning Haley's Compensation Arrangement And
                 Massive Conflict ........................................................................... 14

            3.    Defendants Failed To Disclose That Haley Renegotiated
                 The Merger Only For The Minimum Additional
                 Consideration Needed To Obtain Approval ................................. 17

i

4. The Proxy Contained Misleading Statements Concerning the Fact That Haley Sought Only The Minimum Additional Consideration Necessary.................................................. 19

5. Defendants Failed To Disclose Ubben And ValueAct's True Role .................................................................... 22

D. Defendants' Omissions Were Material .................................................... 22

1. Haley's $165 Million Compensation Plan Was Material ............. 23

2. Haley's Renegotiation Of The Merger For Minimum Additional Consideration To Towers Shareholders Was Material ...................................................................... 25

3. Ubben And ValueAct's Involvement In The Negotiations Was Material ............................................................ 26

E. The Complaint Does Not "Sound in Fraud" ............................................ 27

II. PLAINTIFF'S CLAIMS ARE TIMELY ............................................................ 28

A. The Public Filings Cited By Defendants Did Not Provide Notice Of The Truth ........................................................................ 29

B. Counsel's Knowledge Is Not Imputed To The Class................................. 30

III. THE COMPLAINT ADEQUATELY ALLEGES SECTION 20(a) CLAIMS ........................................................................ 30

CONCLUSION.................................................................................................... 30

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Assad v. DigitalGlobe, Inc.*,
    2012 WL 3129700 (D. Colo. July 21, 2017) ...........................................................12

*Baltimore Cty. v. Cigna Healthcare*,
    238 F. App'x 914 (4th Cir. 2007) ............................................................................9

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. Aug. 27, 2010)....................................10, 17, 19, 27

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988).................................................................................................2

*Bryan v. Land*,
    215 B.R. 398 (B.A.P. 8th Cir. 1997).....................................................................30

*Burt v. Maasberg*,
    2013 WL 1314160 (D. Md. Mar. 31, 2013)............................................. 28-29, 30

*Cozzarelli v. Inspire Pharm. Inc.*,
    549 F.3d 618 (4th Cir. 2008) .................................................................................27

*In re Credit Suisse First Boston Corp. Sec. Litig.*,
    1998 WL 734365 (S.D.N.Y. Oct. 20, 1998) .........................................................11

*Eckstein v. Balcor Film Inv'rs*,
    8 F.3d 1121 (7th Cir. 1993) ...................................................................................15

*Edge Partners, L.P. v. Dockser, L.P.*,
    944 F. Supp. 438 (D. Md. 1996) ..............................................................................9

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013)...................................................................23

*In re Family Dollar Stores, Inc. Stockholder Litig.*,
    2014 WL 7246436 (Del. Ch. Dec. 19, 2014).........................................................25

*Fogarazzo v. Lehman Bros.*,
    341 F. Supp. 2d 274 (S.D.N.Y. 2004)...................................................................22

*Fradkin v. Ernst*,
    571 F. Supp. 829 (N.D. Ohio 1983).......................................................................11

*Fresno Cty., Emps' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)...................................................................27

*Garber v. Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008)....................................................................27

*Globis Partners, L.P. v. Plumtree Software, Inc.*,
   2007 WL 4292024 (Del. Ch. Nov. 30, 2007) .........................................................25

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
   2014 WL 2815571 (S.D.N.Y. June 23, 2014) ........................................................17

*Goodman v. Praxair, Inc.*,
   494 F.3d 458 (4th Cir. 2007) .................................................................................29

*Harter v. St. Mary's Duluth Clinic Health Sys.*,
   2013 WL 354082 (D. Minn. Jan. 29, 2013)...........................................................21

*Hayes v. Crown Central Petroleum Corp.*,
   78 F. App'x 857 (4th Cir. 2003) ..............................................................................9

*Highland Capital, Inc. v. Longview Fibre Co.*,
   1990 WL 3973 (Del. Ch. Jan. 22, 1990).................................................................25

*Honig v. Cardis Enters. Int'l N.V.*,
   2016 WL 6304695 (E.D.N.Y. Oct. 27, 2016).........................................................19

*Howard v. Galesi*,
   1987 WL 18460 (S.D.N.Y. Oct. 6, 1987) ..............................................................21

*J.I. Case & Co. v. Borak*,
   377 U.S. 426 (1964)..................................................................................................8

*In re JPMorgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005).....................................................................27

*KBC Asset Mgmt. NC v. 3D Sys. Corp.*,
   2016 WL 3981236 (D.S.C. July 25, 2016) .............................................................28

*Kiken v. Lumber Liquidators Holdings, Inc.*,
   155 F. Supp. 3d 593 (E.D. Va. Dec. 21, 2015).......................................................28

*Knurr v. Orbital ATK Inc.*,
   276 F. Supp. 3d 527 (E.D. Va. 2017) ..........................................................9, 10, 16

*Kronfeld v. Trans World Airlines, Inc.*,
   832 F.2d 726 (2d Cir. 1987)...............................................................................23-24

*L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opp. Comm'n of Nassau Cty.,
Inc.*,
   558 F. Supp. 2d 378 (E.D.N.Y. 2008) ...................................................................30

*Landsberger v. Martek Biosciences Corp.*,
    2010 WL 3038947 (D. Md. July 30, 2010)............................................................30

*Langner v. Brown*,
    913 F. Supp. 260 (S.D.N.Y. 1996) ......................................................................26

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)......................................................17, 24, 25

*In re Lear Corp. S'holder Litig.*,
    926 A.2d 94 (Del. Ch. 2007)................................................................3, 11, 15, 17

*Link v. Wabash R.R., Co.*,
    370 U.S. 626 (1962)................................................................................................30

*LockSpeiser v. W. MD Co.*,
    768 F.2d 558 (4th Cir. 1985) ..................................................................................9

*Malon v. Franklin Fin. Corp.*,
    2014 WL 6791611 (E.D. Va. Dec. 2, 2014) ....................................................12, 14

*Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*,
    11 A.3d 1175 (Del. Ch. 2010)...............................................................................22

*In re Massey Energy Co. Sec. Litig.*,
    883 F. Supp. 2d 597 (S.D.W.Va. 2012)...........................................................24, 25

*Mendell v. Greenberg*,
    927 F.2d 667 (2d Cir. 1990)..........................................................2, 8, 10, 17

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014).................................................................................22

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) .......................................................12, 13, 30

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970)................................................................................ *passim*

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009)...................................................................17

*Nationwide Life Ins. Co. v. Attaway*,
    254 F.2d 30 (4th Cir. 1958) ..................................................................................30

*NJ v. Sprint Corp.*,
    531 F. Supp. 2d 1273 (D. Kan. 2008)...................................................................27

*Nolte v. Capital One Fin. Corp.*,
  390 F.3d 311 (4th Cir. 2004) ..................................................................30

*Ollila v. Babcock & Wilson Enters., Inc.*,
  2018 WL 792069 (W.D. N.C. Feb. 8, 2018) ...............................16, 27, 28

*In re Om Grp., Inc. Stockholders Litig.*,
  2016 WL 5929951 (Del. Ch. Oct. 12, 2016) ...........................................25

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015)...............................................................16, 20, 21

*In re Pfizer Inc. S'holder Deriv. Litig.*,
  722 F. Supp. 2d 453 (S.D.N.Y. 2010)......................................................26

*Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*,
  381 F.2d 245 (4th Cir. 1967) ..................................................................28

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
  645 F. Supp. 2d 210 (S.D.N.Y. 2009) .....................................................27

*Quinn v. Knight*,
  2016 WL 6471462 (E.D. Va. Nov. 1, 2016)..............................................11

*RMED Int'l v. Sloan Supermarkets, Inc.*,
  185 F. Supp. 2d 389 (S.D.N.Y. 2002).....................................................24

*SEC v. Rauscher Pierce Refsnes, Inc.*,
  17 F. Supp. 2d 985 (D. Ariz. 1998) .........................................................19

*In re Sauer-Danfoss Inc. S'holders Litig.*,
  65 A.3d 1116 (Del. Ch. 2011)..................................................................26

*Schwab v. Philip Morris USA, Inc.*,
  449 F. Supp. 2d 992 (E.D.N.Y. 2006) ..................................................3, 30

*SEC v. Bank of Am. Corp.*,
  677 F. Supp. 2d 717 (S.D.N.Y. 2010)......................................................23

