**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| IN RE WILLIS TOWERS WATSON PLC PROXY LITIGATION | Master File No. 1:17-cv-1338-AJT-JFA <br><br> <u>CLASS ACTION</u> |

**LEAD PLAINTIFF THE REGENTS OF THE UNIVERSITY OF CALIFORNIA'S
MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS JEFFREY W. UBBEN'S AND
VALUEACT CAPITAL MANAGEMENT, L.P.'S
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

Susan R. Podolsky (Va. Bar No. 27891)
**LAW OFFICES OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (571) 366-1702
Facsimile:  (703) 647-6009

*Local Counsel for Lead Plaintiff The Regents of the
University of California*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

Salvatore J. Graziano (*pro hac vice*)
John Rizio-Hamilton (*pro hac vice*)
Rebecca E. Boon (*pro hac vice*)
Julia K. Tebor (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444

*Counsel for Lead Plaintiff The Regents of the
University of California, and Lead Counsel for the
Class*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................... 1

ALLEGATIONS IN THE COMPLAINT REGARDING UBBEN AND VALUEACT .............. 4

    I.      The ValueAct Defendants Direct The Merger Negotiations ................................. 5

    II.     The ValueAct Defendants Negotiate Haley's Compensation ............................... 7

    III.    The ValueAct Defendants Direct Shareholder Solicitations ................................. 8

    IV.    Ubben Directly Renegotiates The Merger Consideration With Haley ................. 10

    V.     The ValueAct Defendants Lobbied To Push The Deal Through ......................... 12

ARGUMENT ................................................................................................................ 13

    I.      THE COMPLAINT PLEADS A VIOLATION OF SECTION 14(a) ................. 14

    II.     THE COMPLAINT PLEADS CONTROL PERSON LIABILITY UNDER
           SECTION 20(a) AS AGAINST UBBEN AND VALUEACT ............................ 14

          A.    Pleading Standards For Control Person Liability ..................................... 14

          B.    Ubben Signed SEC Filings Containing The Proxy And The False
              And Misleading Statements ..................................................................... 17

          C.    Additional Allegations Demonstrating Control ........................................ 18

              1.    ValueAct Admitted In Emails That It Had Control Over Willis'
                    Board Room .................................................................................. 18

              2.    Ubben And Haley's Direct Negotiation Of Haley's
                    Compensation Shows Control ....................................................... 19

              3.    The ValueAct Defendants' Direction Of The Merger Shows
                    Control ......................................................................................... 21

              4.    Ubben's Position As A Director Of Willis Shows Control .......... 26

              5.    ValueAct's 10% Ownership Of Willis Buttresses The Inference
                    Of Control .................................................................................... 28

      D.     The Fourth Circuit Does Not Require That Plaintiff Plead Culpable
Participation ........................................................................................... 29

CONCLUSION.................................................................................................................. 30

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Adams v. Kinder-Morgan, Inc.*,
 340 F.3d 1083 (10th Cir. 2003) ............................................27

*In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*,
 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007)........................26

*In re Alstom SA Sec. Litig.*,
 406 F. Supp. 2d 433 (S.D.N.Y. 2005)..............................16, 17

*In re Am. Apparel, Inc. S'holder Litig.*,
 2013 WL 10914316 (C.D. Cal. Aug. 8, 2013).......................21

*Barker v. Henderson, Franklin, Starnes & Holt*,
 797 F.2d 490 (7th Cir. 1986) ...............................................23

*In re BearingPoint, Inc. Sec. Litig.*,
 525 F. Supp. 2d 759 (E.D. Va. 2007) ...................................29

*In re Bioscrip Sec. Litig.*,
 95 F. Supp. 3d 711 (S.D.N.Y. 2015).....................16, 17, 23, 28

*In re BofI Holding, Inc. Sec. Litig.*,
 2017 WL 2257980 (S.D. Cal. May 23, 2017).........................17

*Carpenter v. Harris, Upham & Company, Inc.*,
 594 F.2d 388 (4th Cir. 1979) ..........................................29, 30

*In re Coventry Healthcare, Inc. Sec. Litig.*,
 2011 WL 1230998 (D. Md. 2011) ........................................30

*Dellastatious v. Williams*,
 242 F.3d 191 (4th Cir. 2001) ...............................................30

*In re Digital Island Sec. Litig.*,
 223 F. Supp. 2d 546 (D. Del. 2002).......................................27

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
 352 F. Supp. 2d 429 (S.D.N.Y. 2005)............................. *passim*

*Gruber v. Gilbertson*,
 2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) .................15, 16

*Hefler v. Wells Fargo & Co.*,
 2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .......................26

*Huttenstine v. Mast*,
  2006 WL 3771096 (E.D. N.C. Dec. 21, 2006) ....................................................30

*Kiken v. Lumber Liquidators Holdings, Inc.*,
  155 F. Supp. 3d 593 (E.D. Va. 2015) ........................................................... *passim*

*In re Kosmos Energy Ltd. Sec. Litig.*,
  955 F. Supp. 2d 658 (N.D. Tex. 2013) ...................................................18, 19, 28

*Kuhns v. Ledger*,
  202 F. Supp. 3d 433 (S.D.N.Y. 2016).................................................................16, 23

*Kyung Cho v. UCBH Holdings, Inc.*,
  890 F. Supp. 2d 1190 (N.D. Cal. 2012) ...........................................................3, 23

*Latham v. Matthews*,
  662 F. Supp. 2d 441 (D. S.C. 2009).....................................................................30

*In re Leslie Fay Cos., Inc. Sec. Litig.*,
  918 F. Supp. 749 (S.D.N.Y. 1996) ....................................................16, 18, 24, 28

*Levy v. Gutierrez*,
  2017 WL 2191592 (D.N.H. May 4, 2017).............................................................20

*Longview Equity Fund, L.P. v. iWorld Projects & Sys., Inc.*,
  2008 WL 833230 (S.D.N.Y. Mar. 26, 2008) ...................................................20, 28

*In re Massey Energy Co. Sec. Litig.*,
  883 F. Supp. 2d 597 (S.D. W. Va. 2012).............................................................30

*Masterson v. Commonwealth Bankshares, Inc.*,
  2 F. Supp. 3d 824 (E.D. Va. 2014) ............................................................. *passim*

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ......................................................... *passim*

*In re Mutual Funds Inv. Litig.*,
  566 F.3d 111 (4th Cir. 2009) ...................................................................... *passim*

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
  553 F. Supp. 2d 902 (S.D. Ohio 2008) ................................................................28

*Nolte v. Capital One Fin. Corp.*,
  390 F.3d 311 (4th Cir. 2004) ...............................................................................30

*O'Sullivan v. Trident Microsystems*,
  1994 U.S. Dist. LEXIS 17065 (N.D. Cal. Feb. 2, 1994) .......................................27

*In re Oak Tech. Sec. Litig.*,
    1997 U.S. Dist. LEXIS 18503 (N.D. Cal. Aug. 4, 1997).......................................27

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996) .................................................................26

*In re PEC Sols., Inc. Sec. Litig.*,
    418 F.3d 379 (4th Cir. 2005) ...................................................................8

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004).......................................................18

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007).......................................................30

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
    351 F. Supp. 2d 334 (D. Md. 2004) .........................................................30

*S.E.C. v. Small Business Capital Corp.*,
    2013 WL 4455850 (N.D. Cal. Aug. 16, 2013) .........................................18

*S.E.C. v. Smith*,
    2005 WL 2373849 (S.D. Ohio Sept. 27, 2005) .......................................18

*In re Safety-Kleen Corp. Bondholders Litig.*,
    2004 WL 3115871 (D. S.C. Mar. 19, 2004) ...........................................30

*Sennott v. Rodman & Renshaw*,
    414 U.S. 929 (1973).............................................................................14

*Silsby v. Icahn*,
    17 F. Supp. 3d 348 (S.D.N.Y. 2014).......................................................28

*In re Sonus Networks, Inc. Sec. Litig.*,
    2006 WL 1308165 (D. Mass. May 10, 2006) .........................................23

*In re Sourcefire, Inc. Sec. Litig.*,
    2008 WL 1827484 (D. Md. Apr. 23, 2008) .............................................30

*Stat-Tech Liquidating Trust v. Fenster*,
    981 F. Supp. 1325 (D. Colo. 1997).....................................................27, 28

*Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*,
    690 F. Supp. 2d 959 (D. Ariz. 2010) .................................................26, 27

*In re TETRA Tech., Inc. Sec. Litig.*,
    2009 WL 6326865 (S.D. Tex. Aug. 10, 2009) .....................................20, 21

*Thomas v. MagnaChip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ..................................................................16, 28

*Trendsetter Investors, LLC v. Hyperdynamics Corp.*,
   2007 WL 172627 (S.D. Tex. Jan. 18, 2007) ...........................................................15, 22

