IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|   |   |
|---|---|
| IN RE WILLIS TOWERS WATSON PLC PROXY LITIGATION | Civil Action No. 1:17-cv-1338 (AJT/JFA) |

## MEMORANDUM OPINION and ORDER

In this putative class action, Plaintiff Regents of the University of California (the "Regents" or "Plaintiff") alleges violations of Sections 14 and 20 of the Securities Exchange Act of 1934 in connection with the merger between Defendants Towers Watson & Co. ("Towers") and Willis Group Holdings, PLC ("Willis"), which resulted in the merged entity called Willis Towers Watson, PLC ("WTW"), also a defendant. In brief summary, Regents alleges that there were inadequate disclosures to Towers' shareholders concerning the conflict of interest on the part of Defendant John Haley, Towers' CEO and chief negotiator with Willis, and how it affected his negotiations with Willis. More specifically, Regents alleges that Defendants negligently failed to disclose the details of discussions that had taken place in September 2015 between Haley and Defendant Jeffrey Ubben—a Willis board member and CEO of ValueAct, a prominent Willis shareholder—concerning a $165 million compensation package that Haley would receive as the CEO of the merged entity, as well as Haley's failure to press for a higher special dividend to Towers shareholders as part of the merger. Presently pending is a Motion to Dismiss the Amended Complaint, filed on behalf of the WTW affiliated defendants [Doc. No. 51] (the "WTW Motion") and a Motion to Dismiss, filed on behalf of the ValueAct affiliated defendants [Doc. No. 54] (the "ValueAct Motion").

This action was originally filed on November 21, 2017.[1] Upon review of the proxy, news reports, and other documents incorporated into the Amended Complaint, and information that was publicly available, the Court concludes that there was publicly available information more than one year before the filing of this action that was sufficient to put the reasonable investor on inquiry notice of Plaintiff's claims arising out of these alleged non-disclosures, including publicly available documents at the time of the proxy solicitation itself that generated significant debate within the investor community, as well as litigation, raising the very concerns and complaints Regents raises here. Accordingly, this action is barred by the applicable one year statute of limitations. The Court also concludes that the alleged non-disclosures are not material in light of the disclosure of Haley's selection as the CEO of the merged entity (and therefore his conflict) and the other information available to an investor concerning the merits of the merger. The Motions will therefore be GRANTED and this action DISMISSED.

## I. BACKGROUND

This securities class action arises out of the merger between the London-based Willis Group Holdings and the Arlington, Virginia-based Towers Watson & Co. to form Willis Towers Watson PLC. The Lead Plaintiff Regents owned 328,385 shares of Towers stock as of October 1, 2015, the record date for the merger. The Defendants are (1) Willis Towers Watson, PLC, the merged entity; Willis Group Holdings, PLC; Towers Watson & Co.; John J. Haley, the CEO of Towers before the merger and the CEO of the merged entity; and Dominic Casserley, CEO of Willis before the merger (collectively referred to as the "WTW Defendants"); and (2) ValueAct Capital Management ("ValueAct" or "VA"), an investment fund manager which held

---

[1] Cambridge Retirement System, another Towers shareholder, filed this putative class action on November 21, 2017. [Doc. No. 1]. On February 20, 2018, the Court appointed Regents the Lead Plaintiff under the Private Securities Litigation Reform Act. [Doc. No. 27]. Regent filed its Amended Complaint on March 9, 2018, [Doc. No. 49] ("Am. Compl."), which asserts the same claims as the original Complaint, but with greater factual detail and support.

approximately 10% of Willis stock at the time of the merger; and Jeffrey W. Ubben, VA's CEO, who served on the Willis board of directors through the closing of the merger (collectively referred to as "the ValueAct Defendants").

Regents alleges the following in support of its claims:

Defendant Casserly, Willis' CEO, first approached Haley to propose a merger between Towers and Willis in January 2015. "From the outset of Haley's negotiations with Willis, Haley viewed the transaction as a 'merger of equals.' . . . Haley had past experience with this same type of deal, and he knew from that experience that the stock price of the 'to-be-consolidated' companies could drop on the announcement of the merger." [Doc. No. 49] ("Am. Compl.") ¶ 39. Because of this experience and knowledge, Haley sold 55% of his stock as soon as Towers and Willis began to seriously consider a merger. *Id.*[2] "There was a particularly significant risk that Towers shareholders would not be receptive to the 'merger of equals' in this case, because Towers was consistently reporting record-breaking financial results, while Willis was in steady decline." *Id.* at ¶ 42.