*Seinfeld v. Gray*,
  404 F.3d 645 (2d Cir. 2005).....................................................................14

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) ...........................................................14, 17, 27

*Smith v. Robbins & Myers, Inc.*,
  969 F. Supp. 2d 850 (S.D. Ohio 2013) ....................................................14

*Swack v. Credit Suisse First Boston*,
　　383 F. Supp. 2d 223 (D. Mass. 2004) ...................................................................................11

*TSC Indus., Inc. v. Northway, Inc.*,
　　426 U.S. 438 (1976)........................................................................................... *passim*

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
　　985 F.2d 1190 (2d Cir. 1993)...................................................................................8

*van der Fluit v. Yates*,
　　2017 WL 5953514 (Del. Ch. Nov. 30, 2017) .......................................................................22

*Virginia Bankshares, Inc. v. Sandberg*,
　　501 U.S. 1083 (1991)...............................................................................................14, 16, 20

## Statutes

15 U.S.C. § 78i(f)...............................................................................................................29

15 U.S.C. § 78u-4(b)(1) .......................................................................................................10

Lead Plaintiff The Regents of the University of California ("Plaintiff") respectfully submits this brief in opposition to the TW/Willis Defendants' Motion to Dismiss the Amended Complaint.

## INTRODUCTION

This class action asserts claims under Sections 14(a) and 20(a) of the Exchange Act based on materially untrue statements and omissions in the proxy materials for the merger between Towers and Willis.[1] Unbeknownst to investors, prior to their vote on the merger, Towers' CEO, John J. Haley, had negotiated with ValueAct, Willis' second largest shareholder, a massive compensation package that would pay Haley up to $165 million over three years to serve as the CEO of the new combined company – if the merger were approved. Despite this troubling conflict of interest, Defendants did not disclose this compensation arrangement in the proxy solicitation materials prior to the shareholder vote on the merger.

In addition, once it became clear that Towers shareholders were not going to approve the originally proposed merger because the consideration that Haley had negotiated was inadequate, Haley salvaged the deal – and rescued his undisclosed pay package – by renegotiating the transaction with ValueAct for what he later admitted was the "minimum [additional consideration] that we need to have a reasonable expectation of shareholder approval." ¶124. Again, these critical facts were not disclosed in the proxy solicitation materials prior to the shareholder vote.

These allegations state a violation of Section 14(a). The Supreme Court has long held that Section 14(a) requires that a company make "full and fair disclosure to shareholders" voting on a proposed transaction so that they may make a fully informed choice. *Mills v. Elec. Auto-Lite Co.*,

---

[1] All capitalized terms not defined herein have the meanings ascribed to them in the Amended Complaint (ECF No. 49, the "Complaint"). "¶__" references are to paragraphs of the Complaint. "Ex. __" references are to the exhibits to the Graziano Declaration. "TW __" refers to TW/Willis' brief in support of their Motion (ECF No. 52). Unless otherwise indicated, all citations and quotation marks in cases have been omitted and all emphasis has been added.

396 U.S. 375, 381-85 (1970). A proxy statement "should honestly, openly and candidly state all the material facts." *Mendell v. Greenberg*, 927 F.2d 667, 670 (2d Cir. 1990).

In response to these straightforward claims, Defendants move to dismiss based on highly fact-intensive arguments that contradict the Complaint's allegations – which are accepted as true for the purposes of this motion – and cannot be considered at this stage. For instance, Defendants contend that the Court must conclude, as a matter of law, that Haley did not reach a final agreement on his compensation before the shareholder vote. However, the Complaint specifically alleges: (a) that Willis' second largest shareholder and Board member, Jeffrey Ubben of ValueAct, negotiated Haley's compensation during an in-person meeting on September 10, 2015; (b) the details of that arrangement, including a three-year "megagrant" of stock; (c) Haley's request (which was granted) that this megagrant include "even more leverage"; and (d) that the terms of the September 2015 agreement were "substantially identical" to the package that the board of the combined company approved after the merger closed. *See* ¶¶80-83, 86, 153.  Such facts easily satisfy Rule 8(a) notice pleading standards, which govern here.

In another improper factual challenge, Defendants assert that the Court must conclude that Haley engaged in a hard-fought negotiation when he renegotiated the deal. This argument again contradicts a central factual allegation in the Complaint, namely, Haley's own sworn testimony in a prior litigation, in which he admitted that he sought only the "<u>minimum we need</u>," rather than seeking to maximize the consideration for Towers shareholders in the renegotiation. ¶124.

Defendants also make a number of arguments contending that the Complaint fails to allege the materiality of their omissions and misstatements. However, the Supreme Court has squarely held that materiality is "an inherently fact-specific finding," *Basic, Inc. v. Levinson*, 485 U.S. 224, 236 (1988), that is "peculiarly one[] for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426

U.S. 438, 450 (1976). Moreover, in this case, there can be no serious question that "there [was] a substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* at 449. Towers shareholders were already concerned with the inadequate consideration being proposed for their shares. Thus, a reasonable Towers shareholder voting on the merger would have considered it important to know that (i) the lead negotiator for Towers had secretly negotiated a $165 million compensation package, thus raising a stark conflict of interest; and (ii) in salvaging the deal (and his own undisclosed package), Haley sought only the minimum additional consideration necessary to have a reasonable chance of approval, rather than the best deal he could get for Towers shareholders. "Put simply, a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders." *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007). At a bare minimum, these facts raise an issue of fact as to materiality that cannot be decided now.

Finally, Defendants assert that Plaintiff's claims are untimely because Plaintiff could have discovered the true facts earlier based on pleadings in other cases, and on information under seal that counsel supposedly knew from litigating the underlying Appraisal Action. Defendants are wrong. None of the pleadings on which Defendants rely disclosed the omitted information. Further, as a matter of law, in a class action such as this one, confidential knowledge of counsel is not imputed to the members of the class for statute of limitations purposes. *See Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1072 (E.D.N.Y. 2006), *rev'd on other grounds*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008).

## STATEMENT OF FACTS

**I.     As Towers And Willis Decide To Merge, Haley Sells Over 50% Of His Stock**

Haley and Willis began to discuss a Towers-Willis merger in early 2015. ¶¶33-39. Aware

3

of the fact that the proposed merger could cause Towers' stock price to go down and interested in his own personal gain, Haley <u>sold 55% of his Towers stock</u> on March 2, 2015, when merger discussions were rapidly advancing. ¶¶39, 49, 94. On June 10, 2015, Haley and Willis agreed to the following terms: (i) Towers shareholders would own 49.9% of the combined company, resulting in an exchange ratio of 2.6490; and (ii) a special dividend of $4.87 per share payable to Towers shareholders, which equaled a total payment of $500 million. ¶¶68-69. Notably, Towers' market capitalization was $1.3 billion higher than Willis'. ¶60. Moreover, Towers' recently reported financial results were consistently strong, whereas Willis' reported earnings continued to disappoint. ¶¶42-48, 51-53. Yet, Towers shareholders would receive only a minority interest in the combined company, and a dividend of less than half of the difference in market value. ¶60.

## II.      Investors Immediately Criticize The Deal For Towers Shareholders

On June 30, 2015, Towers and Willis announced the proposed deal terms. ¶71. As Haley anticipated, Towers stock dropped 8.8%. *Id*. Deutsche Bank reported their "disappoint[ment]" and that "TW investors are somewhat taken aback." ¶73. The *Wall Street Journal* similarly reported in an article entitled, "Willis-Towers Watson: A Merger of Equals – Not Exactly," that the special cash dividend award and exchange ratio amounted to $125.13 per share as of June 29, 2015, well below $137.90, Towers' stock price on the same day. ¶74; *see also* ¶¶74-76.

## III.     Haley Negotiates With ValueAct A Massive Undisclosed Compensation Package

In the wake of the backlash against the proposed merger, Haley negotiated with ValueAct and Ubben to secure a massive compensation package for himself to serve as CEO of the combined company – which gave him a strong incentive to push the unwelcomed deal through. ¶¶79-88.