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   195 F. Supp. 3d 528 (S.D.N.Y. 2016) ...........................................................................23

*In re Washington Mutual, Inc. Sec. Deriv. & ERISA Litig.*,
   259 F.R.D. 490 (W.D. Wash. 2009) ...............................................................................27

*Zishka v. Am. Pad & Paper Co.*,
   2001 U.S. Dist. LEXIS 25988 (N.D. Tex. Sept. 28, 2001)............................................28

## STATUTES

15 U.S.C. § 78n(a) ...................................................................................................... *passim*

15 U.S.C. § 78t(a) ....................................................................................................... *passim*

## OTHER AUTHORITIES

17 C.F.R. §240.12b-2...................................................................................................2, 15

17 C.F.R. §240.14a-2(b)(2)......................................................................................... *passim*

Fed. R. Civ. P. 8 .....................................................................................................2, 3, 14

Fed. R. Civ. P. 15 ..............................................................................................................30

H.R. Rep. No. 73-1383 (1934).........................................................................................15

Lead Plaintiff The Regents of the University of California ("Plaintiff") respectfully submits this brief in opposition to Jeffrey W. Ubben's and ValueAct Capital Management, L.P.'s Motion to Dismiss the Amended Complaint.[1]

## INTRODUCTION

This securities class action concerns the merger between Towers Watson & Co. ("Towers") and Willis Group Holdings plc ("Willis"). As discussed in more detail in Plaintiff's Memorandum of Law in Opposition to the TW/Willis Defendants' Motion to Dismiss the Amended Complaint (the "TW/Willis Opposition"), unbeknownst to shareholders voting on the merger, the proxy solicitation materials contained numerous materially untrue statements and omissions of material fact. First, the proxy solicitation materials failed to disclose that Defendant John Haley, the CEO of Towers, had negotiated a massive compensation arrangement directly with Defendants Jeffrey W. Ubben and ValueAct (the "ValueAct Defendants") before the merger which gave rise to a conflict of interest, which was also not disclosed to shareholders prior to the vote. Second, when shareholder approval was unlikely, the proxy solicitation materials failed to disclose that Haley renegotiated the merger for minimum additional consideration for Towers shareholders directly with Ubben who extracted other favorable terms he was particularly interested in. Overall, the proxy solicitation materials omitted to disclose the heavy "behind-the-scenes" involvement of Ubben and ValueAct who directed merger negotiations and the negotiation of Haley's compensation, as described further below.

The Complaint alleges violations of Section 14(a) of the Exchange Act against Towers,

---

[1] All capitalized terms not defined herein have the meanings ascribed to them in the Amended Complaint (ECF No. 49, the "Complaint"). "¶__" references are to paragraphs of the Complaint. "Ex. __" references are to the exhibits to the Graziano Declaration. "VA __" refers to the ValueAct Defendants' brief in support of their Motion (ECF No. 55). Unless otherwise indicated, all citations and quotation marks in cases have been omitted and all emphasis has been added.

Haley, Willis, Casserley, and Willis Towers Watson, and violations of Section 20(a) of the Exchange Act against Haley, Ubben, ValueAct, and Casserley, as controlling persons. ¶¶236-39. For all of the reasons set forth in the TW/Willis Opposition, the Complaint more than adequately alleges Section 14(a) claims against the TW/Willis Defendants and Section 20(a) claims against Haley and Casserley. This brief addresses the Section 20(a) claims against Ubben and ValueAct.[2]

The ValueAct Defendants' principal argument is that Plaintiff cannot show the ValueAct Defendants' "control" because ValueAct was a minority shareholder and Ubben was one of twelve Willis directors. In essence, the ValueAct Defendants argue that a plaintiff can demonstrate control for the purposes of Section 20(a) only by showing control in the form of contract or ownership. This is simply not the case. Rather, as this Court has recognized, control means the "possession, direct or indirect of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 658-61 (E.D. Va. 2000) (citing 17 C.F.R. §240.12b-2). In finding a showing of control under Section 20(a), courts in the Fourth Circuit, heavily consider "power or potential power to influence and control the activities of a person as opposed to the actual exercise thereof." *In re Mutual Funds Inv. Litig.*, 566 F.3d 111, 130 (4th Cir. 2009) ("*Mutual Funds*"), *rev'd on other grounds Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135 (2011).

Here, numerous factors plainly allege control for the purposes of Rule 8, which governs

---

[2] The TW/Willis Defendants include Towers, John Haley (former CEO of Towers), Willis, Dominic Casserley (former CEO of Willis), and Willis Towers Watson plc ("Willis Towers Watson"). Section 20(a) provides that any person who indirectly or directly controls a person or entity liable for an Exchange Act violation will be held jointly and severally liable for that violation. 15 U.S.C. § 78t(a).

this motion.[3] *Masterson v. Commonwealth Bankshares, Inc.*, 2 F. Supp. 3d 824, 831 n.4 (E.D. Va. 2014). To start, Ubben personally signed an SEC filing containing the Proxy and setting forth the key misleading statements in this case. This alone shows his control over the misstatements and omissions at issue. *Id.* at 832-33 (the most important factor showing control was the signing of financial statements at issue). In fact, directors are routinely held to be control persons under Section 20(a) precisely because they sign such SEC filings. *See, e.g., Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1208 (N.D. Cal. 2012) ("numerous courts have found that allegations that directors signed the statements which contain the material misrepresentations are sufficient to state Section 20(a) control status," and finding director who signed statements which contained misrepresentations liable as a control person); additional authority cited *infra* at 17-18.

Moreover, a host of additional allegations detail the very significant ways that the ValueAct Defendants controlled – and even orchestrated – the key factual occurrences in this case. Indeed, the ValueAct Defendants: (i) boasted that they "control[led] . . . the [Willis] Board room"; (ii) directed the merger negotiations; (iii) negotiated Haley's undisclosed compensation package; (iv) told activist investor Driehaus, in response to their questions about Haley's compensation, that "if you do not want to talk directly to [Ubben] you are not interested in the facts"; (v) lobbied shareholder votes to such an extent that they boasted in contemporaneous emails that ValueAct personnel were the "the ones securing all of the TW votes"; (vi) "ghostwrote" proxy solicitations, including writing a quote that appeared to be "coming out of Haley's mouth"; (vii) publicly denounced "dissident" shareholders and negative proxy service reports; (viii) negotiated the inadequate special dividend for Towers shareholders, and received in exchange Haley's promise

---

[3] Federal Rule of Civil Procedure 8(a) requires that Plaintiff state "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

to return excess capital; and (ix) "cursed out" a shareholder who asked if Haley had negotiated a compensation package. ¶¶55-56, 62-67, 79-88, 116-41, 129-132, Ex. B. Ubben was a director of Willis and ValueAct owned over 10% of Willis' shares. ¶¶29, 32.

The ValueAct Defendants also argue that Plaintiff has not shown their culpable participation in the misconduct underlying the claim, essentially the equivalent of proving scienter. This contention contradicts the law. Virtually every court in the Fourth Circuit that has considered this issue since 1979 has found that a showing of culpable conduct for a Section 20(a) violation is not required. *See, e.g.*, *Mutual Funds*, 56 F.3d at 130-31 (holding that good faith of defendants is an affirmative defense not relevant at the pleading stage); *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 602 (E.D. Va. 2015) (cited by Defendants, VA 17); *Masterson*, 2 F. Supp. 3d at 830.

Control is a "complex factual question," *MicroStrategy*, 115 F. Supp. 2d at 661, and Plaintiff's allegations must be considered as a whole. *Mutual Funds*, 566 F.3d at 131 (allegations "[t]aken together" are sufficient for control). Ultimately, questions of control are not "ordinarily subject to resolution on a motion to dismiss" and "dismissal is appropriate only when a plaintiff does not plead <u>any</u> facts from which it can reasonably be inferred the defendant was a control person." *MicroStrategy*, 115 F. Supp. 2d at 658; *Kiken*, 155 F. Supp. 3d at 603 (same). Here, Plaintiff pleads multiple facts that, taken together, easily support the inference that the ValueAct Defendants were control persons. The ValueAct Defendants' Motion should be denied.

## <u>ALLEGATIONS IN THE COMPLAINT REGARDING UBBEN AND VALUEACT</u>

As discussed in greater detail in the TW/Willis Opposition, Plaintiff alleges that in June of 2015, Towers Watson & Co. ("Towers") and Willis Group Holdings plc ("Willis") entered into a merger agreement. ¶69. The market reaction to this supposed "merger of equals" was immediately negative, with investors and analysts criticizing the deal as a poor one for Towers shareholders.