In March 2015, the companies signed confidentiality and standstill agreements to facilitate negotiations. *Id.* at ¶ 50. At a meeting on May 11, 2015, Haley suggested to Casserley that the equity ownership of the combined company be based on the relative market capitalizations of Towers and Willis. *Id.* at ¶ 54. The Towers board of directors initially formed a Special Committee to analyze the prospect of the merger. On May 14, 2015, the Special Committee, in a meeting where Haley was present, decided to recommend that Haley be CEO of the new entity. *Id.* at ¶ 57. The next day, the full Towers Board, again at a meeting where Haley was present, decided to endorse Haley as CEO of the new entity. *Id.* Willis agreed to that proposal on May 19, 2015. *Id.* Despite the apparent conflict of interest created by Haley's future

---

[2] None of Plaintiff's claims are based on this alleged insider trading on the part of Haley.

role in the new company, the Towers board disbanded the Special Committee on May 15, 2015 and Haley continued to lead the negotiations for Towers. *Id.*

On June 1, 2015, Haley changed his merger proposal from a proportional equity split based on market capitalization to a deal where Towers shareholders would own 49% of the new entity, Willis shareholders would own 51%, and the Towers shareholders would receive a pre-merger special dividend of $500 million. *Id.* at ¶ 59. On June 5, Casserley responded with a proposal of 49.5% equity to the Towers shareholders, 50.5% to the Willis shareholders, but without the special dividend. *Id.* at ¶ 62. Ultimately, the parties agreed to a 49.9%-50.1% Towers-Willis equity split with a $337 million, or $4.87 per share, special dividend to Towers shareholders. *Id.* at ¶ 63. In addition, as a condition to entering the Merger Agreement, Towers required VA, a prominent Willis shareholder, to enter into a voting agreement in support of the merger, which it did. *Id.* at ¶¶ 64–67. The Towers board held a special meeting to discuss the merger, at which its financial advisor, Bank of America Merrill Lynch, presented its financial analysis and opinion that the merger was fair to Towers shareholders. WTW Mem. in Supp., Ex. A ("Proxy") 80.

The Towers board unanimously agreed that the merger agreement was in the best interests of Towers and its shareholders. *Id.* Towers and Willis announced the merger publicly on June 30, 2015. The market reacted negatively: Towers' stock fell 8.8 % from a June 29, 2015 close price of $137.98 to a June 30, 2015 close price of $125.80. Am. Compl. ¶ 71.

Haley and Casserley had decided as early as May 29, 2015 that Ubben, the CEO of ValueAct, would be a member of the Compensation Committee of the post-merger entity, *id.* at ¶ 85; and on September 10, 2015, Ubben meet with Haley to discuss Haley's potential compensation, *id.* at ¶ 80. At this meeting, Haley and Ubben confidentially negotiated a

4

compensation package for Haley as CEO of the merged entity. This compensation package, which included performance incentives of restricted stock "that could multiply 300% based on whether the company achieved certain benchmarks in its stock price performance," and, assuming the new company hit its financial targets, was worth $165 million over three years, more than double his then compensation of $25 million per year as Towers' CEO. *Id*. The chair of the Willis Board's Compensation Committee was not fully aware of the compensation negotiations between Ubben and Haley until ten days after the Towers shareholders approved the merger, *id.* at ¶ 86.; and Haley never disclosed the compensation plan to either Towers shareholder or the Towers board, *id.* at ¶ 87.

On October 13, 2015, Towers filed its initial proxy statement regarding the proposed merger with the SEC. *Id.* at ¶ 97. "The Proxy omitted to disclose anything about Haley's compensation agreement with ValueAct and Willis, including the material fact that Haley had worked with ValueAct and Willis to secure a compensation package valued at up to $165 million over the next three years." Am. Compl. ¶ 98. Additionally, the Proxy "falsely assured investors that the Towers Board was 'aware of' and had 'considered conflicts of interests,'" even though Haley had not disclosed the alleged $165 million compensation plan to the board. *Id.* at ¶ 99.