Undisclosed to investors, on September 10, 2015, Ubben and Alex Baum of ValueAct met with Haley at a ValueAct conference in San Francisco, and provided him with a written compensation plan centered on a so-called "megagrant" of restricted stock in the combined

4

company, which could multiply 300% based on whether the company achieved benchmarks in its stock performance. ¶80. Ubben and Baum explained, as shown in the plan, that Haley's compensation over the next three years could increase from $25 million as CEO of Towers to $165 million as CEO of the new company. ¶80. Haley later testified: "Q. [D]uring your meeting in September 2015, when [ValueAct] showed you this, they were showing you that <u>if you would meet the internal rate of return hurdles that ValueAct would be setting, you could make upwards of $165 million over three years, right</u>? A. <u>Yea</u>." ¶82. Haley "really" liked the proposal, but negotiated for "even more leverage," *i.e.*, a higher multiplier for upside performance. ¶81.

On December 21, 2015, ten days after Towers shareholders voted to approve the merger, the Chair of the newly-merged entity's Compensation Committee, Wendy Lane, emailed Ubben and Baum so that <u>they</u> could update <u>her</u> about Haley's compensation arrangement. ¶¶81, 86.

Haley did not disclose his compensation negotiation to the Towers Board or shareholders, despite its obvious importance to investors evaluating Haley's conflicts and the terms of the merger he had negotiated. ¶87. As Gilbert T. Ray (a Towers Board member and Compensation Committee Chairman) later testified: "Q. <u>When you authorized Mr. Haley to negotiate the special dividend on behalf of stockholders, wouldn't you have wanted to know that Mr. Haley was discussing his compensation at the future company with Mr. Ubben and ValueAct</u>? …A. <u>Yes</u>." ¶88.

## IV.    The Proxy Omits Haley's Massive Compensation Package

On October 13, 2015, Towers filed the Proxy. ¶97. The Proxy omitted to disclose anything about Haley's compensation negotiation. ¶98. Moreover, the Proxy contained multiple materially untrue statements about the supposedly rigorous review the Towers Board had conducted in connection with its recommendation to vote for the merger. For instance, the Proxy falsely assured investors that the Towers Board was "aware of" and had "considered" conflicts of interest, and other "factors" and "risks," in evaluating the proposed deal – when it knew nothing of Haley's

5

$165 million compensation arrangement and the severe conflict it presented. ¶99. The Proxy further represented that Haley would be the CEO of the new company, but omitted to disclose anything about the compensation he had secretly negotiated to serve in that position. ¶100.

During the fall of 2015, the risk that Towers shareholders would not approve the originally-proposed deal was heightened. Willis reported another weak quarter in October 2015, and Towers reported another stellar quarter in November. ¶¶108-09. Meanwhile, investors, including a prominent fund called Driehaus, continued to harshly criticize the merger. ¶¶102, 105. Ubben publicly dismissed Driehaus as a "dissident" and "shin-kicking activist." ¶110. Nonetheless, on November 5, 2015, Glass Lewis and ISS, two leading advisors on corporate governance and investment matters, recommended that Towers shareholders vote against the merger – which meant the merger was unlikely to receive shareholder approval on its current terms. ¶¶113-15.

## V.     Haley Renegotiates The Merger To Get "Minimum" Additional Consideration

Haley recognized that he had to do something or the merger likely would not be approved, and he would not receive his lucrative compensation package. ¶123. Similarly, Ubben and ValueAct were highly motivated to have the transaction close. ¶55. Accordingly, on November 10, 2015, Haley proposed to Ubben that they increase the special dividend from $4.87 to $10 per share. ¶124. Haley later testified that this was "the minimum that we need to have a reasonable expectation of shareholder approval." ¶124. Further demonstrating that this was not a true "negotiation" and Haley had determined to accept the "minimum," Haley's contemporaneous notes stated: "I told Ubben we needed $10 dividend. Didn't trouble him." ¶125.

## VI.    ValueAct Squashes "Dissidents" And "Ghostwrites" Press Releases

As of November 11, 2015, ValueAct used up all of its legally permitted calls to Towers shareholders, so it proposed that Willis steer those who were "on the fence" towards ValueAct. ¶128. As an email later made public stated: ValueAct were "the ones securing all the TW votes"

6

and "[Haley] is seeing in real time how much control we have over the Board room." ¶136. Significantly, during this time period, Driehaus specifically asked Ubben whether there had "been any discussion between Mr. Haley and ValueAct concerning Mr. Haley's compensation arrangements following prospective deal completion." ¶129. In response, Ubben "cursed out" Driehaus. ¶¶131-33. In a further effort to prevent Driehaus from probing this issue, Towers had its outside attorneys, Gibson Dunn, accuse Driehaus of violating the proxy rules. ¶134.

At the same time, ValueAct ghostwrote portions of Towers and Willis press releases. ¶¶135, 139. Ubben wrote in an email, "we want this quote coming out of Haley's mouth." ¶139. The quote in question was then included in a November 19, 2015 Towers press release. ¶140.

## VII.   Defendants' Updated Proxy Continues To Omit Highly Material Facts

As of November 18, 2015, only 43.45% of votes submitted by Towers shareholders were in favor of the merger. ¶141. On November 19, 2015, Towers announced the revised terms of the deal (¶142), and on November 27, 2015, Towers and Willis filed the Proxy Update (¶146). The update contained a five-page summary that purported to disclose all of the additional back and forth between the Haley and Willis that supposedly led to the renegotiation of the deal. ¶146. Nowhere did the Proxy Update disclose Haley's compensation arrangement or conflict of interest, or that, upon renegotiating the deal, he sought only the minimum additional consideration. ¶147.

The Proxy Update also contained multiple materially untrue statements describing an arm's-length negotiation with Casserley in which Haley actively sought more favorable terms for shareholders. In truth, Haley sought only the minimum to have a reasonable chance of approval, and negotiated with ValueAct and Ubben, who were highly interested in closing the deal with an additional leverage promise from Haley for their own personal gain. ¶¶126, 148.

## VIII.   The Merger Closes, Haley Gets His Compensation Award, And ValueAct Sells Out

On December 11, 2015, Towers shareholders, ignorant of the undisclosed facts, voted to

approve the merger, and the merger closed on January 4, 2016. ¶152. In February, April, and June 2016, Willis Towers Watson belatedly disclosed the details of Haley's compensation package. ¶153. The size and structure of Haley's compensation was substantially identical to the agreement that he made in September 2015. *Id.* For example, ValueAct's proposal and Haley's employment agreement both contained a 3-year TSR megagrant. *Id.* In addition, the compensation provided Haley with the "additional leverage" that he asked for in September, by setting the upside for outperformance higher. *Id.* Thereafter, Ubben resigned from the Board and ValueAct sold hundreds of millions of dollars of Willis Towers Watson stock, pocketing its own windfall. ¶161.

## ARGUMENT

## I.     THE COMPLAINT ADEQUATELY ALLEGES SECTION 14(a) CLAIMS

### A.     Pleading Standards And Elements Of A Section 14(a) Claim

The Supreme Court has held that Section 14(a) "ensur[es] full and fair disclosure to shareholders" so that they can make an informed choice on corporate transactions. *Mills*, 396 U.S. at 381-85; *J.I. Case & Co. v. Borak*, 377 U.S. 426, 431 (1964) ("The purpose of [Section] 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation"). Thus, a proxy "should honestly, openly and candidly state all the material facts, making no concealment of the purposes for the proposals it advocates. Unlike poker where a player must conceal his unexposed cards, <u>the object of a proxy statement is to put all one's cards on the table face-up.</u>" *Mendell*, 927 F.2d at 670.

Rule 14a-9, promulgated under Section 14(a), aims to "preserv[e] for all shareholders who are entitled to vote…the right to make decisions based on information that is not false or misleading." *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1197-98 (2d Cir. 1993). The Supreme Court has repeatedly recognized Rule 14a-9's "broad remedial" and "prophylactic" purposes. *TSC*, 426 U.S. at 448 ("[P]articularly in view of the prophylactic purpose

8

of the Rule and the fact that the context of the proxy statement is within management's control, <u>it is appropriate that … doubts be resolved in favor of those the statute is designed to protect</u>.").

A plaintiff pleads a violation of Section 14(a) and Rule 14a-9 by alleging that: (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiff's injury, and (3) that the proxy solicitation was an essential link in the accomplishment of the transaction. *Mills*, 396 U.S. at 385. Plaintiff's claims are subject to liberal Rule 8(a) notice pleading standards, and not stricter Rule 9(b) fraud standards, because Section 14(a) claims are non-fraud claims that require only a showing of negligence. *See Knurr v. Orbital ATK Inc.*, 276 F. Supp. 3d 527, 540 & n.7 (E.D. Va. 2017); *Baltimore Cty. v. Cigna Healthcare*, 238 F. App'x 914, 922 (4th Cir. 2007) ("only the fraud allegations of a complaint must satisfy … Rule 9(b)").