¶¶4, 73-76, 89-96, 113-14. Among other reasons, Towers shareholders were receiving a discount for their shares even though Towers was reporting record-earnings growth quarter after quarter, while Willis' financial performance was in steady decline. ¶¶77-78, 108-09.

Unbeknownst to shareholders, ValueAct, Willis' second largest investor, and Ubben, ValueAct's CEO and a member of the Willis Board of Directors, were heavily involved in the merger negotiations behind the scenes. The merger transaction was crucial to ValueAct because, as ValueAct admits, it normally holds investments for three to five years. *See* Horvath Decl. Ex. I, ECF No. 55-10. ValueAct purchased Willis stock in 2010, and its investment had largely underperformed due to Willis' poor financial performance, including flat earnings from 2008 to 2013. ¶55. The merger would allow ValueAct to make its investment profitable before it exited its position.[4] Indeed, ValueAct was concerned that "things [would] get worse" without the merger. ¶62.

## I.     The ValueAct Defendants Direct The Merger Negotiations

Contrary to the ValueAct Defendants' contentions that they only provided "input" on or "evaluated" the merger, the Complaint alleges in detail that Ubben and ValueAct asserted their power to control and influence the negotiations from the start. ¶¶55-56, 62-67, 79-88, 116-41.

---

[4] Defendants make the argument that (1) they were under no obligation to exit their Willis Towers Watson (previously their Willis) investment; and (2) they did not quickly exit their position. VA 6, 8, n.7. Defendants' own exhibit acknowledges that they "regularly hold positions for 3-5 years" and they purchased their Willis investment in 2010. Horvath Decl. Ex. I, ECF No. 55-10. While Defendants state that ValueAct may hold an investment for up to 10 years if a partner is on the board of the company, their exhibit merely states that ValueAct "occasionally" holds investments for up to 10 years. *Id.* Either way, Defendants do not deny, because they cannot, that the Willis investment had been performing poorly and that it was their strategy to eventually exit the position. ¶14. Further, Defendants do not deny that they sold hundreds of millions of dollars' worth of stock after the merger and after Willis Towers Watson, consistent with Haley's promise to ValueAct, initiated a series of stock buybacks to increase its leverage and stock price. ¶¶21, 161. That ValueAct's selling started in May 2017, but they did not fully exit their position until the end of the year, is irrelevant. VA 8, n.7.

For example, Ubben and ValueAct directed merger discussions regarding the economic structure of the merger as well as the exchange ratio. First, on May 13, 2015, Alex Baum ("Baum"), ValueAct Vice President, emailed Titus Leung, Partner at Perella Weinberg Partners L.P. ("PWP"), Willis' financial advisor for the merger, and sent PWP materials on possible economic structures for the merger. ¶56. Then, on June 4, 2015, Baum sent an email to Ubben describing a detailed discussion about the merger exchange ratio that Baum had with Leung. ¶65. Baum explained that Willis needed direction from ValueAct on the transaction. *Id.* Baum wrote of his conversations with Leung, "They seem to be getting antsy for some guidance." *Id.* Baum reiterated that PWP and Willis were relying on ValueAct and Ubben to direct them with respect to key metrics of the proposed merger, including the exchange ratio, stating:

> Talked to Titus [Leung, PWP]. As might be expected, they threw a ton of arguments at me of why we should be willing to take a lower exchange ratio . . . It does sound like Dominic [Casserley] and Jim [McCann, Chairman of the Willis Board] are both just waiting to take their cues from us on what to do here, though. Perella wanted one more chance to talk it through with you before they give the final word to Citadel [Towers], so I'm getting a call on the calendar for tomorrow with us and Titus. ¶66.

As stated above, the ValueAct Defendants were committed to ensuring that a merger was completed, so that they could achieve better returns on their poorly-performing Willis investment, and they directed merger negotiations accordingly. Indeed, Ubben and ValueAct were giving orders on the exchange ratio to be communicated to Towers. This fact is exemplified by ValueAct emails on June 7, 2015 regarding a proposed economic structure, in which ValueAct Partner Ryan Birtwell noted to Ubben and Baum that Willis' financial status and leverage in the merger would likely decrease over time, stating that "[o]ur hand probably weakens over time given our concerns over how the restructuring plan may impact near-term results and the recent management defections[.]" ¶62. Baum agreed and responded, "I think we're all in agreement that not only does the status quo not work, but there's a real time sensitivity to make a change before things got worse

from continued poor execution/further management defections." *Id.* Ubben instructed Birtwell to tell PWP to "hit the bid," meaning to agree to the economic structure then on the table. *Id.*

## II.     The ValueAct Defendants Negotiate Haley's Compensation

Further showing their influence and control, after the original merger agreement was announced on June 30, 2015, Ubben and ValueAct remained heavily involved in the merger to ensure its completion, including negotiating the terms of Haley's compensation as CEO of the combined entity. The ValueAct Defendants led Haley's compensation negotiation as part of their activist strategy to boost their own returns. These conversations were especially significant given that Haley and Casserley had discussed the post-closing board composition of the combined company a month earlier, and Ubben was going to be (and ultimately became) a member of the Compensation Committee of Willis Towers Watson. ¶¶58, 85.

Specifically, on September 10, 2015, Ubben and Baum met with Haley at a ValueAct conference in San Francisco and presented him with a written compensation plan that centered on a so-called "megagrant" of restricted stock in the combined company, that could multiply 300% based on whether the company achieved certain benchmarks in its stock price performance. ¶80. Ubben and Baum explained to Haley that his compensation over the next three years could increase from $25 million as CEO of Towers Watson to up to $165 million as CEO of Willis Towers Watson if the merger were approved and the benchmarks were achieved. *Id.* Haley liked the structure of the plan and requested even more leverage. ¶81. Haley and Ubben both confirmed these discussions during their depositions in the Appraisal Action. ¶82.

Ubben's negotiations with Haley further show his control over Willis, as illustrated by the fact that on December 21, 2015, ten days after Towers shareholders voted to approve the merger, Wendy Lane, the chair of the Willis Board's Compensation Committee and chair of the newly merged company's Compensation Committee, emailed Ubben to "catch up on the conversations

between yu[sic] and JH [John Haley] regarding comp and your thoughts." ¶¶81, 86. In response, ValueAct emailed Lane the compensation arrangement that Ubben and Haley had negotiated in September 2015. ¶86.

Despite the importance of this information and Haley's conflict of interest, it was not included in the Proxy issued to shareholders on October 13, 2015. ¶¶6, 98. Nor did Haley disclose the information regarding his compensation to the other members of the Towers Board. ¶87. Indeed, as explained below, when a large shareholder reached out to Ubben to ask about any potential compensation that Haley may have negotiated, they were "cursed out" and threatened. ¶¶129-34.

### III.    The ValueAct Defendants Direct Shareholder Solicitations

On October 13, 2015, Towers/Willis filed a joint proxy, including the merger agreement, with the SEC (the "Proxy"). ¶97. On the same day, Willis filed an amendment to its Registration Statement. <u>Ubben signed the amendment in his capacity as a director of Willis</u>. Ex. A-3 at 368/368.[5]  This filing contained the Proxy in full, which stated that shareholder votes were being "solicited by the board of directors of Willis," including Ubben. Ex. A-1 at 4/368.

As discussed in more detail in the TW/Willis Opposition, the Proxy and the Form S-4 omitted to disclose Haley's massive compensation arrangement, including the material fact that Haley had worked with ValueAct and Ubben to negotiate a compensation package valued at up to $165 million over the next three years. ¶¶6, 98.

Analysts and investors continued to respond negatively to the proposal. ¶¶7, 102. Moreover, Glass Lewis and ISS, two leading advisors on corporate governance and investment

---

[5] *See In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 390 n.10 (4th Cir. 2005) (permitting consideration on a motion to dismiss of SEC filings).

matters, issued reports recommending that Towers shareholders vote against the proposed merger because it did not provide fair value to Towers shareholders. ¶113.

Further demonstrating their control and influence, the ValueAct Defendants became actively involved in responding to public criticism. For example, in response to Driehaus' questions, Ubben told Bloomberg on October 27, 2015, "<u>We have a dissident involved, a shin-kicking activist guy who bought the stock after the deal was announced, makes a bunch of noise in the market.</u>" ¶110. According to Ubben, Driehaus was "<u>trying to undermine a long-term great deal to grab $5 or $10. These guys are the guys that should be put out to pasture.</u>" *Id.*

In addition, ValueAct and Ubben worked aggressively behind the scenes to convince large shareholders to vote for the merger. On November 5, 2015, Birtwell sent an email to Ubben proposing that ValueAct use its connections to push the deal through and suggesting that Willis file a presentation drafted by ValueAct. ¶116. ValueAct made this suggestion because ValueAct was attempting to circumvent federal proxy regulations that permit a person to solicit stockholders without having to comply with registration requirements only "where the total number of persons solicited is not more than ten." §14(a), 15 U.S.C. §78n(a); 17 C.F.R. §240.14a-2(b)(2); ¶117.