Reflecting the adverse market reaction to the merger, analysts and investors publicly panned the deal as undervaluing Towers and undercompensating Towers shareholders, both in terms of equity in the merged company and the special dividend. *Id.* at ¶¶ 73-76. On July 9, 2015, Towers shareholders brought a putative class action in Delaware Chancery Court asserting claims for breach of fiduciary duty by the members of the Towers board (the "Fiduciary Action"). *See In re Towers Watson & Co. Stockholders Litig.,* C.A. No. 11270-CB (Del. Ch. 2015). In their Verified Consolidated Amended Complaint, filed on September 9, 2015, after the

5

filing of the S-4 registration statement outlining the terms of the merger, the Fiduciary plaintiffs alleged that Haley "will stay on and manage the combined company after the [merger] is consummated, creating an incentive for Haley to favor a deal with Willis over any competing bidders. As such, Haley was conflicted during the deal negotiation process." WTW Mem. in Supp., Ex. R ("Fiduciary Compl.") at ¶ 11. They also specifically acknowledged that "[t]hough the Proxy[3] does not disclose Haley's compensation as CEO of the combined company, he will be leading a company that is approximately twice as large as Towers Watson, and a sizeable increase in compensation and equity awards for Haley is likely." *Id.* at ¶ 98. The Fiduciary plaintiffs further alleged that the failure by the Towers board to oversee Haley's negotiations and the lack of a "go-shop" clause in the merger allowed Haley's conflict of interest to infect the negotiations. *See id.* at ¶¶ 13 ("Absent such a market check, it would have been impossible for the Board to ensure that it was getting the best deal possible for Towers Watson stockholders."), 68 ("[T]he Board ceded all authority to Haley—who was, at this point in the process, conflicted because he had secured his place as CEO of the combined company—to conduct negotiations on behalf of Towers Watson. Rather than being active participants in the process, the Individual Defendants merely rubber stamped Haley's preferred transaction structure."). According to the Fiduciary plaintiffs, this conflict was not adequately disclosed in the SEC filing on August 27, 2015 and led to a merger agreement that did not adequately reflect the value Towers brought to the merger. *See, e.g.*, *id.* at ¶¶ 67 ("The special dividend, which is taxable, does not come closely [sic] to fairly compensating Towers Watson stockholders for the loss of control of the company."), 116 ("The 'Background of the Merger' section of the [S-4 registration statement]

---

[3] The "Proxy" referred to in the Fiduciary action is the S-4 registration statement filed with the SEC on August 27, 2015. *See* Fiduciary Compl. at ¶ 44.

6

fails to disclose details regarding the synergies of the proposed Transaction, alternatives to the Proposed Transaction, and information pertaining to potential conflicts of interest.").

Beginning in September, 2015, Driehaus Capital Management, an activist hedge fund that was long on Towers and short on Willis, engaged in a public campaign urging shareholders to reject the merger, arguing that the "offer was made at a 9% discount [of Towers' value], representing a 'takeunder.'" *Id.* at ¶ 90. In a press release issued on September 14, 2015, Driehaus concluded that the exchange ratio used to calculate the relative value of TW and Willis stock undervalued Towers shares by more than 25%, and that "even using the financial advisor's [Bank of America's] excessively discounted [valuation] range . . . TW shareholders are receiving insufficient consideration . . . [and] the offer would still need to be increased by 9.1% for TW shareholders to receive fair value." WTW Mem. in Supp., Ex. F ("Driehaus Press Release") 14. In an October 7, 2015 open letter, Driehaus analyzed several similar deals and found that the target of an acquisition was paid an average premium of 30.7%, contrasted with the 9% *discount* the Towers shareholders would receive. WTW Mem. in Supp., Ex. O ("Driehaus Letter") 1. Driehaus also criticized the presence of a non-solicitation agreement in the proposed deal, arguing that it "forc[es] a prospective bidder to go hostile, [which] makes a [competing] bid far less likely." Driehaus Press Release 21. Instead, a "'go-shop' period—a set amount of time during which TW could survey other potential buyers and seek out the acquirer that provides the most shareholder value"—would have benefited Towers shareholders by market testing the deal. *Id.* Additionally, Driehaus questioned Haley's motivations and incentives as Towers' chief negotiator and their likely effect on the merger terms. In its publicly issued letter, Driehaus raised whether "TW management ha[d enough] 'skin in the game?'" and whether "incentives [were] aligned?" *Id.* at 2. Specifically, Driehaus noted that "Mr. Haley would head the larger