A misrepresentation or omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available. *TSC*, 426 U.S. at 449; *Hayes v. Crown Central Petroleum Corp.*, 78 F. App'x 857, 864 (4th Cir. 2003). Because materiality involves mixed questions of law and fact, issues of materiality should not be decided at the pleading stage. *Edge Partners, L.P. v. Dockser, L.P.*, 944 F. Supp. 438, 440-41 (D. Md. 1996) ("Indeed, a court must be careful in considering whether the materiality of an alleged §14(a) violation should even be decided <u>on a summary judgment motion</u>."); *Hayes*, 78 F. App'x at 863-64 (declining to determine immateriality of calculations in proxy as a matter of law); *LockSpeiser v. W. MD Co.*, 768 F.2d 558, 561 (4th Cir. 1985) (materiality of proxy omissions for trier of fact).

## B. <u>Section 10(b) Pleading Standards Do Not Apply To Section 14(a) Claims</u>

As a threshold matter, Defendants improperly conflate the pleading standards for Section 14(a) claims and Section 10(b) fraud claims, arguing that Plaintiff must meet the heightened pleading standards for fraud under Rule 9(b) and the PSLRA. TW 1, 26. As noted above, Rule 8,

and not Rule 9, governs the non-fraud claims asserted here. Moreover, while Section 21D(b)(1) of the PSLRA applies generally to Exchange Act claims, this provision merely directs plaintiffs to "specify each statement alleged to have been misleading [and] the … reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The Complaint easily meets this requirement. *See* ¶¶162-214. By contrast, a strong inference of fraud is not required in this case.[2]

### C.   Defendants Made Actionable Omissions And Misstatements

#### 1.   Defendants Failed To Disclose Haley's Compensation Arrangement

The Complaint alleges that on September 10, 2015, Haley, Ubben, and ValueAct negotiated a compensation plan for Haley worth $165 million over the next three years as the new CEO. ¶¶79-88. This gave rise to a concrete conflict of interest, which led Haley to prioritize securing his own future compensation over maximizing the fair value of the merger to Towers shareholders. This undisclosed compensation arrangement and conflict were highly material to investors, and Defendants' omission of these material facts is actionable under Section 14(a).

Section 14(a) and Rule 14a-9 impose a broad duty to disclose "all the objective material facts relating to the transaction" in the proxy itself. *Mendell*, 927 F.2d at 674; *see In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 757 F. Supp. 2d 260, 326 (S.D.N.Y. Aug. 27, 2010) (same). This broad disclosure duty exists because a proxy is an express request for shareholders to authorize a transaction. *See Mendell*, 927 F.2d at 674 ("Only when the proxy statement fully and fairly furnishes all the objective material facts as to enable a reasonably prudent stockholder to make an informed investment decision is the federal purpose in the securities laws served").

Here, the undisclosed compensation agreement was material. *i.e.*, "there [was] a substantial

---

[2] Courts are split as to whether a strong inference of negligence is required. *See Knurr*, 276 F. Supp. 3d at 540. As set forth below, given Defendants' awareness of the undisclosed facts such a standard would easily be met here, and Defendants do not argue otherwise.

likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available." *TSC*, 426 U.S. at 449. A "reasonable shareholder who was in the process of deciding how to vote" would have considered important the fact that Haley, Towers' lead negotiator, had negotiated a $165 million compensation plan. *Mills*, 396 U.S. at 384. As the court explained in *In re Lear Corp. Shareholder Litig.*:

> <u>Put simply, a reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders,</u> when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.

926 A.2d at 114. *See Quinn v. Knight*, 2016 WL 6471462, *3 (E.D. Va. Nov. 1, 2016) ("Defendants' actions prevented shareholders from voting on an informed basis due to the missing information about the defendants' financial interests in the merger"); *Fradkin v. Ernst*, 571 F. Supp. 829, 849 (N.D. Ohio 1983) (omission of aggregate compensation in proxy material).[3]

Confirming the materiality of these omissions, Towers Director Ray testified that this was information the Board would have wanted to know, especially since Haley was the lead negotiator: "Q. <u>When you authorized Mr. Haley to negotiate a special dividend on behalf of stockholders, wouldn't you have wanted to know that Mr. Haley was discussing his compensation at the future company with Mr. Ubben and ValueAct</u>? …. A. <u>Yes</u>." ¶88. Driehaus' inquiry on this same important subject prior to the shareholder vote further shows materiality. ¶¶129-34.

At a bare minimum, these allegations raise a question of fact as to materiality that cannot be resolved in Defendants' favor at the pleading stage. Indeed, "a complaint may not properly be dismissed pursuant to Rule 12(b)(6) on the grounds that the alleged misstatements or omissions

---

[3] *See also Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 237 (D. Mass. 2004) (failure to disclose conflict of interest actionable omission of material fact); *In re Credit Suisse First Boston Corp. Sec. Litig.*, 1998 WL 734365, *6 (S.D.N.Y. Oct. 20, 1998) (same).

are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 657 (E.D. Va. 2000).[4]

In response, Defendants contend that the omission of Haley's massive compensation package is not actionable because "publicly available information and other facts alleged in the Complaint" supposedly prove – as a matter of law – that no final agreement was reached before the merger was consummated. TW 13. Specifically, Defendants claim that: (i) Ubben did not have the authority to negotiate a deal on behalf of the Willis Towers Watson Board; (ii) the September 2015 meeting was just to discuss "general compensation philosophy," not Haley's actual compensation as the CEO; and (iii) there was no final agreement until the merger was consummated and the Board formally approved the pay package. TW 13-14, 22. Such premature factual arguments disputing the Complaint's allegations should be rejected at this stage.

Further, the Complaint alleges facts refuting Defendants' assertions. To start, Willis depended on Ubben to negotiate Haley's compensation. Thus, when the Compensation Committee Chair wanted to know about Haley's arrangement after shareholder approval of the deal, she emailed Ubben and ValueAct directly to "catch up on the conversations between yu [sic] and JH [Haley] regarding comp …." ¶86. In response, ValueAct emailed her the compensation plan that was negotiated with Haley. ¶81. Haley knew that Ubben was going to be (and became) a member of the Compensation Committee, which provided Haley with further comfort that his compensation package was secure. ¶85. Indeed, in ValueAct's own words, Haley was "seeing in

---

[4] Defendants consistently rely on inapposite cases addressing the "extraordinary remedy" of preliminary injunctions which require a showing of "likelihood of success on the merits." *See Malon v. Franklin Fin. Corp.*, 2014 WL 6791611, at *3 (E.D. Va. Dec. 2, 2014); *Assad v. DigitalGlobe, Inc.*, 2012 WL 3129700, at *7 (D. Colo. July 21, 2017).

real time how much control we [ValueAct] have over the [Willis] Board room." ¶136. In addition, when Driehaus specifically asked about "Haley's compensation arrangements following prospective deal completion," Towers' Director of Investor Relations brought in Ubben to help answer those questions. ¶¶129-33. *See also* Ex. A.

The Complaint further alleges that the written compensation plan that Ubben provided to Haley at their September 2015 meeting contained specific details of Haley's compensation which <u>were the same</u> as the terms in the plan that was ultimately approved by the Willis Towers Watson Board and formalized after the merger. ¶¶81, 83, 153. The September 2015 plan and the final disclosed compensation plan were "substantially identical" in size and structure. ¶153. For example, ValueAct's proposal and Haley's employment agreement with Willis both contained the same 3-year TSR megagrant. *Id.* The final compensation plan also provided Haley with the additional leverage that he asked for in September, by setting the upside for outperformance higher. *Id.* At best, Defendants' contention that there was no agreement in September 2015 is a fact issue that cannot be decided in their favor now, as shareholders were not even informed that the parties discussed such a lucrative compensation arrangement in the proxy disclosures.[5]

Defendants also contend that – regardless of the materiality of the omitted facts – an omission cannot give rise to a Section 14(a) violation unless it renders affirmative statements false.