Similarly, on November 6, 2015, Birtwell, on the advice of ValueAct's General Counsel, suggested that Willis copy a ValueAct presentation and file it as a Willis Form 8-K:

> <u>Could we (Willis)</u> take a version of VA's Ira Sohn Conference presentation and <u>essentially replicate it and file as an 8K to release it publicly</u>? They said it was very compelling and everyone seemed to agree it was strong support for doing deal on current terms (TW and Willis mgmt.). The VA GC apparently has said they themselves cannot publish it but that Willis could (at least if replicated as a Willis document). ¶119.

Further, in connection with ISS's proxy report advising shareholders not to vote for the merger, ValueAct issued an open letter on November 10, 2015 calling the ISS recommendation "<u>bumpitrage</u>," a derogatory term describing a strategy where shareholder activists purchase the

9

stock of a target company to lobby for a bump in the deal terms. ¶122.

### IV.    Ubben Directly Renegotiates The Merger Consideration With Haley

As discussed in more detail in the TW/Willis Opposition, the adverse ISS and Glass Lewis recommendations increased the risk that Towers stockholders would not vote to approve the merger. ¶123. Without the deal, Haley would not receive his massive compensation package. *Id.* Nor would ValueAct be able to execute its exit strategy on its poor-performing Willis investment. *Id.*

On November 10, 2015, Haley approached Ubben and proposed increasing the special dividend to $10 per share. ¶124. As Haley later testified in the Appraisal Action, this increase was "the minimum that we need to have a reasonable expectation of shareholder approval." *Id.* Haley's notes confirm that he negotiated directly with Ubben and state: "I told Ubben we needed $10 dividend. Didn't trouble him." ¶125. In return for the increase in the special dividend, ValueAct extracted a promise from Haley that he would "initiate a plan to return excess capital to shareholders," thereby supporting ValueAct's own desired rate of return on its investment. ¶126.

After reaching an agreement on the $10 special dividend, ValueAct aggressively lobbied stockholders to ensure that the merger would close. ¶¶128-41. As of November 11, 2015, ValueAct had contacted so many Towers shareholders to urge them to vote for the merger that it had "used up [its] ten outbound calls within the exemption from the [federal] rules and [could] only take inbound calls." ¶128. ValueAct and Willis' proposed solution was to have Willis contact Towers shareholders who were "on the fence" and steer them towards ValueAct, as ValueAct had already "converted a few TW shareholders to vote in favor of the deal." *Id.*

At the same time that ValueAct/Ubben were lobbying shareholders, Ubben took control of refusing requests for information from Driehaus. ¶¶129-33. On November 10, 2015, Matthew Schoenfeld at Driehaus emailed Towers' Director of Investor Relations, Aida Sukys, about

ValueAct's involvement in the merger and any conversations ValueAct had with Haley concerning his compensation. ¶129. Sukys forwarded the email to Ubben and Casserley. Ex. B. In his email, Schoenfeld stated that "we have a few questions regarding Mr. Haley's relationship with ValueAct Capital. Specifically, shareholders are concerned that this relationship with [ValueAct] has impaired – and, more importantly, continues to impair – Mr. Haley's ability to negotiate in good faith on behalf of Towers Watson shareholders." *Id.* Schoenfeld asked the following questions:

- What were the nature of Mr. Haley's communications with ValueAct prior to deal announcement (June 30, 2015)? Were these communications fully and completely detailed in the Form S-4 filing?

- With respect to the record date (October 1st 2015), was ValueAct made aware of this date, and/or provided with information concerning the date not provided publicly? Was any coordinated effort made for ValueAct to purchase Towers Watson shares prior to the record date?

- What is the nature of communication with ValueAct more recently? <u>Has Mr. Haley been coordinating with ValueAct against the interest of Towers Watson shareholders? How often has Mr. Haley been in contact with ValueAct and in what capacity? Why is he in contact with ValueAct instead of Willis management?</u>

- <u>Has there been any discussion between Mr. Haley and ValueAct concerning Mr. Haley's compensation arrangements following prospective deal completion?</u> Relatedly, have there been any discussions between Mr. Haley and ValueAct concerning ValueAct's role in the prospective pro-forma company, which have not been disclosed publicly?

Ubben admonished Schoenfeld for not coming to Ubben with his questions in the first place since Ubben was the one in control of "the facts." Ubben wrote "<u>I presume if you do not want to talk directly to me you are not interested in the facts</u>" and "<u>You have no idea how much goes into a deal like this on both sides. And to be held up is offensive.</u>" ¶131, Ex. B. Ubben and Schoenfeld then engaged in a 20-minute long telephone call, during which Ubben cursed at Schoenfeld. ¶132. As Schoenfeld described it in a November 11, 2015 email to Sukys:

> I received an email from TW's lawyer this evening. Earlier today I was harassed by TW folks. Yesterday, I was cursed out by Mr. Ubben (there were fifty f-bombs directed at me in a 20 minute conversation- namely, 'you little piece of f-cking sh-t,' 'shut the f-ck up,' 'you dumb f-cking a-hole,' 'go f-ck yourself'). . . . This

behavior is disturbing and unprofessional. *Id.*

ValueAct and Ubben also continued to ghostwrite Willis and Towers press releases. For example, a November 13, 2015 press release issued by Willis incorporated language written by ValueAct, which Birtwell and Baum "were involved" in writing. ¶135. Extracting ValueAct's promised deal with Haley, on November 18, 2015, Birtwell was "working on a quote regarding leverage" to be used as a quote from Haley in a Towers press release and a quote from Willis in a Willis press release. ¶¶15, 139. Specifically, on November 18, 2015, Titus Leung (PWP) proposed the following language to Birtwell, which described the cash distribution plan that Ubben had negotiated in exchange with Haley for the increased special dividend: "Pending the approval of the new board, in the 6-12 months following the close of the deal we plan to distribute excess cash to shareholders to achieve a leverage ratio for the new company broadly in-line with Willis' legacy leverage profile." ¶139. Birtwell forwarded the proposed language to Ubben and Baum. *Id*. In response, on November 18, 2015, Ubben echoed in an email to Birtwell and Baum: "we want this quote coming out of Haley's mouth. This is a home run." *Id.* Indeed, the November 19, 2015 proxy solicitations from Willis and Towers announced the plan to return excess capital to shareholders, and the Towers proxy solicitation contained a substantially identical quote. ¶¶139-40.

## V.     The ValueAct Defendants Lobbied To Push The Deal Through

Given the importance of this merger to ValueAct's exit strategy, ValueAct continued to lobby Towers shareholders to push the deal through. According to a November 14, 2015 ValueAct email between Ubben and Birtwell, ValueAct was controlling and directing shareholder solicitation, and were "the ones securing all of the TW votes." ¶136. The same email noted that "[Haley] is seeing in real time how much control we [ValueAct] have over the Board room." *Id*.

Ubben repeatedly contacted Towers stockholders directly to lobby for the merger. Ubben emailed BlackRock, which owned 6.6% of Towers stock, telling its CEO to vote for the merger,

and that Haley wanted to "make himself available" for him. ¶137. Ubben also personally emailed the Chairman and CEO of Vanguard, in an effort to get Vanguard, which owned 6.12% of outstanding Towers stock, to vote in favor of the merger. *Id.*

On November 27, 2015, Towers and Willis filed an update to the proxy statement/prospectus with the SEC (the "Proxy Update"), which contained multiple materially untrue statements and omissions. ¶¶146-50. The Proxy Update failed to disclose that Haley had negotiated a compensation package for himself as CEO of the combined company with Ubben, valued at $165 million over the next three years, and that, upon renegotiating the deal with Ubben, he had then sought only the minimum additional consideration necessary to have a reasonable expectation of shareholder approval rather than negotiating the best possible deal. ¶¶147-48.

On December 11, 2015, Towers shareholders, ignorant of the undisclosed facts summarized above, voted to approve the merger, which closed on January 4, 2016. ¶152. Subsequently, Willis Towers Watson disclosed the details of Haley's compensation plan, which was substantially identical in size and structure to the compensation package Haley and Ubben negotiated and agreed upon in September 2015. ¶153.

Consistent with Haley's promise to ValueAct and Ubben, Willis Towers Watson initiated a series of stock buybacks to increase its leverage and stock price (¶¶154-55), and ValueAct then sold hundreds of millions of dollars of stock – over 5.5 million shares for proceeds of over $816 million. ¶21. Ubben then resigned from the Willis Towers Watson Board effective November 15, 2017. ¶161.