7

combined company" and that "CEOs who head companies with larger market capitalizations tend to be paid more than CEOs of smaller peers; this certainly appears true for Towers' peers . . . ." *Id.*

Likewise, two proxy advisory service firms, Glass Lewis & Co. and Institutional Shareholder Services, Inc. ("ISS"), advised Towers shareholders to reject the merger as proposed. Am. Compl. ¶ 89. In particular, in a report dated November 5, 2015, ISS noted that Towers was the stronger partner in this "merger of equals," citing Towers' stronger revenue growth (8.8% CAFR, as compared to Willis's 3.1%) and net income growth (23.4% annual increase in EBITDA, as compared to Willis's 1.6% decline). WTW Mem. in Supp., Ex. P ("ISS Report") 12. Like Driehaus, ISS also pointed out the lack of any "market-check" on the terms of the merger. *See* ISS Report 13 ("The real test of that thesis [that the merger's terms were appropriate] would have been some credible form of market check . . . which might have demonstrated clearly that this was or was not fair value for Towers."). ISS ultimately concluded that while there were benefits to be had by Towers shareholders in the merger, "none of these potential benefits become unavailable if they receive fair value, rather than a 9 percent discount, for their shares." *Id.* 13. The ISS Report also highlighted for shareholders Driehaus' concerns that "Haley's incentive to approve the merger with Willis is predicated on the belief that as CEO of the combined entity, he would receive a substantial increase in compensation." *Id.* at 4.

Against the backdrop of this adverse market reaction to the announced merger, on November 10, 2015, Haley approached Ubben and proposed an increase in the special dividend to the Towers shareholders from $4.87 per share to $10 per share. According to Regents, this amount was not the maximum Haley believed he could obtain for Towers' shareholders, but only "the minimum that [was] need[ed] to have a reasonable expectation of shareholder approval."

8

Am. Compl. ¶ 124. According to Haley's notes at the time, the $10 figure "[d]idn't trouble [Ubben]." *Id.* at ¶ 125. Towers announced the revised terms of the merger on November 19, 2015. *Id.* at ¶ 142. After this renegotiation, ValueAct lobbied heavily in favor of the merger, including "ghostwriting" Towers and Willis press releases, *id.* at ¶¶ 135, 139, and having Willis "steer" any Towers shareholders who were "on the fence" towards ValueAct, *id.* at ¶ 128.

After the renegotiation and increased special dividend, on November 27, 2015, Towers and Willis filed a Proxy Update, which included a summary purporting to disclose the further negotiations between Haley and Willis. *Id.* at ¶ 146. "Nowhere did the Proxy Update disclose Haley's compensation arrangement or conflict of interest, or that, upon renegotiating the deal, he sought only the minimum additional consideration." *Id.* at ¶ 147.

On December 11, 2015, the Towers shareholders voted to approve the merger, which closed on January 4, 2016. *Id.* at ¶ 152. Following shareholder approval of the merger, another round of litigation ensued. On March 3, 2016, an appraisal action was also filed in Delaware Chancery Court (the "Appraisal Action"). *See In re Appraisal of Towers Watson & Co.*, C.A. No. 12064-CB (Del. Ch.). Public filings in the Appraisal Action alleged that, despite the lack of disclosure in the Proxy issued on October 13, 2015, "Mr. Ubben[] was highly involved in the Merger, including but not limited to, the negotiations of Mr. Haley's executive compensation." WTW Mem. in Supp. Ex. V ("Appraisal Mtn. to Compel") 5 (motion to compel in the appraisal action filed publicly on September 27, 2016); *see also id.* at Ex. W 4 n.6 (supplement to a motion to compel in the Appraisal Action filed publicly on October 25, 2016); *id.* at Ex. U 6 (affidavit in support of motion in New York state court to enforce subpoena in the Appraisal action, filed publicly on September 26, 2016).