---

[5] Notably, the level of formality and finality that Defendants demand before any shareholder disclosure (TW 14), would not have been possible until after the merger closed, regardless of the strength of the arrangement reached between Haley and Ubben. Indeed, while the parties do not yet have discovery, emails submitted by Defendants show that Haley was "shocked" and "mystifie[d]" when an outside consultant incorrectly presented a compensation plan for Haley after the merger that was "considerably less than the ValueAct structure and proposal we have been working with." Schronce Decl. Ex. M. Thus, discovery will show that while the compensation plan that Haley negotiated with Ubben pre-merger needed to be formalized after the merger, the terms would not be reduced and the Compensation Committee continued to refer to it as the "ValueAct" plan. In all events, these factual arguments go beyond the Complaint and are premature now.

This argument fails because it contravenes the law set forth above holding that the omission of a material fact is itself actionable. Defendants' authority does not show otherwise.[6] In any event, as set forth below, these omissions indeed rendered numerous statements in the Proxy misleading.

### 2. The Proxy Contained Multiple Misleading Statements Concerning Haley's Compensation Arrangement And Massive Conflict

In addition to the affirmative duty to disclose material facts under Section 14(a), "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Singer v. Reali*, 883 F.3d 425, at 440 (4th Cir. 2018). Here, Defendants made multiple statements in the proxy materials concerning "potential conflicts" and the rigorous review that the Towers Board purportedly conducted to vet those conflicts. Having determined to speak on these issues, Defendants had a duty to disclose Haley's massive $165 million compensation arrangement and conflict of interest.

For example, the Proxy stated that the Towers Board was "aware of" and "considered" conflicts of interest. ¶¶168-73. Contrary to these statements, Haley had privately negotiated his compensation package, and had not disclosed this conflict to the rest of the Towers Board, such that the Board was not "aware of", and certainly had not "considered," this stark conflict of interest. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1098, n.7 (1991) ("Once the proxy statement purported to disclose the factors considered [by the board of directors, t]here was an obligation to portray them accurately"); *Smith v. Robbins & Myers, Inc.*, 969 F. Supp. 2d 850, 870 (S.D. Ohio 2013) (statement that Board "considered" strategic alternatives when they did not actionable). The Proxy also stated that Haley would be CEO of the merged company, while

---

[6] *See Seinfeld v. Gray*, 404 F.3d 645, 650 (2d Cir. 2005) ("To succeed on a Rule 14a–9 material omission claim, the plaintiff must show that there was a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available"); *Malon*, 2014 WL 6791611, at *6 n.7 (quoting the language of Rule 14a-9).

omitting the massive compensation package he negotiated for that position. ¶¶179-80.

Defendants argue that these statements were not misleading because "the TW Board was well aware that Mr. Haley had a potential conflict of interest," since the Proxy disclosed that "Haley would be CEO of the combined entity if a merger were consummated." TW 15. However, the fact that Haley was going to become the CEO of Willis Towers Watson in the future – and thus had a "potential" conflict – is completely different from knowing that Haley already negotiated a $165 million compensation package, and therefore had an enormous and then-existing conflict of interest. Simply stated, his motive for closing the deal was plainly now far different that securing the most valuable consideration for Towers' shareholders. This difference would be of obvious significance to a reasonable shareholder voting on the merger, particularly because the compensation that Haley had agreed upon led Haley "to favor [the] deal at a less than optimal price" for Towers shareholders. *See, e.g.*, *Lear*, 914 A.2d at 114; *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993) (Easterbrook, J.) ("A prospectus stating a risk that such a thing *could* happen is a far cry from one stating that this *had* happened.").

Defendants also contend that, even if Haley and Ubben did reach an arrangement on Haley's compensation, this fact "says nothing about whether the Merger was the result of a 'thorough, independent board process' or an 'extensive evaluation and negotiation by an engaged, independent board.'" TW 15. However, the Complaint alleges that these statements are false because: (i) Haley, the lead Towers negotiator and Chairman of the Board, was operating under a material conflict of interest; (ii) the Towers Board was ignorant of the highly material term that Haley had already negotiated a $165 million compensation package for himself; and (iii) Haley sought only the minimum additional consideration for shareholders to secure his compensation. ¶¶185-92, 205-06. Indeed, Haley dismissed a previously constituted Special Committee of his

15

board to review the merger as soon as it was agreed that he would become the new CEO. ¶57.

Defendants also incorrectly assert that these statements are "classic statements of optimism and opinion that are either non-actionable or subject to a higher pleading burden" under *Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015). TW 15. To start, the statements are not opinions. Under *Omnicare*, a fact "is a thing done or existing or an actual happening," whereas an opinion is "a belief, a view, or a sentiment." *Id*. at 1325; *see Knurr*, 276 F. Supp. 3d at 536. ("The most important distinction between fact and opinion is that a statement of fact 'expresses certainty about a thing, whereas a statement of opinion…does not'"). The statements about "board process" and "negotiation" do not use words like "believe" or "think." Rather, they affirmatively describe processes that purportedly occurred, when in fact, they did not. ¶185 ("Transaction Was the Result of Thorough, Independent Board Process"); *see ¶¶*189, 205.

Moreover, even if the Court finds that any of these statements were "opinions," they are still actionable here. *Omnicare* held that the falsity of an opinion may be alleged by pleading that the statement "omits material facts about the issuer's inquiry into or knowledge concerning [the] statement" and that the omitted facts show that the issuer "lacked the basis for making those statements that a reasonable investor would expect." 135 S. Ct. at 1328-33; *see Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *6 (W.D. N.C. Feb. 8, 2018) (opinions actionable where plaintiff alleged "defendants' contemporaneous knowledge" that contradicted statements). Here, the statements in the Proxy concerning the negotiation and purportedly thorough Board review were "reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Id.* (quoting *Virginia Bankshares*, 501 U.S. at 1093).

The Complaint further alleges that the Board's supposedly "extensive" or "rigorous" evaluation did not consider Haley's compensation arrangement or conflict of interest. Therefore,

even if the statements identified by Defendants were opinions, they are actionable because they

lacked the factual basis that a reasonable shareholder voting on the merger would expect.[7]

### 3. Defendants Failed To Disclose That Haley Renegotiated The Merger Only For The Minimum Additional Consideration Needed To Obtain Approval

Faced with the reality that Towers shareholders were not going to approve the merger on

its originally proposed terms (¶¶123, 141; *see* Schronce Decl. Ex. J, "The actual vote is still bad."),

Haley determined to obtain only "the minimum [additional consideration] that we need to have a

reasonable expectation of shareholder approval." ¶124. To accomplish this goal, Haley "told

Ubben we needed $10 dividend. Didn't trouble him." ¶125. The fact that Haley as the lead Towers

re-negotiator failed to press hard for further consideration for his own shareholders because he had

an undisclosed $165 million financial interest in the transaction (which was ten times more

valuable to him personally than his remaining Towers stock) are "objective material facts relating

to the transaction" that would have been obviously important to voting shareholders. *Mendell*, 927

F.2d at 674; *Mills*, 396 U.S. at 384; *Lear*, 926 A.2d at 114. Defendants' failure to disclose these

facts in the proxy materials violated Section 14(a). *Bank of Am.*, 757 F. Supp. 2d at 326.

In addition to this duty to disclose, the Proxy Update contained a five page report

purporting to disclose the details of the lengthy renegotiation of the merger and the individuals

involved. ¶¶146-48, 194-96. Having elected to discuss the details of the renegotiation, Defendants

were obligated to disclose the true, complete facts. *Singer*, 883 F.3d 425. Defendants failed to do

---

[7] Nor are the statements inactionable puffery. *See, e.g.*, *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508 (S.D.N.Y.), *opinion corrected on denial of reconsideration*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009) (defendant "maintains its independence in its relationships" actionable); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) ("Goldman's representations about its purported controls for avoiding conflicts," including its "extensive procedures" actionable); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (statement about "truly independent investment research" actionable).

so. Instead, they claimed falsely that Haley renegotiated with Willis CEO Casserley when, in fact, Haley negotiated directly with Ubben (who already had negotiated his compensation). ¶125.