## **ARGUMENT**

Control under Section 20(a) "is a complex factual question." *MicroStrategy,* 115 F. Supp. 2d at 661. As such, it is "not ordinarily subject to resolution on a motion to dismiss, and dismissal is appropriate only when a plaintiff does not plead any facts from which it can reasonably be

inferred the defendant was a control person." *Id.*; *see also Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 603 (E.D. Va. 2015) (same).

Moreover, because "Section 20(a) does not require that the control person act with scienter . . .[or] be directly liable for fraud," a plaintiff need only satisfy the general pleading standard of Rule 8(a), which Plaintiff has readily done here. *See Kiken*, 155 F. Supp. 3d at 603 (Rule 8 pleading standard applies to Section 20(a)); *Masterson*, 2 F. Supp. 3d at 831 n.4 (same); *MicroStrategy*, 115 F. Supp. 2d at 659-61 (same).

## I.      THE COMPLAINT PLEADS A VIOLATION OF SECTION 14(a)

To state a claim for control person liability under Section 20(a) in the Fourth Circuit, a plaintiff must show a primary violation of the securities laws and control by the defendant over the primary violator. *See MicroStrategy*, 115 F. Supp. 2d at 658-61. For the reasons set forth in the TW/Willis Opposition, Plaintiff has adequately alleged a violation of Section 14(a) of the Exchange Act and Rule 14a-9 against the TW/Willis Defendants as primary violators.

## II.     THE COMPLAINT PLEADS CONTROL PERSON LIABILITY UNDER SECTION 20(a) AS AGAINST UBBEN AND VALUEACT

The Complaint adequately alleges that Ubben and ValueAct both acted as a controlling person of Towers, Haley, Willis, Casserley, and Willis Towers Watson. ¶237.

### A.      Pleading Standards For Control Person Liability

Section 20(a) is "remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Sennott v. Rodman & Renshaw*, 414 U.S. 929, 929 (1973). The SEC defines "control" as "possession, direct or indirect of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *MicroStrategy.*, 115 F. Supp. 2d at 658-61 (citing 17 C.F.R. § 240.12b-

2)). In analyzing control, courts "have given heavy consideration to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof."[6] *Kiken*, 155 F. Supp. 3d at 602-03.

Control persons for the purposes of Section 20(a) are not limited to officers, directors, or owners, and can include entities. *Trendsetter Investors, LLC v. Hyperdynamics Corp.*, 2007 WL 172627, at *26 (S.D. Tex. Jan. 18, 2007) ("Control-person liability under Section 20(a) of the Exchange Act is not limited to employers, officers, or directors of a company but can encompass any person who possesses the power to influence the operations and activities of the primary violator."); *see also Gruber v. Gilbertson*, 2018 WL 1418188, at *16 (S.D.N.Y. Mar. 20, 2018) ("Control [] can arise not only from stock ownership, but from other business relationships, interlocking directors, family relationships and a myriad of other factors."); *Mutual Funds*, 566 F.3d at 130 ("An enterprise may control another organization and, indirectly, that organization's agents and employees."). Indeed, Congress drafted the control provisions of the federal securities laws broadly to account for situations such as this one, where a party exerts significant control over another company's business, decision-making process, and public statements. *See* H.R. Rep. No. 73-1383, at 26 (1934) ("It would be difficult if not impossible to enumerate or to anticipate the many ways in which actual control may be exerted").

In considering Plaintiff's Section 20(a) claim, allegations in the Complaint must be considered as a whole. *Mutual Funds*, 566 F.3d at 131 (finding control sufficiently alleged after

---

[6] Courts similarly require a showing that "defendant had the power to control both the general affairs of the entity primarily liable for the predicate securities violation, and the power to directly or indirectly control or influence the specific corporate policy that resulted in the predicate securities violation." *Kiken*, 155 F. Supp. 3d at 602. Here, Plaintiff alleges numerous facts showing that the ValueAct Defendants had the power to control the TW/Willis Defendants' general affairs, including their decision to enter into a merger and on which terms, the negotiation of Haley's compensation package, and the renegotiation of the merger consideration.

reviewing all allegations "together"); *see also In re Leslie Fay Cos., Inc. Sec. Litig.*, 918 F. Supp. 749, 763 (S.D.N.Y. 1996) ("Of course, we must consider the total effect of the various indicia of control in combination.").

Defendants suggest that control may only be alleged through majority stock ownership or through a contractual right. VA 3-4. That is not the law. As noted above, control may be exerted directly or indirectly, and through "a myriad of other factors." *Gruber,* 2018 WL 1418188, at *16. None of Defendants' cited authority, the majority of which is from outside of the Fourth Circuit, stands for the proposition that a plaintiff need allege majority-stock ownership or a contractual right to assert a Section 20(a) claim. *See, e.g.*, *Kuhns v. Ledger*, 202 F. Supp. 3d 433, 440 (S.D.N.Y. 2016) (stating that a claim of control can be exerted through "the ownership of voting securities, by contract, or otherwise," but finding that allegations of minority ownership by themselves were insufficient); *In re BioScrip Sec. Litig.*, 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015) (finding no control as to one defendant where there were no allegations other than minority stock ownership and the ability to appoint directors, but finding control as to other defendants who had authority over SEC filings); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 492-93 (S.D.N.Y. 2005) ("minority stock ownership and the ability to appoint a minority of the board" alone as to one defendant were not sufficient, but positions as officers and signatory to SEC filings containing misstatements were sufficient as to two other defendants). Rather, as other courts have observed, Defendants' cited cases stand only for the unremarkable proposition that stock ownership or a position as a director, standing alone, is not sufficient to state a Section 20(a) claim. *See, e.g.*, *Thomas v. MagnaChip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1049 (N.D. Cal. 2016) (citing several of Defendants' cases and noting that these cases "stand merely for the proposition, which no one here disputes, that a party that has always held only a minority share of the company does

not, <u>by virtue of that fact alone</u>, possess 'control' over that company."). Here, the Complaint contains multiple factual allegations of actual control which, taken together, are more than sufficient to state Section 20(a) claims against the ValueAct Defendants.

**B.     Ubben Signed SEC Filings Containing The Proxy And The False And Misleading Statements**

The fact that Ubben signed Willis SEC filings containing the Proxy establishes control as a matter of law. *See Masterson*, 2 F. Supp. 3d at 834 (finding that the signing of financial statements is sufficient to show control and that "otherwise, the signatures on such financial statements would be meaningless."); *BioScrip*, 95 F. Supp. 3d at 741 ("[d]irectors and officers who sign registration statements or other SEC filings are presumed to control those who draft those documents."). Indeed, in each of the ValueAct Defendants' cited cases in which the court found a primary violation of the Exchange Act and a defendant signed the relevant SEC filing or agreement, the court sustained the Section 20(a) claim. *See, e.g.*, *BioScrip*, 95 F. Supp. 3d at 741; *In re Alstom SA*, 406 F. Supp. 2d at 492-93; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 468-69 (S.D.N.Y. 2005).

Specifically, Ubben was a personal signatory of Willis' SEC filings, including an amendment to Willis' Registration Statement, which contained the Proxy and the false and misleading statements at issue. Ex. A-3 at 368/368. Moreover, the Proxy requested shareholders' votes on behalf of "the board of directors of Willis," meaning that the Proxy was, at its core, a document issued by the Board, including Ubben. Ex. A-1 at 4/368. These facts are sufficient to show Ubben's control over Willis. *See In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *26 (S.D. Cal. May 23, 2017) (defendants were control persons where they signed reports in allegedly false or misleading proxy statement); *see also In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) (directors who signed registration statement were control

persons); *Leslie Fay*, 918 F. Supp. at 763 (directors who signed public documents containing misrepresentations were control persons).

While nothing further is needed to state a Section 20(a) claim against Ubben as a control person, as discussed below, the Complaint alleges a plethora of additional real-time facts showing the ValueAct Defendants' influence and control.

### C.    Additional Allegations Demonstrating Control

#### 1.    ValueAct Admitted In Emails That It Had Control Over Willis' Board Room

In November 14, 2015, Ubben and Birtwell exchanged emails regarding ValueAct contacting Towers shareholders to tell them to vote for the merger. In these emails, Birtwell noted to Ubben that ValueAct were "the ones securing all of the TW votes." ¶136. The same email boasted that "[Haley] is seeing in real time how much control we [ValueAct] have over the Board room." *Id.* This admission of control is sufficient to support Ubben and ValueAct's liability under Section 20(a). *See S.E.C. v. Smith*, 2005 WL 2373849, at *10 (S.D. Ohio Sept. 27, 2005) (admission of control and responsibility for final decisions supportive of liability under Section 20(a)); *S.E.C. v. Small Business Capital Corp.*, 2013 WL 4455850, at *15 (N.D. Cal. Aug. 16, 2013) (same).