This action was filed on November 21, 2017. Regents asserts causes of action under Section 14(a) and Section 20 of the Exchange Act. Specifically, Count I alleges that Willis Towers Watson, Towers, Willis, Haley, and Casserley "were at least negligent in filing the Proxy, Proxy Update, and proxy solicitations" by failing to disclose Haley's conflict of interest, his compensation package, his failure to negotiate for more than the minimum necessary special dividend, and Ubben's involvement in the negotiation process. *Id.* at ¶ 231. Count II asserts supervisory liability for the Section 14 violations against Haley, Ubben, ValueAct, and Casserley. Both Counts seek class certification under Rule 23. Because the claims are barred by the applicable one year statute of limitations, the Motions will be granted and this action dismissed.

## II. LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1994). A claim should be dismissed "if, after accepting all well-pleaded allegations in the plaintiff's complaint as true . . . it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *see also Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001). In considering a motion to dismiss, "the material allegations of the complaint are taken as admitted," *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citations omitted), and the court may consider exhibits attached to the complaint, *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F. 2d 1462, 1465 (4th Cir. 1991).

Moreover, "the complaint is to be liberally construed in favor of plaintiff." *Id.*; *see also Bd. of Trustees v. Sullivant Ave. Props., LLC*, 508 F. Supp. 2d 473, 475 (E.D. Va. 2007). In

10

addition, a motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Nevertheless, while Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (the complaint "must be enough to raise a right to relief above the speculative level" to one that is "plausible on its face"); *see also Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). As the Supreme Court stated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008), "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw a reasonable inference that the defendant is liable for the conduct alleged."

In an action brought under the Private Securities Litigation Reform Act, Pub. L. 104-67, 109 Stat. 737 ("PSLRA"), certain elements of a plaintiff's claim must be pleaded with greater particularity than the traditional Rule 8 standard. A plaintiff who alleges "that the defendant (A) made an untrue statement of material fact; or (B) omitted to state a material fact . . . shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1). Similarly, where a securities action has scienter as an element, "the complaint shall, with respect to each act or omission alleged to violate [the securities laws], state with particularity giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2).

Courts are not limited solely to the four corners of the complaint in assessing a motion under Rule 12(b)(6), but also may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The public filings made in earlier court actions

challenging the merger and the public debate that occurred among investors and commentators during the proxy solicitation are properly within the scope of the Court's consideration of the motion to dismiss, because "it is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm-warnings' were adequate to trigger inquiry notice . . . ." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

## III. ANALYSIS

### A.   The Amended Complaint is barred by the applicable one year statute of limitations.

The Exchange Act provides that "[n]o action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation . . . ." 15 U.S.C. § 78i(f). The Exchange Act creates a "one-year limitation period [from] when the plaintiff knows of the facts on which the action is based *or* has such knowledge as would put a reasonably prudent purchaser on notice to inquire, so long as that inquiry would reveal the facts on which a claim is ultimately based." *Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1303 (4th Cir. 1993) (citation omitted). A plaintiff need not be in possession of all the facts which underlie the complaint to have been on inquiry notice of the violation. Rather, "[i]nquiry notice is triggered by evidence of the *possibility* of fraud, not by complete exposure of the alleged scam. Merely bringing suit after the scheme has been laid bare . . . will not satisfy the requirements of due diligence when there were prior warnings that something was amiss." *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993); *see also Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350 (2d Cir. 1993) ("[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises."). Based on publicly available information, including

commentary on the merger and earlier lawsuits challenging the merger in Delaware, Regents was on inquiry notice with respect to its claims as early as September, 2015, and certainly no later than October 1, 2016, more than one year before the filing of this action on November 21, 2017.