In response, Defendants make the improper fact argument that, "[a]lthough the merger agreement required Mr. Haley to seek approval of the Merger on the terms originally agreed upon, he repeatedly attempted to get a better deal for TW stockholders." TW 17. According to Defendants, Haley "pushed Willis to agree to a cash dividend that was *significantly higher than TW's initial offer in May*." TW 17. This argument ignores that Towers shareholders were not going to approve the merger on the "terms originally agreed upon" and Haley was motivated to secure his own undisclosed compensation. ¶¶123-25; 141. More importantly, it ignores that whatever Haley's obligations were, Defendants omitted and misstated material facts in describing how the amended terms came to be. Defendants failed to disclose that Haley negotiated with Ubben (who had negotiated his compensation) and that (according to his own testimony) Haley negotiated "for the minimum that we need to have a reasonable expectation of shareholder approval." *Id.* Defendants further ignore that, based on Haley's contemporaneous notes, he did not have to "push Willis" because when he told Ubben that they "needed $10," it "didn't trouble him," as Ubben had his own strong motives to see the merger close. ¶125.

Defendants next argue that "telling his counter-party in a negotiation that $10.00 is the lowest he could accept certainly does not establish that Mr. Haley actually *believed* that $10.00 was the lowest price stockholders would accept." TW 17. Haley's "actual beliefs" are irrelevant to whether the Complaint states a Section 14(a) claim because Towers shareholders were not advised that the revised deal was based on the lowest additional amount needed for shareholder approval. Instead, the Proxy Update stated falsely that the revised deal was based on arms-length negotiation. But should the Court find it appropriate to analyze Haley's "beliefs," the Complaint

18

expressly alleges that $10 "was <u>the absolute minimum that Haley believed was necessary to obtain the Towers stockholder vote</u>," based on Haley's own testimony. ¶¶123-25. At most, this is another factual challenge inappropriate for determination on the pleadings.

>    **4.    The Proxy Contained Misleading Statements Concerning the Fact That Haley Sought Only The Minimum Additional Consideration Necessary**

Defendants' failure to disclose the truth about Haley's renegotiation of the merger rendered misleading several statements in the Proxy Update and other proxy solicitation materials that falsely described a picture of an arm's-length negotiation in which Haley actively sought more favorable terms for Towers shareholders from Casserley. ¶¶148, 151. These statements were false because Haley did not try to maximize the value of the dividend paid to Towers shareholders. ¶148. Instead, Haley shared with Ubben and ValueAct (who had already set his lucrative compensation) the bare minimum additional compensation he "needed" which minimal amount "didn't trouble" Ubben. ¶¶124-25. *See, e.g., Honig v. Cardis Enterprises Int'l N.V.*, 2016 WL 6304695, at *9 (E.D.N.Y. Oct. 27, 2016) (statements about a deal false and misleading where deal was "not an arm's length contractual transaction" as defendants represented); *SEC v. Rauscher Pierce Refsnes, Inc.*, 17 F. Supp. 2d 985, 990 (D. Ariz. 1998) (statement that transaction "was an arm's length transaction" false and misleading when defendants were on both sides of the deal).

Defendants assert that whether the transaction was "fair," "compelling," and "favorable" to Towers shareholders is a "matter of opinion," and "the Complaint contains no particularized facts demonstrating that any TW director believed the renegotiated consideration was unfair, not compelling, or unfavorable to stockholders." TW 18. But, courts have held that in the proxy solicitation context, "[e]ven 'indefinite and unverifiable' terms, such as observations that an offer was 'fair' or of a 'high value' can be actionable under Section 14(a) and Rule 14a-9, because they are based on 'provable facts.'" *Bank of Am.*, 757 F. Supp. 2d at 290. Here, the Complaint alleges

that the transaction was not "fair," "compelling," or "favorable" to Towers shareholders because Haley negotiated for only the minimum additional consideration necessary with Ubben in order to secure his own undisclosed compensation package which he also arranged through Ubben. Whether Haley did this or not is a "provable fact," it is in his own notes (¶125), and accordingly, the statements are actionable.

Further, even if the Court finds that any of these statements were "opinions," the Complaint alleges that Defendants omitted information that made the opinions misleading. Again, Haley's own sworn testimony establishes that he sought only the minimum consideration necessary to have a reasonable chance of shareholder approval – and the omission of this critical fact is more than sufficient to make any opinion statements actionable under *Omnicare*. *See supra*, at 16.

Defendants also argue that the fact that the Towers Board "recommended the *original* Merger with a significantly lower cash dividend, and that TW's financial advisor gave a formal opinion that the *lower original* Merger consideration was fair to TW stockholders," indicate that the Towers Board believed that the terms were fair. TW 18. Neither the members of the Board, nor Towers' financial advisor, are Defendants in this case. Moreover, the factual issue of what the Board may have believed was impacted by the fact that they did not know the omitted material facts. *See Virginia Bankshares*, 501 U.S. at 1092 ("Reasons for directors' recommendations or statements of belief are … characteristically matters of corporate record subject to documentation, to be supported or attacked by evidence of historical fact outside a plaintiff's control"). Further, while such "additional consideration" was higher than the original terms, it was not as high as it would have been if Haley was truly negotiating to maximize value to Towers shareholders instead of settling for the "minimum." In fact, it resulted in a discount below the pre-deal price of Towers stock and ISS (and Driehaus) reported that it was still worse than the "worst" discount in the past

20

five years in a supposedly "merger of equals" transaction. ¶¶143-44.

Defendants further contend that statements that the terms of the revised merger (i) were the product of "significant negotiation"; (ii) represented Willis' "best and final offer"; and (iii) allowed Towers stockholders to "realize increased near-term value while maintaining the full long-term benefits of the transaction" are not false because "Plaintiff alleges no particularized facts disputing that Willis initially refused to change the terms of the original Merger Agreement, meaning by definition, that the revised terms were the product of renegotiation." TW 18. This is a straw man argument that may be swiftly rejected.

Plaintiff is not required to allege facts "disputing" alternative versions of events set forth by Defendants in order to state Section 14(a) claims. In any event, the Complaint alleges that such statements were false because "Haley had negotiated for the minimum additional consideration for Towers shareholders, to which Ubben readily agreed," facts which completely contradict the assertion that the revised deal was the product of a "significant renegotiation," and was Willis' "best and final" offer. ¶¶204, 210.

Finally, Defendants' argument that "whether th[e] renegotiation was 'significant' is another statement of opinion" which fails under *Omnicare* is also wrong. Courts have held that similar statements are actionable statements of fact. *See, e.g.*, *Howard v. Galesi*, 1987 WL 18460, at *5 (S.D.N.Y. Oct. 6, 1987) (statement that no negotiations were taking place actionable statement of fact); *Harter v. St. Mary's Duluth Clinic Health System*, 2013 WL 354082, at *6 (D. Minn. Jan. 29, 2013) (statement that "numerous negotiations" were coming up was actionable). Even if the statement is an opinion, the Complaint alleges undisclosed facts that render it misleading: when Haley told Ubben he needed the bare "minimum" of $10, it "didn't trouble him." This is not a "negotiation" at all, let alone a "significant" one.

### 5.     Defendants Failed To Disclose Ubben And ValueAct's True Role

Defendants' failure to disclose Ubben and ValueAct's extensive involvement in Haley's compensation arrangement and the merger negotiations is also actionable because it is information that would have been important to a reasonable voting shareholder.[8] Further, the fact that Haley was negotiating his compensation with Ubben and ValueAct was something that the Board would "have wanted to know." ¶88. The failure to disclose ValueAct's involvement also rendered multiple statements in the proxy materials false and misleading. As discussed above, the proxy materials described an arm's length negotiation with Casserley, when Haley was negotiating his compensation and the revised deal terms with Ubben. ¶148.

In response, Defendants contend that the statement in the Proxy Update that Haley negotiated with Casserley is technically true, even though it omits entirely the role of Ubben. TW 19. Courts routinely hold that such "half-truths" are actionable under the Exchange Act. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context"); *Fogarazzo v. Lehman Bros.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004) ("A statement can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact.").

### D.     Defendants' Omissions Were Material

Defendants raise a series of improper fact arguments under the rubric of "materiality," each of which may be swiftly rejected at this stage of the litigation.

---

[8] Delaware requires disclosure of pre-signing negotiation of post-closing employment terms, *Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1179 (Del. Ch. 2010), and the negotiators, *van der Fluit v. Yates*, 2017 WL 5953514, at *7-8 (Del. Ch. Nov. 30, 2017).