Defendants make several arguments in response, none of which are convincing. Seeking to avoid the plain meaning of their own contemporaneous word "control," Defendants rely on *In re Kosmos Energy Ltd. Securities Litigation*, 955 F. Supp. 2d 658, 674 (N.D. Tex. 2013), to argue that Birtwell's use of the term "control" does not mean that the ValueAct Defendants were control persons under Section 20(a). *Kosmos* has no bearing here. In that case, plaintiffs argued that defendants were control persons because, in relevant part, the entity described itself as a "controlled entity" under the New York Stock Exchange rules. The court reasoned that there was

no law holding that controlled status under NYSE rules was relevant to control under 20(a) – a conclusion that is irrelevant to this case. *Id.* at 674. Further, here, unlike in *Kosmos*, ValueAct <u>admitted</u> to controlling the Willis Board room and merger strategy, Ubben signed SEC filings containing the Proxy, and Plaintiff has pled numerous other allegations showing that the ValueAct Defendants are control persons under 20(a), as explained herein.

The ValueAct Defendants also argue that because Plaintiff has added "ValueAct" in brackets to Birtwell's email (¶136), it is unclear who had "control." VA 24. This argument is without merit as the context of Birtwell's email makes clear he was referring to himself and ValueAct with use of the word "we." *Id.* If there is any doubt (Plaintiff is having trouble identifying one), that, at best, would raise an issue of fact improper for resolution on a motion to dismiss.

Defendants finally argue that there are no allegations that ValueAct or Ubben had the power to direct the TW/Willis Defendants to take a specific action. As discussed below, this argument is without merit because the Complaint contains numerous allegations showing that ValueAct and Ubben exercised their power to direct the TW/Willis Defendants.[7]

2.   <u>Ubben And Haley's Direct Negotiation Of Haley's Compensation Shows Control</u>

Ubben/ValueAct's negotiation of Haley's compensation as the CEO of Willis Towers Watson shows control. *See Kiken*, 155 F. Supp. 3d 593 at 610 (sustaining Section 20(a) claim where complaint alleged that defendant exercised control over the specific policies underlying the misconduct at issue); *Longview Equity Fund, L.P. v. iWorld Projects & Sys., Inc.*, 2008 WL 833230, at *10 (S.D.N.Y. Mar. 26, 2008) (control alleged, in part, because defendant was the lead

---

[7] Defendants' cite to *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 352 F. Supp. 2d at 468-69, is not on point. In *Flag*, all individual defendants who signed the entity's SEC filings or were responsible for their preparation were deemed to have control. Only one individual defendant who did not sign and had no involvement was dismissed. *Id.*

negotiator with regard to the agreement at issue); *Levy v. Gutierrez*, 2017 WL 2191592, at *18 (D.N.H. May 4, 2017) (control alleged where defendant was the signer and lead negotiator of the agreement at issue). As discussed above, on September 10, 2015, Ubben and Baum met with Haley at a ValueAct conference in San Francisco and negotiated with him a compensation package valued at up to $165 million over the next three years. ¶80.[8] This package was substantially the same as what Haley ultimately received. ¶¶83, 153.

Defendants contend that Ubben and ValueAct had no ability to bind the Willis Board with regard to a compensation arrangement. This argument fails for several reasons. First, the ValueAct Defendants point to no case law supporting that Plaintiff needs to show authority to bind a controlled person, and thus this point is irrelevant. Second, Willis knew about the negotiations and relied on the ValueAct Defendants to negotiate this arrangement which was substantially identical to what Willis Towers Watson subsequently disclosed, which plainly shows the power to influence and control with regard to the events in this case. ¶¶86, 153; *see also* TW/Willis Opposition, at 12; *see also Longview Equity Fund, L.P.*, 2008 WL 833230, at *10; *In re TETRA Tech., Inc. Sec. Litig.*, 2009 WL 6326865, at *1 (S.D. Tex. Aug. 10, 2009) (finding control sufficiently alleged where the complaint described defendant's involvement and supervision over insurance claims negotiations at issue).

In addition, when dissident shareholder Driehaus reached out to Sukys, Towers' Director of Investor Relations, in November of 2015 to inquire as to ValueAct's relationship with Haley and whether Haley had negotiated a compensation package, Sukys forwarded the email to Ubben.

---

[8] Defendants seem to make a factual allegation that somehow Haley's compensation package is unimportant because Willis Towers Watson needed to reach certain goals for Haley to earn $165 million. VA 9. This is irrelevant. The compensation package itself was material, and this material information was not disclosed to Towers shareholders.

*See* Ex. B. Then, in December of 2015, Wendy Lane, the chair of the Willis Board's Compensation Committee (who became the chair of Willis Towers Watson's Compensation Committee) emailed Ubben to "catch up on the conversations between yu[sic] and JH [John Haley] regarding comp …." ¶86. In response, ValueAct personnel emailed Lane the compensation arrangement that had been negotiated in September. *Id.*

Ubben and ValueAct do not explain, nor can they, why Sukys or Lane would be emailing them regarding Haley's compensation package if they were not, in fact, directing the negotiations. *See In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *37 (C.D. Cal. Aug. 8, 2013) (control properly alleged, in part, because founder of controlled company acknowledged influence of defendants).

Defendants argue in response that: (1) Ubben and ValueAct had no authority to bind Willis Towers Watson to any compensation agreement; and (2) there was in fact no formal agreement on compensation prior to the vote. VA 25. Such a factual dispute should not be considered at the pre-discovery stage.[9] *See* TW/Willis Opposition at 13.

### 3. The ValueAct Defendants' Direction Of The Merger Shows Control

The ValueAct Defendants directed the merger structure and negotiations – including key deal terms – in several ways, which show control.

First, Ubben/ValueAct had the power to direct or cause the direction of the Willis/TW Defendants with regard to the structure of merger. As discussed above, on May 13, 2015 ValueAct sent PWP materials on economic structures for the merger. ¶56. Baum wrote that Casserley and

---

[9] Indeed, a document submitted by Willis/TW Defendants' counsel shows that the merged entity continued to refer to Haley's compensation plan as the "ValueAct structure" after the merger. Schronce Decl. Ex. M, ECF No. 52-15.

McCann were "<u>just waiting to take their cues from us on what to do here</u>" and PWP was waiting

to talk to Ubben/ValueAct before "<u>they give the final word to Citadel [Towers]</u>" on the exchange

ratio. ¶66; *see also* ¶62 (ValueAct directing PWP to "hit the bid").

Second, Ubben and Haley directly renegotiated the merger consideration after it became

increasingly likely that Towers shareholders would not approve the merger. Haley approached

Ubben and proposed increasing the special dividend to $10 per share, which he testified was the

"<u>minimum that [they would] need to have a reasonable expectation of shareholder approval.</u>"

¶¶124-25. In return for the increase in the special dividend, ValueAct extracted another key deal

term uniquely important to ValueAct and its exit strategy: that the combined entity would return

excess capital to shareholders, a promise that Haley repeated in a press release soon after. ¶126.

Third, along with negotiating the merger structure and Haley's compensation package, as

discussed above, after the merger was announced the ValueAct Defendants: ghostwrote proxy

solicitations (¶¶135, 139); publicly denounced and privately cursed out Driehaus (¶¶131-33);[10]

publicly denounced ISS and their negative report on the merger on behalf of TW/Wills (¶122); and

reached out to large Towers shareholders on behalf of TW/Willis to convince them to vote for the

merger (¶137). *See Trendsetter, LLC*, 2007 WL 172627, at *27 (outside consultant who played a

"lead role" in marketing the investment at issue was a control person). ValueAct contacted many

Towers shareholders (¶128), and admitted that they were "<u>the ones securing all of the TW votes</u>."

¶136.

---

[10] Defendants seem to imply that Ubben/ValueAct's response to Driehaus was justified because "Driehaus [] made money by agitating in response to an announced merger." VA 10. That Ubben/ValueAct reacted in such an offensive manner to an investor trying to maximize consideration for shareholders only further shows the self-interested nature of their actions. Additionally, regardless of this argument, Ubben/ValueAct's actions towards Driehaus illustrate personal involvement, influence and control.

Such facts, taken together, adequately allege control. *See In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 542 (S.D.N.Y. 2016) (control pled where complaint alleged, among other things, that defendants directed the destruction of documents, served as spokespersons, and attended meetings approving the investments at issue); *In re Sonus Networks, Inc. Sec. Litig.*, 2006 WL 1308165, at *24 (D. Mass. May 10, 2006) (sustaining control person claims when defendants "were actively participating in the decision-making processes of the corporation."); *UCBH Holdings, Inc.*, 890 F. Supp. 2d at 1205-08 (finding control person liability had been adequately pled against a company's officer because he "exercised day-to-day control over the loans" that were the subject of the alleged misconduct).