The Proxy, issued on October 13, 2015, disclosed that that Haley had been designated as the CEO of the new entity and that he participated in the merger discussions with a potential conflict. *See* Proxy 36 ("Willis and Towers Watson directors and officers may have interests in the Merger different from the interests of Towers Watson stockholders and Willis stockholders."), 74, 82, 113, 135. Beyond the Proxy, outside criticism of the merger noted both that Haley was conflicted based on his future role in the merged entity and the likely significant increase in compensation he would receive as the CEO of a larger entity. *See, e.g.*, Driehaus Letter 2 (noting that "Mr. Haley would head the larger combined company" and that "CEOs who head companies with larger market capitalizations tend to be paid more than CEOs of smaller peers; this certainly appears true for Towers' peers . . . ."). It was also publicly known that Haley was given significant autonomy and discretion in shaping the deal by the Towers board, thus potentially allowing his conflict to infect the final deal. The Fiduciary Action filed in Delaware in 2015 specifically alleged that the Towers Board was nothing more than a "rubber-stamp[ for] for Haley's preferred transaction structure." Fiduciary Compl. at ¶ 68. The Amended Complaint repeatedly refers to Haley as Towers' "lead negotiator." Am. Compl. ¶¶ 168, 170, 173, 175, 178, 186, 188, 190, 206, 208. The ISS Report, Driehaus Letter, and the Fiduciary Action all argued that the Towers Board's failure to oversee Haley and the lack of a market check in the agreement threatened the fairness of the deal. These and other Haley-focused criticisms persisted from the time the merger was first announced on June, 2015 until even after shareholder approval of the merger on December 11, 2015 and the closing of the merger on January 4, 2016.

Regents argues that it was not until early- to mid-2017 that a reasonable investor had publicly available information sufficient to place him on notice of the effect of Haley's disclosed conflict on the terms of the merger. *See* Pl.'s WTW Resp. [Doc. No. 56] 29; Am. Compl. ¶¶ 153 (disclosures in February, April, and June 2016 "belatedly disclosed the details of Haley's compensation package, but [they] did not disclose that Haley's compensation was consistent with the agreement that Haley secretly made with ValueAct and Willis in September 2015."), 215. Specifically, Regents points to Haley's notes, which were made public on February 6, 2017 in the Appraisal Action, suggesting that Haley appreciated that a higher special dividend than $10 per share could be negotiated, Am. Compl. ¶ 125, and also the details of the compensation discussion between Haley and Ubben that had occurred in September, 2015, as shown in emails made public in April 2017 in the Appraisal Action. But none of the information that emerged in 2017 materially changed what a reasonable investor already knew by the time of the shareholder vote in December 2015.

The criticisms leveled against the merger that raised material concerns for a reasonable investor were more fundamental and broader than simply the amount of the special dividend or the specifics of Haley's future compensation package as the merged entity's CEO. For example, Driehaus and ISS identified as problematic not principally the amount of the special dividend, but rather the exchange rate established to determine the relative value of Towers and Willis shares, which they thought undervalued the growth potential brought to the new company by Towers, and the minority position that Towers shareholders would have in the new company. *See, e.g.*, ISS Report 11 ("[Historical trading ratio data] calls into question the appropriateness, for Towers shareholders, of [the] exchange ratio for the merger . . . . This, more than any other element, appears to have driven the 9.3% discount at announcement."), 13 ("In light of these

factors, it would appear that TW shareholders, who are being asked to accept the 'less equal' side of this merger of equals, are perhaps not being properly compensated for the added risks they will possibly incur.").

As for the amount of a special dividend that was warranted for Tower shareholders, the Driehaus Letter issued on October 7, 2015 specifically argued based on publically available financial data that a special dividend of more than $24.87 could be paid without leveraging the merged company more than Willis was leveraged pre-merger. Driehaus Letter 3–4. ISS suggested in its Report issued on November 5, 2015 that Haley could have likely gotten such a dividend, given that "[i]t [was] unlikely to be the case, after all, that Willis c[ould] afford to walk away from this transaction[.]" ISS Report 13. Moreover, the Fiduciary Action filed in September 2015 was premised in part on the very issue raised in the Amended Complaint: that a conflicted Haley was allowed to undersell Towers by a hands-off Towers board for his own gain at the expense of the Towers shareholders. Accordingly, Regents would have been aware of the view that the $10 dividend did not represent the maximum economically justifiable consideration the conflicted Haley could have negotiated when it was announced in November 2015.