### 1.    Haley's $165 Million Compensation Plan Was Material

Defendants contend that Haley's compensation plan was not material because the Proxy disclosed "that Mr. Haley's future employment as CEO was a potential conflict of interest." TW 20. However, knowing that Haley had a "potential" conflict as the future CEO is a far cry from knowing that he had, in fact, an actual and severe conflict of interest.

Defendants next contend that information from third-party sources outside the proxy solicitations, including questions from Driehaus, made "TW's stockholders … well aware that Mr. Haley's future role as CEO of the combined company was a potential conflict." TW 21. This "truth-on-the-market defense" fails for multiple reasons.

First, Defendants explicitly stated in the Proxy: "You should rely only on information contained in this joint proxy statement/prospectus or that we have referred to you. Willis and Towers Watson have not authorized anyone to provide you with any additional information." Ex. B, at 226. Having specifically instructed Plaintiff and the other Towers shareholders not to rely on any information outside of the Proxy, Defendants cannot now point to reports from third parties like Driehaus and ISS to argue about what shareholders should have known. *See SEC v. Bank of Am. Corp.*, 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010) ("[S]ince the Bank itself warned investors not to rely on the media, it would be unreasonable for a shareholder to consider the media pronouncements to be part of the relevant mix of information"); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 522 (S.D.N.Y. 2013) ("A reasonable investor will not be charged to regard press reports as a reliable source of information after having read such advice").

Second, Section 14(a) requires that a proxy disclose – within its four corners – all material facts regarding the proposed transaction precisely because investors are not required to decipher public reports in order to infer the existence of undisclosed material information. The third-party sources Defendants rely on are irrelevant as a matter of law. *See Kronfeld v. Trans World Airlines,*

23

*Inc.*, 832 F.2d 726, 736 (2d Cir. 1987) ("There are serious limitations on a corporation's ability to charge its stockholders with knowledge of information from a document such as a proxy statement…on the basis that the information is public knowledge and otherwise available to them.").

<u>Third</u>, even if the Court wished to consider this "intensely fact-specific" defense (*In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 616-17 (S.D.W.Va. 2012)), Defendants have failed to carry their heavy burden of establishing truth-on-the-market as a matter of law. "Before the truth-on-the-market defense can be applied, the defendant must prove that the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by their previous statements." *RMED Int'l v. Sloan Supermarkets, Inc.*, 185 F. Supp. 2d 389, 402 (S.D.N.Y. 2002) (no truth-on-the-market where public reports did not reveal "the very information" at issue); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238-39 (S.D.N.Y. 2006) (public information "raised some concern in the market," but did not negate the company's assurances).

Here, the information that Defendants rely on consists of vague speculation and questions that were met with false denials, curses, or no answers at all. It is undisputed that <u>none</u> of the sources on which Defendants rely actually revealed to investors at the time that Haley had negotiated a $165 million compensation package with ValueAct (and Defendants acknowledge as much by referring obliquely to "potential" conflicts). Thus, the truth on the market defense fails.

Indeed, Defendants adamantly and publicly <u>denied the existence of Haley's conflict of interest</u> and instructed investors, in blunt terms, <u>to disregard Driehaus entirely</u>. In response to Driehaus' "public[] question[s]" about a potential conflict of interest (TW 21), Towers told shareholders that Driehaus made "<u>demonstrably false statements regarding compensation to</u>

support its allegations of a conflict of interest." ¶187. Ubben publicly denounced Driehaus as a "shin-kicking activist" and "dissident" (¶110), and privately cursed out Driehaus when it asked whether Haley had been given a compensation deal. At a minimum, this "truth-on-the-market" defense cannot be decided at this stage. *Massey*, 883 F. Supp. 2d at 617; *Lapin*, 506 F. Supp. 2d at 238 ("burden of establishing the truth-on-the-market defense is extremely difficult, perhaps impossible, to meet at … summary judgment").[9]

Finally, Defendants contend that if the proxy materials disclosed that Ubben and Haley had "secured a massive compensation package," this disclosure would have been inaccurate because "Ubben had neither the ability nor the authority to bind the post-Merger entity." TW 23. Similarly, Defendants argue that even if an agreement had been reached, it would have been "pure speculation" as to whether the Willis Towers Watson Board would have approved the agreement, and accordingly, no disclosure was required. TW 23. This is another attempt to dispute the Complaint's factual allegations, which fails for the reasons set forth above at 12-13.

### 2. Haley's Renegotiation Of The Merger For Minimum Additional Consideration To Towers Shareholders Was Material

Defendants argue that the failure to disclose that Haley sought only the minimum consideration was not material because "it is a mischaracterization of what actually occurred." TW 24. This factual argument directly contradicts the Complaint and Haley's own sworn testimony

---

[9] Defendants cite Delaware cases which did not address federal claims or pleading standards, and are inapplicable. *See Highland Capital, Inc. v. Longview Fibre Co.*, 1990 WL 3973, at *2 (Del. Ch. Jan. 22, 1990) (plaintiff's "unusual" argument acknowledged that each relevant issue was disclosed); *Globis Partners, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *10-12 (Del. Ch. Nov. 30, 2007) ("Plaintiff's conclusory statement '[w]ithout this information, Plumtree shareholders were unable to determine the true value of Plumtree' does not meet its burden of proving materiality"); *In re Om Grp., Inc. Stockholders Litig.*, 2016 WL 5929951, at *15-16 (Del. Ch. Oct. 12, 2016) ("conclusory assertions" of one meeting insufficient to infer "actual conflict" or materiality); *In re Family Dollar Stores, Inc. Stockholder Litig.*, 2014 WL 7246436, at *19-20 (Del. Ch. Dec. 19, 2014) ("it is unclear what additional information could even be disclosed").

and cannot be accepted as true at this stage.

Defendants also argue that requiring Haley to disclose that he "believed he could extract more value from the negotiation…would be tantamount to self-flagellation," and is thus immaterial. TW 24. Not so. The fact that Haley sought only the minimum consideration he could achieve was clearly important to shareholders deciding whether to approve the deal. *See Langner v. Brown*, 913 F. Supp. 260, 270 (S.D.N.Y. 1996) (rejecting "self-flagellation" argument when the omissions at issue were material). Further, this "self-flagellation" argument does not apply where, as here, the "absence [of the information at issue] renders [] statement[s] false or misleading." *In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453, 465 (S.D.N.Y. 2010).[10]

Lastly, Defendants assert that the Proxy Update did not have to disclose "*why* the TW Board determined to request $10 per share." TW 24. But the fact that Haley and Ubben agreed on $10 per share as the minimum additional consideration to Towers shareholders is the material omission at issue in this case. The issue of "why" the Board may have approved this when they did not know about Haley's conflict or negotiations with Ubben and ValueAct is irrelevant.

### 3. Ubben And ValueAct's Involvement In The Negotiations Was Material

In another iteration of their "truth-on-the-market" defense, Defendants assert that "stockholders knew" that Ubben was on the Board and that ValueAct's voting agreement was disclosed. TW 24-25. Defendants also downplay Ubben's discussions with Haley as mere "details." *Id.* There is an obvious difference between disclosing Ubben's role on the Board and ValueAct's voting agreement, and disclosing that Ubben and ValueAct negotiated a $165 million compensation package for Haley, and then renegotiated the merger for only minimum additional consideration. And there is no dispute that <u>none</u> of the documents cited by Defendants disclosed

---

[10] *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1131 (Del. Ch. 2011) is inapt as it addresses why a director dissented or abstained.

those facts. These are not mere "additional details"; they are facts that would have been important to a reasonable shareholder voting on the merger.

Defendants' contention that they were under no obligation to provide a "play-by-play" of the merger negotiations is also wrong. TW 25. Because Defendants detailed the extensive back-and-forth of the merger negotiations in the Proxy and Proxy Update (¶¶164, 194), they were obligated to disclose the whole truth. *Singer*, 883 F.3d at 440.