In response, Defendants argue that these allegations merely show an ability to "persuade or advise." VA 20-21.[11] This argument lacks support.

First, Ubben and ValueAct were not merely "participating" in negotiations, but, as the facts summarized above and alleged in the Complaint show, they were <u>directing </u>those negotiations and making key decisions about the sufficiency of the consideration for shareholders and extracting concessions for increasing the consideration.[12] These allegations show control.

---

[11] The Complaint pleads the power to influence and control, not merely the ability to persuade. In the ValueAct Defendants' cases (VA 17), plaintiffs did not plead any allegations showing the power to control more than stock ownership or ability to appoint directors. *See, e.g.*, *BioScrip*, 95 F. Supp. 3d at 740 (control not pled where plaintiff solely alleged that individual controlled 26% of stock and had the right to designate two directors); *Kuhns*, 202 F. Supp. 3d at 441 (insufficient control alleged where claim only based on fact that individual was the largest minority shareholder); *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494 (7th Cir. 1986) (insufficient allegations of control where plaintiff merely alleged that law firm should have stopped its clients from selling certain securities). In contrast, the Complaint pleads numerous facts showing the ValueAct Defendants' personal involvement, influence and control.

[12] Defendants' citation to *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 352 F. Supp. 2d at 457 is inapposite. There, the Court, analyzing claims under Section 15 of the Securities Act of 1933, found that there were no allegations of control other than the fact that Verizon owned 30% of Flag's voting shares and had the power to appoint three members to the board of directors. *Id.* at 468. Otherwise, the allegations merely showed that Flag "sought to cultivate a strategic alliance

Second, the ValueAct Defendants contend that the discussions between Ubben/ValueAct and Haley were merely to "ensure[] that both a director and investor of Willis … would accept increasing the special dividend for the TW shareholders." VA 11. This improper factual dispute simply ignores the multitudes of allegations regarding the ValueAct Defendants' direction of the merger and negotiation of Haley's compensation, as described in Sections I and II above. Additionally, the fact that the ValueAct Defendants were able to extract a promise on the return of excess capital they personally desired from Haley further shows their control. At best, the ValueAct Defendants' argument raises an issue of fact that cannot be decided in their favor at this stage.

The ValueAct Defendants also argue that the language of the Complaint is inconsistent with control because Ubben/ValueAct provided "input" as to actions the TW/Willis Defendants should take and sometimes those actions were not taken. Similarly, the ValueAct Defendants assert elsewhere in their motion that they did not have a direct role in the merger negotiations and only "evaluated" the merger. VA 7. These improper factual challenges fail.

While the ValueAct Defendants contend that out-of-context soundbites from ValueAct emails, such as "should," "guidance," and "advice" show that the ValueAct Defendants were merely providing input, the Complaint alleges far more. These words must be read in the context of the entire allegation as well as in the context of the entire Complaint, and the gravamen of the Complaint is that Ubben and ValueAct controlled several key aspects of the underlying misconduct, including negotiating Haley's secret compensation arrangement and renegotiating the special dividend. *See, e.g.*, *Mutual Funds*, 566 F.3d at 131; *Leslie Fay*, 918 F. Supp. at 763.

---

with Verizon, and took substantial risks to do so." *Id.* at 459.  As discussed above, the Court found control adequately pled as to defendants who signed SEC filings. *Id.* at 468.

Third, Defendants' argument that the ValueAct Defendants did not have control because the Complaint does not allege that they met with Haley in June 2015 as originally proposed (VA 22) is irrelevant. The Complaint alleges that the ValueAct Defendants asserted their power to influence and control the merger negotiations even before meeting with Haley and meetings did occur in July and September. ¶¶67, 80. *See supra* Sections I and II.

Fourth, Defendants' argument that the ValueAct Defendants' ghostwriting of proxy solicitations does not show control because they merely "proposed" language lacks merit. VA 22. The ValueAct Defendants' pattern of ghostwriting proxy solicitations, including writing a quote which was published as if it came "out of Haley's mouth" shows their ability to control the shareholder solicitation process. ¶¶15, 135, 139. And, as noted above, Ubben signed the Registration Statement containing the Proxy, demonstrating his control over the misstatements and omissions at the heart of this case.

Fifth, Defendants contend that ValueAct/Ubben lacked control because not every thought that was discussed with the TW/Willis Defendants was implemented. VA 11, 22. This argument is not relevant under Fourth Circuit law, as the law does not require the complete exercise of power at each turn. *Kiken*, 155 F. Supp. 3d at 602-03 ("[C]ourts have given heavy consideration to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof."); *Mutual Funds*, 566 F.3d at 130 (finding that the question is not whether the defendant exercised control, but rather whether he or she had the "potential power to influence and control the activities."). Further, that every suggestion or idea may not have been implemented could be due to numerous factors, including that ValueAct/Ubben decided against its implementation, and these types of arguments are inappropriate on a motion to dismiss.[13] In any

---

[13] Defendants cite to *Flag*, 352 F. Supp. 2d at 459 to support their arguments. As discussed above,

event, the Complaint describes many instances in which the actions the ValueAct Defendants discussed with the TW/Willis Defendants were implemented. *See supra* Sections I-V.

Last, Defendants argue that Plaintiff does not allege that Towers asked its shareholders to contact ValueAct. VA 11, 22. This is irrelevant. Haley and Casserley were copied on emails to investors and were informed of ValueAct's solicitation of shareholders, and consented to it. ¶137. Willis even attempted to refer shareholders who were "on the fence" to ValueAct. ¶128. Additionally, Towers directed Driehaus' questions about Haley's compensation to ValueAct. *See supra* at 11. These facts show that the TW/Willis Defendants knew that the ValueAct Defendants were acting on behalf of TW/Willis in soliciting shareholder votes, and are sufficient to illustrate the potential power to influence and control.

### 4.   Ubben's Position As A Director Of Willis Shows Control

Ubben's position as a director of Willis (¶32) also supports Plaintiff's Section 20(a) claim. Indeed, "director status 'is a sort of red light' indicating the potential, for day-to-day involvement in a company." *Teamsters Local 617 Pension and Welfare Funds v. Apollo Grp., Inc.*, 690 F. Supp. 2d 959, 976 (D. Ariz. 2010); *see also Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *13 (N.D. Cal. Feb. 27, 2018) (citing *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996)) (same); *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, 2007 WL 2615928, at *10 (S.D.N.Y. Sept. 10, 2007), *adhered to on reconsideration*, 542 F. Supp. 2d 266 (S.D.N.Y. 2008) (finding control where plaintiffs "alleged that by dint of their service as directors, Defendants 'directed and caused' the corporation's management to adopt policies that later

---

aside from being outside of the Fourth Circuit, *Flag* is not on point. In that case, plaintiff's Section 15 claims alleged merely that Flag was "instructed" to purchase capacity for Verizon, but that there was no other evidence of Verizon's direction or involvement in the purchase. *Id.* Here, numerous allegations, and the underlying documents, illustrate Ubben/ValueAct's direction and control.

resulted in 10(b)-5 actions[.]"). Ubben's position as a director of Willis coupled with the numerous

other factual allegations of control, as set forth above, is sufficient for Section 20(a).

Defendants argue that Ubben's status as an outside director alone is insufficient to show

control. VA 18-20. However, the allegations in the Complaint must be considered not "alone" but

as a whole, *see supra* at 16, and Plaintiff has alleged numerous additional facts showing that Ubben

had the power to influence and control the TW/Willis Defendants. *See Stat-Tech Liquidating Tr.

v. Fenster*, 981 F. Supp. 1325, 1342-43 (D. Colo. 1997) (although status as an outside director, in

and of itself, does not give rise to an inference of control, evidence that an outside director and

significant minority shareholder participated in issuing the misleading statements is sufficient to

meet the plaintiff's burden under §20(a)).

Further, the allegations regarding Ubben's and ValueAct's direction of the merger "signal

a level of involvement and control beyond merely" the status as a director. *Teamsters Local 617*,

690 F. Supp. 2d at 976 (finding the complaint's "allegations as to [defendant], and the reasonable

inferences therefrom, signal a level of involvement and control beyond being merely a titular

member of the Audit Committee"); *see also In re Washington Mutual, Inc. Sec. Deriv. & ERISA

Litig.*, 259 F.R.D. 490, 509 (W.D. Wash. 2009) (allegations that "affirmatively link board

membership to [defendant-company's] primary violations" are sufficient to plead control person

liability).[14]

---

[14] Defendants' cited cases are inapposite, as in those cases, plaintiffs did not allege the same
plethora of control allegations as the Complaint here. *See, e.g.*, *Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083, 1108 (10th Cir. 2003) (allegation that defendant was a director without any other
allegations of "control or influence"); *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D.
Del. 2002) (complaint alleged no responsibilities other than serving as directors); *In re Oak Tech.
Sec. Litig.*, 1997 U.S. Dist. LEXIS 18503, at *41 (N.D. Cal. Aug. 4, 1997) (control inadequately
pled where plaintiffs only alleged that defendant was a director); *O'Sullivan v. Trident
Microsystems*, 1994 U.S. Dist. LEXIS 17065, at *55 (N.D. Cal. Feb. 2, 1994) (plaintiffs alleged
no facts to establish that outside directors exerted control over the company).