For these reasons, the facts available to the investing public by the Fall of 2015 were sufficient to put the reasonable investor on notice of the essential facts asserted in the Amended Complaint. Moreover, as of September 2016, even Ubben's involvement in the alleged clandestine negotiations of Haley's compensation was publicly known. In a motion to compel filed publicly on September 27, 2016 in the Appraisal Action, plaintiffs asserted that "Willis is refusing to collect, search and produce documents from Willis director Jeffrey W. Ubben," which were relevant to the Delaware Action "because the documents produced by Towers to-date indicate that Mr. Ubben, was highly involved in the Merger, including, but not limited to,

15

*the negotiations of Mr. Haley's executive compensation.*" Appraisal Mtn. to Compel ¶ 10 (emphasis added).[4] Given Ubben's status as a Willis shareholder and director, as well as a booster for the merger, and given Haley's known conflict of interest, it would be apparent to the reasonable investor that there was a possibility that Ubben used his influence over Haley's compensation to influence Haley in negotiating the merger.

Regents contends that the disclosed information available to it was insufficient to trigger the running of the limitations period since it did not reveal all of the non-disclosed information. For example, Regents claims that the filings in the Delaware Actions "nowhere disclose the key facts hidden from shareholders, namely, that Haley had actually negotiated a $165 million compensation plan with Ubben and ValueAct, and that Haley renegotiated the merger for minimum consideration to secure that compensation." Pl.'s WTW Resp 29. However, knowledge of that level of detail was not required to place Regents on inquiry notice. Likewise, it is not necessary for Regents to have known the specifics of Haley's negotiations raising the special dividend from $4.87 to $10 per share. Instead, it was sufficient for a shareholder to have known that (1) Haley was conflicted as the CEO-designate of the new entity and likely in line for a compensation increase with the larger new entity; (2) the Towers board had largely delegated negotiations regarding the merger to Haley; (3) the original merger agreement was considered to be unfair to Towers shareholders; (4) there was reason to believe that Towers, through Haley, could have negotiated a significantly larger special dividend than $10 per share without negatively affecting the new entity; (5) Towers never subjected the deal to a "market check" to determine the propriety of the terms of the deal; and (6) Ubben had been involved in compensation negotiations with Haley.

---

[4] While the discovery documents which disclosed that Ubben was involved in negotiating Haley's compensation were themselves confidential at the time, the motions revealed to the public the fact of Ubben's involvement and that such documents existed.

For the above reasons, a reasonable investor was on inquiry notice concerning the claims asserted in this action more than a year before the filing of this action.

### B. The Amended Complaint fails to allege facts that make the alleged non-disclosures material.

The information available to investors also establishes that the complained-of misrepresentations were not "material." A fact that would be merely relevant or of interest to an investor is not material. *See In re Cogent Inc. Shareholder Litig.*, 7 A.3d 487, 511 (Del. Ch. 2010) ("While it is always possible to request just one more piece of information," that does not make a fact material). Instead, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available." *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Here, the Proxy affirmatively disclosed that Haley would be the CEO of the new company and as a result he operated under a potential conflict of interest. Driehaus and ISS affirmatively raised Haley's conflict of interest and its potential effects on the fairness of the deal—i.e., whether he obtained only the "minimum additional consideration" necessary—which was at the core of the public debate at the time of the Proxy and merger vote. A reasonable investor would have assumed, as the market commentary did, that a CEO's compensation increases with the company's market capitalization. *See Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) ("It is important to note that a 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing."). There is no contention that the amount of Haley's compensation had a material impact on the financial fortunes of the new entity. The exact amount of Haley's new compensation at the time of the proxy solicitation and vote was a mere

detail that would not "significantly alter[] the 'total mix' of the information made available." *TSC*, 426 U.S. at 449. Count I therefore must be dismissed.

Because Count II, alleging control person liability under Section 20 of the Exchange Act, requires an underlying violation of another section of the Act, that Count must also be dismissed without any need to address whether or to what extent Ubben and ValueAct are "control persons" under Section 20.

## IV. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that the Motions [Doc. Nos. 51, 54] be, and the same hereby are, GRANTED; and it is further

ORDERED that this action be, and the same hereby is, DISMISSED.

The Clerk is directed to forward copies of this Order to all counsel of record and to enter judgment in favor of Defendants pursuant to Fed. R. Civ. P. 58.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
July 11, 2018.