### E.  The Complaint Does Not "Sound in Fraud"

Defendants wrongly contend that the Complaint must plead scienter with particularity because its allegations "sound in fraud." TW 26. Where, as here, Plaintiff has not alleged any fraud claims, has disavowed fraud in the Complaint (Compl. 1), and has expressly pled negligence in connection with their Section 14(a) claim, Plaintiff's claims are subject to Rule 8(a), and Rule 9(b) scienter allegations are not required. *See NJ v. Sprint Corp.*, 531 F. Supp. 2d 1273, 1285 (D. Kan. 2008) ("this difference in pleading is dispositive"); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009); *Fresno Cty., Emps' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 557–60 (S.D.N.Y. 2017); *Bank of Am.*, 757 F. Supp. 2d at 332-33. Defendants' cases are inapposite because they involved situations where the complaint alleged <u>both</u> fraud and non-fraud claims based on "exactly the same" allegations.[11]

Even if scienter allegations were required, the Complaint would still pass muster. "Scienter is pled by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior" and "the adequacy of the scienter allegations is to be measured by the facts collectively alleged in the complaint." *Ollila*, 2018 WL 792069, at *2. Haley obviously knew about

---

[11] *See Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008); *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 238 (S.D.N.Y. 2009); *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005).

or recklessly disregarded his own conflict in securing a massive compensation package for himself, as well as the fact that he personally renegotiated the merger for minimum consideration, and negotiated directly with Ubben and ValueAct. Casserley knew about or recklessly disregarded Haley's conflict, the compensation package, the renegotiation of the merger for minimum consideration, and ValueAct and Ubben's true role, through his direct personal involvement in these issues. ¶¶35, 37-38, 54, 58-61, 63, 68 (direct interactions with Haley) ¶66 ("waiting to take [his] cues" from ValueAct and Ubben); ¶¶58, 85 (discussing post-closing board composition); ¶¶129-33 (receiving emails from Ubben denouncing Driehaus); ¶141 (receiving an email reflecting that the merger had only 43.45% of the Towers vote as of 11/18/15). Such allegations suffice to demonstrate a strong inference of scienter. *See, e.g.*, *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 606 (E.D. Va. Dec. 21, 2015) (scienter satisfied based on direct, personal involvement in the subject of the misstatements); *Genworth*, 103 F. Supp. 3d at 785 (same); *Ollila*, 2018 WL 792069, at *3 (allegations that defendants "had access to information on [relevant] issues" sufficient).[12] As senior corporate officers, Haley's knowledge or reckless disregard would be imputed to Towers and Willis Towers Watson, and Casserley's would be imputed to Willis. *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 250 (4th Cir. 1967).

## II.   PLAINTIFF'S CLAIMS ARE TIMELY

As a last-ditch attempt, Defendants assert that Plaintiff's claims are barred under Section 14(a)'s one-year statute of limitations. TW 27-30. "It is rarely appropriate to resolve the affirmative defense of limitations based on a prediscovery motion to dismiss," as it "often entails a fact

---

[12] Multiple additional facts support scienter: (i) the merger concerned Towers' and Willis' "core operations" and "high-ranking officers presumably know facts about the core operations of the company"; (ii) Haley and Casserley were "intimately involved" in those operations, *Kiken*, 155 F. Supp. 3d at 606-07; and (iii) Towers' denials in response to questions about Haley's compensation. *KBC Asset Mgmt. NC v. 3D Sys. Corp.*, 2016 WL 3981236, at *9 (D.S.C. July 25, 2016).

intensive inquiry." *Burt v. Maasberg*, 2013 WL 1314160, at *31 (D. Md. Mar. 31, 2013); *see Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (same).

The one-year statute of limitations period for Section 14(a) claims begins to run when a plaintiff discovers, or a reasonably diligent plaintiff should have discovered, <u>the facts constituting the violation</u>. 15 U.S.C. § 78i(f). Here, as the Complaint details, Plaintiff did not, and could not, have discovered the facts constituting the underlying violation until such facts were made public in the Appraisal Action between February 6, 2017 and August 21, 2017. ¶215.

### A.    <u>The Public Filings Cited By Defendants Did Not Provide Notice Of The Truth</u>

Defendants wrongly assert that Plaintiff was put on notice of the Section 14(a) claims by litigation filings alleging that Ubben was "highly involved in the merger," including the "negotiations of Mr. Haley's executive compensation," and that Haley "was a conflicted director" because he knew that he would become the new CEO and "likely receive a major increase in compensation." TW 27-29. Defendants heavily rely on <u>a single paragraph in an attorney affidavit</u> filed in a motion to compel in New York State Court stating that <u>confidential</u> documents produced by Towers as of September 26, 2016 indicated that "Ubben[] was highly involved in the merger, including, but not limited to, the negotiations of Mr. Haley's executive compensation." *Id*.

These arguments fail for two reasons. First, in order to succeed on the affirmative defense of statute of limitations at the pleading stage, "all facts necessary to the affirmative defense must clearly appear on the face of the complaint." *Burt*, 2013 WL 1314160, at *31. The litigation documents Defendants rely on appear nowhere "on the face of the complaint" in this case. Second, these filings nowhere disclose the key facts hidden from shareholders, namely, that Haley had actually negotiated a $165 million compensation plan with Ubben and ValueAct, and that Haley renegotiated the merger for minimum consideration to secure that compensation. The same documents cited by Defendants state that there is <u>no</u> publicly available evidence of negotiations

between Haley and Ubben regarding Haley's compensation. TW 28.[13]

**B.    Counsel's Knowledge Is Not Imputed To The Class**

Defendants further contend that because other attorneys at BLB&G served as counsel in the Appraisal Action, they knew unspecified information before the public did, and their knowledge is imputed to Plaintiff and the Class. TW 29. Defendants are wrong as a matter of law.

Because "[t]he mass nature of the class action requires that both the court and counsel carefully protected unnamed plaintiffs' rights," the knowledge of class counsel is <u>not</u> imputed to the members of the class for statute of limitations purposes as a matter of law. *See Schwab*, 449 F. Supp. 2d at 1072 (Class actions "<u>do[] not permit the imposition of the principles of agency in a way that would bar the suit and deprive class members of experienced counsel</u>"); *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opp. Comm'n of Nassau Cty., Inc.*, 558 F. Supp. 2d 378, 397–98 (E.D.N.Y. 2008), *aff'd*, 710 F.3d 57 (2d Cir. 2013) (same). *See also* Graziano Decl. ¶2.[14]

**III.    THE COMPLAINT ADEQUATELY ALLEGES SECTION 20(a) CLAIMS**

Haley and Casserley do not dispute the element of control. Because the Complaint adequately alleges primary violations under § 14(a), it also states a claim for control person liability under § 20(a). *See MicroStrategy*, 115 F. Supp. 2d at 661.

**<u>CONCLUSION</u>**

Defendants' motion to dismiss should be denied. If this Court grants Defendants' motion, in part or in full, Plaintiff respectfully requests leave to amend pursuant to Fed. R. Civ. P. 15.[15]

---

[13] *Landsberger v. Martek Biosciences Corp.*, 2010 WL 3038947 (D. Md. July 30, 2010) addressed the inapplicable limitations period for securities fraud. *See Burt*, 2013 WL 1314160, at *31.

[14] Defendants' cases address the inapposite issue of the imputation of an attorney's knowledge of procedural matters in an individual action, *Link v. Wabash R.R., Co.*, 370 U.S. 626, 634 (1962), *Bryan v. Land*, 215 B.R. 398 (B.A.P. 8th Cir. 1997); or do not address limitations implications of an attorney's knowledge, *Nationwide Life Ins. Co. v. Attaway*, 254 F.2d 30, 36 (4th Cir. 1958).

[15] Leave to amend should only be denied when amendment would be prejudicial or futile, or where the movant acted in bad faith. *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 317 (4th Cir. 2004).

Dated: May 7, 2018

Respectfully submitted,

/s/ Susan R. Podolsky

Susan R. Podolsky (Va. Bar No. 27891)
**LAW OFFICES OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (571) 366-1702
Facsimile:  (703) 647-6009
spodolsky@podolskylaw.com

*Local Counsel for Lead Plaintiff The Regents of the University of California*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

Salvatore J. Graziano (*pro hac vice*)
John Rizio-Hamilton (*pro hac vice*)
Rebecca E. Boon (*pro hac vice*)
Julia K. Tebor (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
sgraziano@blbglaw.com
johnr@blbglaw.com
rebecca.boon@blbglaw.com
julia.tebor@blbglaw.com

*Counsel for Lead Plaintiff The Regents of the University of California, and Lead Counsel for the Class*

NY/1185614

31

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of May 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

_____*/s/ Susan R. Podolsky*_____
Susan R. Podolsky (Va. Bar No. 27891)