While Plaintiff "is not compelled to present evidence of participation in the alleged primary violation as part of his or her initial burden, the plaintiff may choose to do so because such evidence is probative on the issue of control." *Stat-Tech Liquidating Tr.*, 981 F. Supp. at 1342-43. Here, Plaintiff has done just that, and has sufficiently shown Ubben's power to influence and control the TW/Willis Defendants with regard to the key aspects of the underlying transaction.

5.   <u>ValueAct's 10% Ownership Of Willis Buttresses The Inference Of Control</u>

ValueAct's 10.23% ownership of Willis (and its status as Willis' second largest shareholder) is yet another factor illustrating the power to influence and control. ¶29; *See, e.g.*, *Leslie Fay*, 918 F. Supp. at 762 (control shown, in part, because of 12% ownership); *Longview Equity Fund, L.P.*, 2008 WL 833230, at *10 (finding control alleged, in part, because defendant owned 13% of the company wrongdoer's shares).

Defendants argue that minority stock ownership – by itself – does not show control. VA 18-20. However, this argument fails, as ValueAct's stock ownership is one of the many allegations demonstrating control.[15] *See Kiken*, 155 F. Supp. 3d at 610 (finding that stock ownership "is only

---

[15] In Defendants' cited cases, unlike here, the complaints at issue did not contain substantial allegations supporting control. *See, e.g.*, *BioScrip*, 95 F. Supp. 3d at 740 (mere allegations of stock ownership and ability to appoint a minority of the board do not rise to the level of actual control); *Silsby v. Icahn*, 17 F. Supp. 3d 348, 371 (S.D.N.Y. 2014) (control not alleged through allegations of stock ownership and employment of two directors at a separate enterprise alone); *Zishka v. Am. Pad & Paper Co.*, 2001 U.S. Dist. LEXIS 25988, at *5 (N.D. Tex. Sept. 28, 2001) (control insufficiently pled where plaintiffs alleged only stock ownership and that defendant had ability to place persons on the board of directors); *Kosmos*, 955 F. Supp. 2d at 674-77 (control not pled where "allegations of control are based almost entirely on the Shareholder Defendants' stock ownership and the fact that they each designated two of their employees as directors[.]"); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 553 F. Supp. 2d 902, 913 (S.D. Ohio 2008) (allegations of minority interest without more insufficient to show control); *In re Flag*, 352 F. Supp. 2d at 458 (stock ownership and ability to appoint directors by itself insufficient for Section 15 control). Other courts have distinguished these cases on such grounds. *See Thomas*, 167 F. Supp. 3d at 1049 (citing several of Defendants' cases and noting that <u>these cases "stand merely for the proposition, which no one here disputes, that a party that has always held only a minority share of the company does not, by virtue of that fact alone, possess 'control' over that company</u>.").

one factor" in determining control).

> **D.     The Fourth Circuit Does Not Require That Plaintiff Plead Culpable Participation**

The ValueAct Defendants contend that Plaintiff must plead "culpable conduct" (the equivalent of scienter). This is incorrect. It is widely accepted in the Fourth Circuit and in most courts of appeal that plaintiffs are <u>not</u> required to plead "culpable conduct," but that defendants may attempt to show "good faith" as an affirmative defense at a later stage of the litigation. *Mutual Funds*, 566 F.3d at 130 ("[O]nce the plaintiff establishes the prima facie case [of control], the burden shifts to the defendant to show a lack of culpable participation or knowledge."). This is particularly true in a negligence case.

Defendants cite to *Carpenter v. Harris, Upham & Company, Inc.*, 594 F.2d 388, 394 (4th Cir. 1979), which discussed culpable conduct. However, this case has been distinguished as inapposite because it was decided on summary judgment and, therefore, involved consideration of the affirmative defense of good faith. *See Masterson*, 2 F. Supp. 3d at 830. Indeed, this Court has found that *Mutual Funds* clarified the law and determined that plaintiff need not allege culpable participation. *Id.* (citing *Mutual Funds* and rejecting argument that culpable conduct must be pled because "the Court is obligated to follow [] published on-point precedent"); *see also Kiken*, 155 F. Supp. 3d at 602.[16] And, virtually all Fourth Circuit courts discussing this issue after *Carpenter* was

---

[16] The ValueAct Defendants misleadingly state in a footnote that they "acknowledge a split of authority, including within the courts of this Circuit, as to whether a plaintiff must plead 'culpable participation' to state Section 20(a) claim." However, there is clear precedent in the Fourth Circuit that Plaintiff need not plead culpable conduct. Pre-*Mutual Fund* cases, such as *In re BearingPoint, Inc. Sec. Litig.*, 525 F. Supp. 2d 759, 780-81 (E.D. Va. 2007), cited by the ValueAct Defendants, are no longer the law. Defendants cannot reasonably argue that after *Mutual Funds*, and given all of the Eastern District of Virginia precedent since that time, a showing of culpable conduct is still required by this Court. Moreover, the Court in *BearingPoint* failed to find a primary violation of the Exchange Act, and thus performed no analysis of control under Section 20(a).

decided in 1979 have found that no showing of culpable conduct is required on a motion to dismiss.[17] *See, e.g.*, *Mutual Funds*, 566 F.3d at 130; *Kiken*, 155 F. Supp. 3d at 602; *Masterson*, 2 F. Supp. 3d at 830; *MicroStrategy*, 115 F. Supp. 2d at 658.[18]

Even if the Court finds that a pleading of culpable participation is required, which it is not, that is not an issue here. Ubben/ValueAct were aware of Haley's undisclosed conflict of interest – i.e., his massive compensation package – as well as his undisclosed renegotiation of the merger for the minimum additional consideration. Thus, the ValueAct Defendants "knew or should have known that the primary violator, over whom that person had control" was engaging in the conduct underlying the violation. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 661 (S.D.N.Y. 2007).

## CONCLUSION

The ValueAct Defendants' motion to dismiss should be denied. If this Court grants the motion, in part or in full, Plaintiff respectfully requests leave to amend pursuant to Fed. R. Civ. P. 15.[19]

---

[17] Moreover, requiring allegations of scienter or recklessness in connection with 20(a) control claims is particularly unsupported here, where the primary liability pursuant to Section 14(a) requires only a showing of negligence. *See* TW/Willis Opposition at 9. The ValueAct Defendants' only response is to incorrectly claim without basis "Negligence is not enough." VA 26.

[18] *See also Dellastatious v. Williams*, 242 F.3d 191, 194 (4th Cir. 2001); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 626 (S.D. W. Va. 2012); *In re Coventry Healthcare, Inc. Sec. Litig.*, 2011 WL 1230998, at *18 (D. Md. 2011); *Latham v. Matthews*, 662 F. Supp. 2d 441, 467-68 n.24 (D. S.C. 2009); *In re Sourcefire, Inc. Sec. Litig.*, 2008 WL 1827484, at *7 (D. Md. Apr. 23, 2008); *Huttenstine v. Mast*, 2006 WL 3771096, at *6 (E.D. N.C. Dec. 21, 2006); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 408 (D. Md. 2004); *In re Safety-Kleen Corp. Bondholders Litig.*, 2004 WL 3115871, at *8 (D. S.C. Mar. 19, 2004).

[19] Leave to amend is liberally granted and should only be denied "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 317 (4th Cir. 2004).

Dated: May 7, 2018

Respectfully submitted,

*/s/ Susan R. Podolsky*

Susan R. Podolsky (Va. Bar No. 27891)
**LAW OFFICES OF SUSAN R. PODOLSKY**
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (571) 366-1702
Facsimile:  (703) 647-6009
spodolsky@podolskylaw.com

*Local Counsel for Lead Plaintiff The Regents of the University of California*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

Salvatore J. Graziano (*pro hac vice*)
John Rizio-Hamilton (*pro hac vice*)
Rebecca E. Boon (*pro hac vice*)
Julia K. Tebor (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
sgraziano@blbglaw.com
johnr@blbglaw.com
rebecca.boon@blbglaw.com
julia.tebor@blbglaw.com

*Counsel for Lead Plaintiff The Regents of the University of California, and Lead Counsel for the Class*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 7th day of May 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

_/s/ Susan R. Podolsky_

Susan R. Podolsky (Va. Bar No. 27891)