**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| IN RE WILLIS TOWERS WATSON PLC PROXY LITIGATION | Civil Action No. 1:17-cv-01338-AJT-JFA<br><br>CLASS ACTION |

# THE TW/WILLIS DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

**HUNTON ANDREWS KURTH LLP**
951 East Byrd Street
Richmond, Virginia 23219-4074
Tel: (804) 788-8201
Fax: (804) 788-8218

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Counsel for the TW/Willis Defendants*

Dated: July 13, 2020

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

RELEVANT FACTUAL BACKGROUND ......................................................................... 3

A. Lead Plaintiff Invests In TW Through A Specialized Fund Aimed At Profiting From "Mispriced" Securities ............................................. 3

B. Lead Plaintiff Purchases Substantial Amounts Of Both TW And Willis Stock Following The Announcement Of The Merger ..................... 4

C. TW And Willis Jointly File The Proxy Materials And Set The Record Date ........................................................................................ 5

D. TW's Stock Price Rises Upon The Merger's Approval............................ 7

ARGUMENT ....................................................................................................... 8

I. APPLICABLE LEGAL STANDARDS ............................................................ 8

II. CERTIFICATION SHOULD BE DENIED BECAUSE DAMAGES ARE NOT MEASURABLE ON A CLASS-WIDE BASIS ........................................... 9

A. Lead Plaintiff's Proposed Event Study Methodology Does Not Match Its Theory of Liability........................................................ 10

B. Lead Plaintiff And The Proposed Class Have Not Suffered Any "Actual Damages" Or "Out of Pocket" Losses....................................... 14

C. Lead Plaintiff's "Lost Opportunity" Damages Theory Must Be Rejected As Overly Speculative And Contrary To The Available Economic Evidence ................................................................... 15

III. THE MOTION SHOULD BE DENIED FOR SEVERAL ADDITIONAL REASONS ........................................................................................ 23

A. Lead Plaintiff's Proposed Class Definition Is Significantly Overly Broad........................................................................................ 23

B. Lead Plaintiff Is Not Typical And Cannot Represent The Proposed Class ........................................................................................ 27

CONCLUSION.................................................................................................... 35

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)....................8

*Amchem Prods.*, *Inc.* v. *Windsor*,
521 U.S. 591 (1997)....................8, 9

*In re Appraisal of Columbia Pipeline Group, Inc.*, 2018 WL 4182207
(Del. Ch. Aug. 30, 2018) ....................32

*Azar v. Blount Int'l Inc.*,
2019 WL 7372658 (D. Or. Dec. 31, 2019) ....................25

*Baehr v. Creig Northrop Team, P.C.*,
953 F.3d 244 (4th Cir. 2020) ....................24

*In re Bausch & Lomb Inc. Sec. Litig.*,
244 F.R.D. 169 (W.D.N.Y. 2007), *opinion modified on denial of reconsideration*, 2007 WL 3197318 (W.D.N.Y. Oct. 26, 2007) ....................34

*In re BP p.l.c. Sec. Litig.*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)....................12

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012)....................24

*Broussard v. Meineke Discount Muffler Shops*, *Inc.*,
155 F.3d. 331 (4th Cir. 1998) ....................27

*Bryan v. Land*,
215 B.R. 398 (B.A.P. 8th Cir. 1997)....................30

*In re Cable & Wireless, PLC Sec. Litig.*,
217 F.R.D. 372 (E.D. Va. 2003) ....................34

*Clark v. Trans Union, LLC*,
2017 WL 814252 (E.D. Va. Mar. 1, 2017) ....................9

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013).................... *passim*

*In re DaimlerChrysler AG Sec. Litig.*,
216 F.R.D. 291 (D. Del. 2003) ....................25

*In re DaimlerChrysler AG Sec. Litig.*,
294 F. Supp. 2d 616 (D. Del. 2003)....................16, 17

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014)....................24

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)....................24

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)....................14, 22

*E. Tex. Motor Freight Sys. Inc. v. Rodriguez*,
431 U.S. 395 (1977)....................34

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014)....................9, 23

*Ft. Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014)....................12

*Gariety v. Grant Thornton, LLP*,
368 F.3d 356 (4th Cir. 2004)....................8

*Goldkrantz v. Griffin*,
1999 WL 191540 (S.D.N.Y. Apr. 6, 1999), *aff'd*, 1999 WL 1212560 (2d Cir. Dec. 13, 1999)....................17

*Gordon v. Sonar Capital Mgmt. LLC*,
92 F. Supp. 3d 193 (S.D.N.Y. 2015)....................26, 34

*Gould v. American-Hawaiian S.S. Co.*,
535 F.2d 761 (3d Cir. 1976)....................15, 16

*Gray v. Wesco Aircraft Holdings, Inc.*,
2020 WL 1904019 (S.D.N.Y. Apr. 16, 2020), *appeal filed*, No. 20-1530 (2d Cir. May 6, 2020)....................18

*In re GTx, Inc. Shareholders Litigation*,
2020 WL 3439356 (S.D.N.Y. June 23, 2020)....................18

*Gunnells v. Healthplan Servs., Inc.*,
348 F.3d 417 (4th Cir. 2003)....................9

*Hammond v. Powell*,
462 F.2d 1053 (4th Cir.1972)....................23

*In re Heckmann Corp. Sec. Litig.*,
2013 WL 2456104 (D. Del. June 6, 2013)....................22

*Hurtado v. Gramercy Prop. Tr.*,
425 F. Supp. 3d 496 (D. Md. 2019)....................24

*Hurwitz v. LRR Energy L.P.*,
2018 WL 6804481 (D. Del. Jan. 2, 2018)....................22, 25

*J. I. Case Co. v. Borak*,
377 U.S. 426 (1964)....................16

*Krakauer v. Dish Network, L.L.C.*,
925 F.3d 643 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 676 (2019)....................9

*Lienhart v. Dryvit Sys.*,
255 F.3d 138 (4th Cir. 2001)....................27

*Link v. Wabash R.R. Co.*,
370 U.S. 626 (1962)....................30

*Mack v. Resolute Energy Corp.*,
2020 WL 1286175 (D. Del. Mar. 18, 2020)....................18

*McMorrow v. Mondelez Int'l, Inc.*,
2020 WL 1157191 (S.D. Cal. Mar. 9, 2020)....................12-13

*Meredith v. Mid-Atl. Coca Cola Bottling Co.*,
129 F.R.D. 130 (E.D. Va. 1989)....................8

*Merck & Co., Inc. v. Reynolds*,
559 U.S. 633 (2010)....................29

*In re Mills Corp. Sec. Litig.*,
257 F.R.D. 101 (E.D. Va. 2009)....................8

*Mills v. Elec. Auto-Lite Co.*,
396 U.S. 375 (1970)....................24

*Nationwide Life Ins. Co. v. Attaway*,
254 F.2d 30 (4th Cir. 1958)....................30

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)....................12

*In re Organogenesis Sec. Litig.*,
241 F.R.D. 397 (D. Mass. 2007)....................34

*Ostano v. Commerzanstalt Telewide Sys., Inc.*,
794 F.2d 763 (2d Cir. 1986)....................26

*In re Pfizer Inc. Sec. Litig.*,
819 F.3d 642 (2d Cir. 2016)....................11, 12

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
292 F. Supp. 3d 14 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019)....................13

*In re Refco Inc. Sec. Litig.*,
2013 WL 4078410 (S.D.N.Y. Aug. 2, 2013)....................26

*Sandberg v. Va. Bankshares, Inc.*,
979 F.2d 332 (4th Cir. 1992), *vacated*, 1993 WL 524680 (4th Cir. Apr. 7, 1993)....................27

*Schulein v. Petroleum Dev. Corp.*,
2014 WL 114520 (C.D. Cal. Jan. 6, 2014)....................22

*Shiring v. Tier Technologies, Inc.*,
244 F.R.D. 307 (E.D. Va. 2007)....................27

*Sicav v.Wang*,
2015 WL 268855 (S.D.N.Y. Jan. 21, 2015)....................12

*Soutter v. Equifax Info. Servs., LLC*,
307 F.R.D. 183 (E.D. Va. 2015)....................10

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)....................24

*Stieberger v. Sullivan*,
738 F. Supp. 716 (S.D.N.Y. 1990)....................30, 31

*In re Tangoe, Inc. Stockholders Litig.*,
333 F. Supp. 3d 77 (D. Conn. 2018)....................18

*Tse v. Ventana Medical Systems, Inc.*,
297 F.3d 210 (3d Cir. 2002)....................17

*Va. Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991)....................16

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................8

*In re Willis Towers Watson plc Proxy Litig.*,
2018 WL 3423859 (E.D. Va. July 11, 2018), *rev'd*, 937 F.3d 297 (4th Cir. 2019) ....28

*In re Willis Towers Watson plc Proxy Litig.*,
937 F.3d 297 (4th Cir. 2019) ....28, 29, 30, 31, 33

*Ziglar v. Abbasi*,
137 S. Ct. 1843 (2017) ....16

**Statutes & Rules**

15 U.S.C. § 78bb(a) ....14, 26

Fed. R. Civ. P. 23 .... *passim*

**Other Authorities**

Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 Bus. Law. 1 (1982) ....12

Defendants Willis Towers Watson plc ("WTW"), Towers Watson & Co. (n/k/a WTW Delaware Holdings LLC) ("TW"), Willis Group Holdings plc (n/k/a Willis Towers Watson plc) ("Willis"), John J. Haley, and Dominic Casserley (collectively, the "TW/Willis Defendants") respectfully submit this memorandum of law in opposition to Lead Plaintiff The Regents of the University of California's ("Lead Plaintiff") motion for class certification and memorandum of law in support thereof (the "Motion" or, when cited, "Mot."). ECF No. 147.

**PRELIMINARY STATEMENT**

Lead Plaintiff asks this Court to certify a proposed class on the pretense that certification is a foregone conclusion. It is not. The principal claim here is under Section 14(a) of the Securities Exchange Act of 1934 for allegedly material omissions and misstatements in the proxy materials for the cash and stock "merger-of-equals" between TW and Willis, which was announced in June 2015 and closed in January 2016 (the "Merger"). One requirement of a Section 14(a) claim is that the alleged omission(s) or misstatement(s) caused economic loss. Yet, the Merger was incredibly accretive. Indeed, Lead Plaintiff's own investment in TW was enormously profitable, as Lead Plaintiff (i) acquired more than 95% of its more than 300,000 TW shares *after* the "stock drop" that it posits is responsible for the bulk of the proposed class's alleged damages, and, in the process, (ii) earned an approximately 18% return on that investment in the quarter the Merger was approved alone. Moreover, Lead Plaintiff has continued to hold some portion of its WTW shares from the closing through at least March of this year, a period in which the shares traded as high as $220 per share.

Unable to avoid these facts, Lead Plaintiff has put forward the bizarre and unprincipled theory that the proposed class has suffered economic loss by virtue of a stock price decline (upon the initial announcement of the Merger) that occurred *months before* -- and, thus, is *wholly untethered* to -- the alleged violation of Section 14(a). Aside from the illogic of that theory, the

United States Supreme Court has cautioned that it is a trial court's duty to test a damages theory at the certification stage to ensure that a proposed damages theory is the result of the alleged wrong and that unsupported (and unsupportable) methodologies of the type advanced by Lead Plaintiff never reach a jury.  *See* Point II, *infra*.

Moreover, even if Lead Plaintiff's damages theory were an appropriate one (and it is not), the Motion should be denied, at least in substantial part, for several additional reasons:

*First*, Lead Plaintiff seeks to certify a class comprised of the holders of TW shares on the "record date" for the stockholder vote on the Merger, October 1, 2015, despite the fact that the Merger closed *more than three months later*, on January 4, 2016.  During that three-month period, millions of TW shares changed hands.  Yet, any holder that sold its shares after the record date, but before the closing of the Merger, could not have been damaged by the Merger -- including because Section 14(a) requires "transaction causation," meaning that a recoverable loss must have been caused by the transaction to which the allegedly false or misleading proxy relates (here, the Merger).  Any holders who sold earlier -- *before* the Merger was actually consummated (and, thus, *before* the Merger could have caused a recoverable loss) -- must be excluded from any certified class.  *See* Point III.A, *infra*.

*Second*, the Motion ignores that the Merger was *not* simply a cash transaction.  It was primarily a *stock* transaction pursuant to which the stockholders of two publicly traded companies, TW and Willis, became stockholders of a larger, combined publicly traded company, WTW.  Accordingly, any loss suffered by the stockholders of one Merger party -- *e.g.*, because they (allegedly) were not paid enough by the other Merger party -- necessarily must have been a gain for the stockholders of the other Merger party.  In other words, the losses/gains of the stockholders of the two Merger parties offset.  What is more, there was substantial overlap between the two

companies' stockholders and, thus, those stockholders who held *both* TW *and* Willis shares, to the extent they suffered any loss on their TW shares, also obtained an offsetting gain on their Willis shares. Thus, the TW shares of those overlapping stockholders, as to which there can be no cognizable damages, must be excluded from any class. *See* Point III.A, *infra*.

*Finally*, Lead Plaintiff is not "typical" of the proposed class (including because it is subject to unique defenses) and, therefore, is an inappropriate class representative. Indeed, discovery has revealed, as the TW/Willis Defendants have long suspected, that this action was instigated at the behest of Lead Plaintiff's counsel, who had access to confidential information that formed the basis for the claims here more than one year prior to the filing of the action, which knowledge should be imputed to Lead Plaintiff for statute of limitations purposes. Further, discovery has revealed that Lead Plaintiff's external investment managers, to whom Lead Plaintiff conferred complete trading discretion, were in favor of the Merger and made numerous statements that are diametrically opposed to Lead Plaintiff's claims. *See* Point III.B, *infra*.

## RELEVANT FACTUAL BACKGROUND

### A. Lead Plaintiff Invests In TW Through A Specialized Fund Aimed At Profiting From "Mispriced" Securities

Lead Plaintiff oversees the investment of over $100 billion of assets through accounts managed by external investment advisors. [redacted] [1] [redacted]

[1] References to "Ex. __" are to the exhibits attached to the Transmittal Declaration of Johnathon E. Schronce filed contemporaneously with this opposition brief.

[redacted]

**B. Lead Plaintiff Purchases Substantial Amounts Of Both TW And Willis Stock Following The Announcement Of The Merger**

TW and Willis, both publicly traded companies, entered into the initial Merger Agreement on June 29, 2015. Ex. 3, Proxy (defined below), at 79-80. That day, TW's stock price closed at $137.98 per share. TW and Willis jointly announced the Merger, a cash and stock "merger of equals" in which the two companies' stockholders would become stockholders of a combined, publicly traded WTW, the next morning on June 30, 2015, prior to the opening of the market. *See* Ex. 4, June 30, 2015 Willis Press Release. Pursuant to the terms of the Merger Agreement, TW stockholders were to receive 2.6490 Willis shares and a pre-closing cash dividend of $4.87 for every TW share. *See id.* at 3. Upon the Merger's announcement on June 30, 2015, TW's stock price declined by 8.8%, to close at $125.80 per share, while Willis's stock price increased by 3.3%. *See* Am. Compl. ¶ 71, ECF No. 49. [redacted]

[redacted]



[2]

### C. TW And Willis Jointly File The Proxy Materials And Set The Record Date

The claims in this case center on Lead Plaintiff's allegations that the TW/Willis Defendants

[2]



omitted material information from the proxy materials disseminated in connection with the TW stockholder vote on the Merger. On October 13, 2015, TW and Willis jointly filed a proxy statement concerning the Merger (the "Proxy"), urging their respective stockholders to vote in favor of the Merger. *See generally* Ex. 3, Proxy. Lead Plaintiff alleges that the Proxy and a later proxy supplement filed on November 27, 2015 (the "Proxy Supplement") were false and misleading because they did not disclose, among other things, a September 2015 meeting between Mr. Haley and representatives of a 10.3% Willis stockholder, Defendant ValueAct Capital Management, L.P. ("ValueAct"), including ValueAct's then-CEO Jeffrey Ubben, about ValueAct's compensation philosophy for CEOs.

The Proxy set November 18, 2015 as the date for the special meeting of TW stockholders to vote on the Merger, and October 1, 2015 as the "Record Date" for that vote -- meaning that only those TW stockholders who held their shares as of October 1, 2015 were eligible to vote, regardless of any trading in the shares thereafter. *See id.* at 64. [redacted][3] However, by November 18, 2015, it had become clear that the TW stockholder vote would fall just short of the threshold needed to approve the Merger and, accordingly, the vote was adjourned. Following the adjournment, TW and Willis renegotiated the Merger consideration. Mr. Haley secured Willis's agreement to increase the special dividend to $10.00 per share, and TW and Willis filed the Proxy Supplement describing the November 2015 renegotiations. *See* Ex.

---

[3] [redacted]

15, Proxy Supplement.

**D. <u>TW's Stock Price Rises Upon The Merger's Approval</u>**

[REDACTED] Upon the announcement of the voting results, TW's stock price increased 4.41% from its closing price of $127.34 on December 10, 2015, to close at $132.96 on December 11, 2015, and Willis's stock price increased 3.78%. *See* Ex. 17, Fischel Report ¶ 33.[4]

On December 29, 2015, the last day that TW's stock traded before the issuance of the $10.00 special dividend in connection with the Merger, TW's stock price closed at $139.94 per share, which was $1.96 per share *above* the pre-Merger announcement (*i.e.*, unaffected) price of $137.98. [REDACTED]

The Merger closed on January 4, 2016, upon which TW's stockholders received WTW shares in exchange for their TW shares. [REDACTED]

[4] "Fischel Report" refers to Ex. 17, the Expert Report of Dr. Daniel R. Fischel.

[redacted] Additionally, Lead Plaintiff has voted "FOR" the election of Mr. Haley as a WTW director each year since 2016. *See, e.g.*, Ex. 20, 2018 Regents Vote Summary; Ex. 21, 2019 Regents Vote Summary.

**ARGUMENT**

**I. APPLICABLE LEGAL STANDARDS**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotations omitted). Accordingly, Fed. R. Civ. P. 23 "imposes stringent requirements for certification that in practice preclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). Lead Plaintiff "bear[s] the burden of demonstrating that the requirements of Rule 23 are satisfied" by a preponderance of the evidence. *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004); *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 104 (E.D. Va. 2009).

Rule 23 requires "a two-step analysis." *Meredith v. Mid-Atl. Coca Cola Bottling Co.*, 129 F.R.D. 130, 132 (E.D. Va. 1989). *First*, the movant must show that the proposed class meets the prerequisites set forth in Rule 23(a), including that the claims of the representative parties are "typical" of the claims of the proposed class (referred to as the "typicality" requirement) and that the representative parties will fairly and adequately protect the interests of the class (referred to as the "adequacy" requirement). *See* Fed. R. Civ. P. 23(a). *Second*, the "part[y] seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 613-14 (1997).

Lead Plaintiff seeks to certify the proposed class under Rule 23(b)(3), which is allowed only where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members."  *Clark v. Trans Union, LLC*, 2017 WL 814252, at *14 (E.D. Va. Mar. 1, 2017).  It is well-established that "the predominance criterion is far more demanding" than the "commonality" requirement of Rule 23(a), *Amchem*, 521 U.S. at 623-4, and "the mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement."  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 366 (4th Cir. 2014).  Moreover, "[d]istrict courts have wide discretion in deciding whether or not to certify a class." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003).  "Since the requirements of Rule 23 are often 'enmeshed in the factual and legal issues comprising the plaintiffs' cause of action,' the district court must rigorously examine the core issues of the case at the certification stage." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019) (quotation omitted), *cert. denied*, 140 S. Ct. 676 (2019).

## II.    CERTIFICATION SHOULD BE DENIED BECAUSE DAMAGES ARE NOT MEASURABLE ON A CLASS-WIDE BASIS

The damages model Lead Plaintiff has chosen to put forth in this action makes class certification inappropriate.  Lead Plaintiff posits that, "where, as here, 'liability can be determined on a class-wide basis,' Rule 23's requirements are satisfied, and issues concerning the calculation of damages present no bar to class certification."  Mot. at 22.  That is plainly incorrect, including because Lead Plaintiff overlooks and relies entirely on case law that pre-dates or fails to acknowledge the Supreme Court's seminal decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  There, the Supreme Court flatly rejected the notion that "at the class-certification stage any method of measurement is acceptable so long as it can be applied classwide," because "[s]uch a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* at 35-36.

Rather, to survive the predominance test, Lead Plaintiff must proffer a damages model that "measure[s] *only* those damages attributable" to its asserted theory of injury. *Id*. at 35 (emphasis added). "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*

Lead Plaintiff further contends that "[c]ourts should otherwise avoid evaluating the merits at the class-certification stage, as 'the likelihood of the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is proper.'" Mot. at 8 (quoting *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 195 (E.D. Va. 2015)). Lead Plaintiff is again incorrect. In *Comcast*, which supersedes Lead Plaintiff's cases and controls the analysis, the Supreme Court explained that the certification inquiry "will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'" 569 U.S. at 33-34. Indeed, the Supreme Court reversed because, "[b]y refusing to entertain arguments against respondents' damages model that bore on the propriety of class certification, simply because those arguments would also be pertinent to the merits determination, the Court of Appeals ran afoul of our precedents requiring precisely that inquiry." *Id.* at 34. This Court, accordingly, must "probe behind the pleadings" and, in turn, deny certification based on Lead Plaintiff's failure to present an acceptable damages model. *Id.* at 33.

### A.   Lead Plaintiff's Proposed Event Study Methodology Does Not Match Its Theory of Liability

Certification should be denied because Lead Plaintiff has failed to proffer a damages model that matches its legal theory -- namely, that the proxy materials omitted Mr. Haley's pre-Merger discussion with Mr. Ubben and, in the process, allegedly misled TW's stockholders and caused them to approve the Merger, in violation of Section 14(a). *See Comcast*, 569 U.S. at 38.

The facts of *Comcast* are instructive. There, the plaintiffs -- Philadelphia-area Comcast cable customers -- alleged that the company's anticompetitive activities in the region shielded the

company's prices from competitive pressures. *Id.* at 29-30. That claim required proof of injury from the alleged antitrust violation, for which the plaintiffs proffered four theories. *Id.* at 30-31. The district court, however, found that only one of those theories was capable of class-wide proof: the "overbuilder" theory. *Id.* at 31. Yet, the plaintiffs' damages expert, by his own admission, presented a damages model that failed to isolate damages attributable solely to the overbuilder theory. *Id.* at 31. Instead, his regression model compared actual cable prices with the "hypothetical prices" that he asserted "would have prevailed but for [Comcast's] allegedly anticompetitive activities." *Id.* at 32. As he further admitted, this "but for" scenario measured damages stemming from "the alleged anticompetitive conduct *as a whole*." *Id.* at 36-37 (emphasis added).

The district court certified the proposed class and the Court of Appeals affirmed, rejecting the defendants' challenge to the plaintiffs' damages theory because that challenge overlapped with the merits of the case. *Id.* at 35. The Supreme Court reversed, finding that the Court of Appeals' unwillingness "to decide 'whether the [plaintiffs' expert's] methodology [was] a just and reasonable inference or speculative'" reduced the Rule 23(b)(3) predominance test to a "nullity." *Id.* at 35-36. The Supreme Court emphasized that a class representative's proposed damages methodology cannot "identif[y] damages that are not the result of the wrong," and that "[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Id.* at 37-38 (quotations omitted).

Here, Lead Plaintiff uses an event study that does not measure damages attributable to its theory of liability. In composing an event study, an expert first studies how the defendant company's stock has historically performed in relation to companies in the defendant's industry and the market as a whole to determine the stock's "predicted return." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016). Next, the expert singles out dates on which news allegedly

"correcting" an alleged fraud entered the market. *Id.* The price movement on that day is the "actual return." Then, "[b]y comparing the predicted return with the actual return on the date of release of the supposedly correct information or immediately thereafter, the [event study] attempts to isolate the change in the return earned by investors that is attributable solely to the allegedly withheld or false information." *Id.* (quoting Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 Bus. Law. 1, 18 (1982)). The difference, known as the "residual return," measures the artificial inflation in the stock allegedly caused by the fraud prior to the correction and the damages attributable to that alleged fraud. *See Pfizer*, 819 F.3d at 649.

This type of methodology, which Lead Plaintiff proffers here, often works in cases under Section 10(b) of the Securities Exchange Act, involving "the purchase or sale of a security," because they typically involve allegations that: (i) the security's price was artificially inflated due to fraud; and (ii) stockholders were damaged following a price decline attendant to a "corrective disclosure" that revealed the fraud. The methodology typically works in that context because the residual return purports to measure losses attributable to the revelation of the alleged fraud.[5]

[5] Of course, even in Section 10(b) cases, courts have declined to certify proposed classes for failure to present a viable damages methodology under *Comcast*. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) ("Simply invoking the event study methodology . . . d[id] not assuage the Court that the class-wide damages methodology proposed w[ould] track Plaintiffs' theories of liability."); *see also Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) (rejecting as equivalent to "no damages model at all" an expert's assertion "that there are unspecified 'tools' available to measure damages"); *Ft. Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141-42 (S.D.N.Y. 2014) (declining to certify class because plaintiffs' expert merely "mention[ed] three methods" and failed to provide the court with "assurance beyond [the expert's] say-so" that "there [was] a damages model that [would] permit the calculation of damages on a classwide basis"); *Sicav v.Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) (declining to certify class because plaintiffs failed to show, "concretely, how [they] propose[d] to reliably establish damages"). Moreover, outside of the securities context, courts routinely decline certification on *Comcast* grounds. *See, e.g.*, *McMorrow v. Mondelez Int'l, Inc.*, 2020 WL 1157191, at *9 (S.D.

However, the methodology does not work, as here, in the context of a claim under Section 14(a), where there is no "corrective disclosure." That, presumably, is why Lead Plaintiff does not cite a *single case* in which an event study methodology like the one it proffers was put forth, much less accepted by a court, in a Section 14(a) case.[6]

Lead Plaintiff's proposed damages expert, Dr. David I. Tabak, asserts that his event study shows that "statistically significant price movements in response to specific events represent the gains or losses that [TW] shareholders experienced as a result of the merger." PX14 (Tabak Report) ¶ 9.[7] He then posits that, "[h]ad the proper disclosures, as alleged by Plaintiff, been made, and the merger been rejected, then these price movements would have been reversed." *Id.* However, he effectively *assumes* his own conclusion without the economic evidence that would show that to be the case, such as the reaction to a corrective disclosure. In fact, as the TW/Willis Defendants' damages expert, Dr. Fischel, explains in his report, the economic evidence does *not* support either of the two lynchpins of Dr. Tabak's damages methodology -- (i) that stockholders would have rejected the Merger, or (ii) that the price movements would have been reversed. Those

---

Cal. Mar. 9, 2020) (declining to certify class because "Plaintiffs' theory of liability is . . . not consistent with their damages model as required by *Comcast*"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 143 (D.D.C. 2017) (declining to certify class because plaintiff failed to provide a "reliable means of assessing class-wide damages"), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019).

[6] While Lead Plaintiff does not allege a corrective disclosure *per se*, it has alleged that WTW "belatedly disclosed the details of Haley's compensation package" on several dates in February, April, and June 2016, Am. Compl. ¶ 153, ECF No. 49, and that public court filings on May 26, 2017 disclosed that Mr. Haley's final compensation plan was consistent with the plan that ValueAct had presented to him at their allegedly secret meeting in September 2015. *Id.* ¶ 80. Lead Plaintiff, however, does not and cannot allege that any of these disclosures constituted a "corrective disclosure": there was *no* statistically significant price reaction on the dates of those disclosures. *See* Ex. 17, Fischel Report ¶ 46 n.98.

[7] References to "PX __" are to the exhibits attached to the Declaration of Salvatore J. Graziano filed with the Motion. *See* ECF No. 147-1.

predicates are required to ensure that Lead Plaintiff's methodology is built on "just and reasonable inference[s]" and not "speculative," as required by *Comcast*. 569 U.S. at 35-36; *see infra*, Section II.C. Lacking an economic basis, Dr. Tabak's event study does not meet the *Comcast* requirements and, therefore, class certification is inappropriate.

### B. Lead Plaintiff And The Proposed Class Have Not Suffered Any "Actual Damages" Or "Out of Pocket" Losses

Lead Plaintiff ignores that the Securities Exchange Act limits recoverable damages in cases thereunder to "actual damages." 15 U.S.C. § 78bb(a) ("No person permitted to maintain a suit for damages under the provisions of this chapter shall recover . . . a total amount in excess of the *actual damages* to that person on account of the act complained of.") (emphasis added). It also overlooks the Supreme Court's opinion in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), which further underscores that "[a] private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." *Id.* at 338. While the TW/Willis Defendants do not dispute that some courts have held that "out-of-pocket" losses may be an appropriate damages measure under Section 14(a), Mot. at 21, there are *no* such losses here.

[redacted]

Moreover, Lead Plaintiff's attempt to recover a purported "out-of-pocket" loss based on a stock price decline that occurred in June 2015 is, [redacted]

[redacted]. It is, of course, impossible that TW's stock price in June 2015 was impacted -- and, in turn, gives rise to damages *actually* caused -- by the non-disclosure of a meeting that did not take place for another three months and allegedly was omitted from a proxy statement that was not disseminated for another four months. Any "out of pocket" theory that relies upon a June 2015 stock price decline, accordingly, must be rejected. Instead, the only damages that could flow from the alleged proxy omissions would have to *post*-date both (i) the September 2015 meeting and (ii) the filing of the Proxy and the Proxy Supplement, in October and November 2015, respectively. Yet, TW's stock price *increased* after these events. *See* Ex. 17, Fischel Report Ex. 1.

### C. Lead Plaintiff's "Lost Opportunity" Damages Theory Must Be Rejected As Overly Speculative And Contrary To The Available Economic Evidence

Given the absence of "out of pocket" losses here, which Lead Plaintiff acknowledges is the "standard" measure of damages for a Section 14(a) claim, the Court should be highly skeptical of any after-the-fact, litigation-driven damages theory Lead Plaintiff puts forward. Lead Plaintiff's theory is that, had the alleged proxy omissions been disclosed, TW's stockholders would have voted against the Merger, and that, as a result, TW's stock price supposedly would have returned to its pre-Merger announcement (*i.e.*, unaffected) level. *See* PX14, Tabak Report ¶ 9. Notwithstanding Lead Plaintiff labeling this an "out-of-pocket loss" theory (*see* Mot. at 21), it is, in actuality, a form of "lost opportunity" damages -- *i.e.*, the "loss of a possible profit or benefit, an addition to the value of one's investment." *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976).

There are a number of problems with this theory. First, the TW/Willis Defendants are aware of no decision from within the Fourth Circuit which has held that "lost opportunity" damages qualify as "actual damages" for purposes of a claim under the Securities Exchange Act.

The acceptance of "lost opportunity" damages by certain courts outside the Fourth Circuit can be traced to the decision of the U.S. Court of Appeals for the Third Circuit in *Gould*, in which the court simply surmised -- without any true statutory analysis or review of the legislative history -- that "while the [Securities Exchange] Act speaks in terms of 'actual' damages the dichotomy is between actual and punitive damages." *Id.* at 781. Further, the *Gould* court justified its activism based upon the Supreme Court's suggestion in *J. I. Case Co. v. Borak*, 377 U.S. 426, 435 (1964), that the "federal courts have the power to grant all necessary remedial relief" to redress violations of Section 14(a). 535 F.2d at 781. However, the Supreme Court has expressly rejected the *Borak* approach, stating that "[t]he rule that has emerged in the years since *Borak* and *Mills* came down is that recognition of any private right of action for violating a federal statute must ultimately rest on congressional intent to provide a private remedy," and that "[f]rom this the corollary follows that the breadth of the right once recognized should not, as a general matter, grow beyond the scope congressionally intended." *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102 (1991); *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (recognizing *Borak*'s abrogation). Indeed, this more recent precedent and the Securities Exchange Act's rejection of "windfall" profits command that courts resist straying from the Securities Exchange Act's text limiting recoveries to "actual damages."

Second, even in the few cases outside of this Circuit that have allowed "lost opportunity" theories, the courts were careful to limit any recoveries to just those that were non-speculative. In other words, the alleged damages had to be "based on 'certain, fixed and demonstrable profits thwarted by a defendant's alleged fraud.'" *In re DaimlerChrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 627 (D. Del. 2003) (quotation omitted). Lead Plaintiff's proposed damages expert, Dr. Tabak, is thus incorrect that, "as a matter of law, [Lead] Plaintiff does not have to prove what would have

happened to [TW's] share price in the 'but-for world' where the disclosures they allege should have been made had indeed been made."  PX14, Tabak Report ¶ 19.  Lead Plaintiff must -- but cannot -- prove that fact.

For example, in *Tse v. Ventana Medical Systems, Inc.*, 297 F.3d 210 (3d Cir. 2002), the Court of Appeals affirmed the district court's grant of summary judgment in favor of defendants because the plaintiffs' proposed damages theory was "wholly speculative," as it assumed that, had an executive compensation package been disclosed, stockholders would have voted down a merger and the company would have secured a deal with a more favorable exchange ratio for stockholders. *Id.* at 220-23.  According to the Court of Appeals, "[t]he highly speculative chain of events that the plaintiffs ask us to infer from the evidence they have presented" was exactly the sort of "wholly speculative" scenario in which "lost opportunity" damages should be forbidden.  *Id.* at 223. Likewise, in *DaimlerChrysler* (which Lead Plaintiff cites), the court agreed that in *Tse*, "omissions about the directors' compensation package were entirely unrelated to the value of the plaintiffs' investment" (a view that resonates here), and noted that "[b]ecause there was no link between the alleged omission and the value of the investment, I agree that it would be highly speculative to assume that the stockholders would have voted against the merger based on the disclosure of the directors' compensation package."  294 F. Supp. 2d at 632.[8]

Recent cases routinely reject damages claims that depend on "hypothes[es] about what the parties would have done if the circumstances surrounding their transaction had been different."

---

[8] *See also Goldkrantz v. Griffin*, 1999 WL 191540, at *8 (S.D.N.Y. Apr. 6, 1999) (rejecting as "too speculative to support recovery of damages" and "deficient as a matter of law" plaintiff's damages theory that required showing: (i) the buyer "would have abandoned the licensing arrangement if it were forced to disclose in the proxy statement its intent not to use the license;" (ii) the seller's negotiator "would have demanded more compensation for all shareholders" if he had not been granted the licensing agreement, and (iii) the buyer would have agreed to more consideration), *aff'd*, 1999 WL 1212560 (2d Cir. Dec. 13, 1999).

*Gray v. Wesco Aircraft Holdings, Inc.*, 2020 WL 1904019, at *26 (S.D.N.Y. Apr. 16, 2020) (quotation marks omitted). For example, in *Mack v. Resolute Energy Corp.*, 2020 WL 1286175 (D. Del. Mar. 18, 2020), the court rejected plaintiff's loss causation theory that, "if the material omissions had not occurred, the shareholders would have voted the merger down" and their pre-merger stock allegedly would have been worth more, because "[i]t would be difficult to make a good faith allegation that the market value on [the merger date] was greater than [the merger consideration] per share." *Id.* at *10. And, in *In re GTx, Inc. Shareholders Litigation*, 2020 WL 3439356 (S.D.N.Y. June 23, 2020), a case involving a stock-for-stock merger in which plaintiffs alleged a similar theory of loss causation, the court noted: "[t]o permit Plaintiffs to recover on the 'assumption that had the [c]ompany remained independent,' [its shares] would have achieved a hypothetically higher stock value, would 'improperly result in the windfall damages prohibited.'" *Id.* at *5; *see also In re Tangoe, Inc. Stockholders Litig.*, 333 F. Supp. 3d 77, 109 (D. Conn. 2018).

Dr. Tabak's damages estimate depends on similar speculation. [REDACTED] Second, Dr. Tabak *assumes* that stockholders would care enough about the disclosure of a single meeting between Mr. Haley and Mr. Ubben -- which occurred two months after the Merger was originally announced and two months before it was renegotiated and had nothing to do with the Merger's economic terms -- enough to change the votes of more than 19% of the stockholders who voted for the Merger. That would equate to nearly 8 million shares changing from "FOR" to "AGAINST" based on the additional disclosure of that single meeting. Third, and even more attenuated, Dr. Tabak *assumes* that if the Merger had been rejected, the terms would not have been renegotiated and TW's stock price would have returned to its unaffected trading price five months prior, as of June 30, 2015. PX14, Tabak Report ¶ 9.

Of course, these assumptions, beyond being entirely and impermissibly speculative, are also contrary to the available economic evidence, which does *not* support Dr. Tabak's foundational assumption that disclosure would have prompted stockholders to reject the Merger:

- By the time of the stockholder vote on the Merger, stockholders understood that Mr. Haley would receive a "substantial increase in compensation" as CEO of the combined, post-Merger company. Ex. 17, Fischel Report ¶ 42. It was also public knowledge that Willis's CEO, Mr. Casserley, was paid more than Mr. Haley, and Mr. Haley would not make less in compensation than Mr. Casserley as CEO of the post-Merger company. Ex. 3, Proxy, at 115-20.

- Stockholders also already knew that Mr. Haley's substantial TW holdings incentivized him to obtain the best deal possible. Ex. 17, Fischel Report ¶ 43.

- ISS and Glass Lewis, two of the most significant and influential proxy advisors, did not change their recommendations "AGAINST" the Merger even after Mr. Haley re-negotiated the consideration to more than double the previously agreed upon and announced special dividend -- meaning that stockholders like Lead Plaintiff, who vote in accordance with ISS and do not perform their own, independent assessment or make their own, independent voting decisions, also would not have changed their votes. *Id.* ¶ 44.

- 

- TW's stockholders voted to approve the Merger and, as Dr. Tabak concedes, they "would not have been expected to support any deal that would have given them less than what they would have received in the absence of a merger." Ex. 17, Fischel Report ¶ 44 n. 91.

- Following the Merger, WTW's stock price did not materially change once the market learned of Mr. Haley's actual compensation plan, which Lead Plaintiff alleges was substantially similar to the supposed "proposal" that was discussed in September 2015 and should have been disclosed in the proxy materials. *Id.* ¶ 46.

- More than 87% of the WTW shares that were voted at WTW's 2016 annual stockholder meeting voted "FOR" an amendment to the company's 2012 Equity Incentive Plan to facilitate Mr. Haley's new compensation arrangement. *Id.* ¶ 47.

- Approximately 83% of the shares voted at WTW's 2017 annual stockholder meeting voted "FOR" Mr. Haley's compensation arrangement in an advisory "say

on pay" vote. *Id.* ¶ 48.[9]

Professor Fischel's report also demonstrates that the economic evidence does not support the next assumption underpinning Dr. Tabak's damages model: that the TW stock price movements following the announcement and approval of the Merger "would have been reversed" upon the stockholders' rejection of the Merger. PX14, Tabak Report ¶ 9. In fact, Dr. Fischel shows that the economic evidence contradicts Dr. Tabak's view that TW's stock price would have increased by $12.19 per share -- or $6.57 per share higher than the $5.62 per share that, in reality, it increased upon the Merger's approval. Ex. 17, Fischel Report ¶ 51. As Professor Fischel explains, TW's closing price on December 10, 2015, the day before the stockholder vote, "reflected the probability-weighted average value of both possible outcomes of the shareholder vote." *Id.* That the price increased by $5.62 upon the Merger's approval means that the price would have *declined* if the Merger had been rejected. Dr. Tabak's model presupposes that the price would have increased even more on rejection than it did on approval, which simply makes no economic sense.[10]

[redacted],

[9] Although Dr. Tabak highlights ISS's 2017 recommendation "AGAINST" Mr. Haley's compensation plan, he ignores two other key facts: that *both* a majority of WTW's stockholders (well in excess of the number needed to approve the Merger) voted "FOR" that plan *and* that Glass Lewis recommended that WTW's stockholders vote "FOR" that plan. PX14, Tabak Report ¶ 23; *see also* Ex. 17, Fischel Report ¶ 48.

[10] [redacted]



Finally, the ramifications of accepting Dr. Tabak's methodology are profound. Following *Comcast*, the TW/Willis Defendants are aware of only three cases that have certified a Section 14(a) class following a contested motion for certification. Two of those cases were decided by

11



courts in the Third Circuit, which is an outlier that has limited *Comcast* to antitrust cases. *See Hurwitz v. LRR Energy L.P.*, 2018 WL 6804481, at *3 n.3 (D. Del. Jan. 2, 2018) (warning certification could be "revisit[ed]"); *In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104, at *14 (D. Del. June 6, 2013).[12] In the third case, *Schulein v. Petroleum Dev. Corp.*, 2014 WL 114520 (C.D. Cal. Jan. 6, 2014), the defendants conceded that it was possible to value the twelve limited partnerships at issue there, but argued that that exercise rendered the case better suited for individual (as opposed to class-wide) adjudication. *See id.* at *7. Significantly, if this Court were to grant the Motion, the TW/Willis Defendants believe it would mark only the second post-*Comcast* certification of a contested Section 14(a) class outside of the Third Circuit -- and, importantly, the first such certification to be granted over a *Comcast*-based objection to the proposed damages methodology itself. Moreover, the TW/Willis Defendants believe that it would be the first contested post-*Comcast* certification of a Section 14(a) class in the Fourth Circuit.

To allow a proposed Section 14(a) class action to survive *Comcast* scrutiny solely based upon a stock price decline upon the announcement of a merger -- without any connection to the alleged violation for which the stockholders seek redress -- would extend Section 14(a) in a way never intended, effectively imposing liability against companies strictly for, and providing stockholders with insurance against, negative stock price reactions attendant to the announcement of a merger. It would also contradict Supreme Court precedent holding that the goal of the securities laws is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura*, 544 U.S. at 345. Simply put, certification is an untenable result -- again, particularly where, as here,

[12] As noted above, courts outside of the Third Circuit routinely apply *Comcast* to cases that do not raise antitrust issues, including cases involving securities claims. *See supra* n.5.

*the stock drop occurred well before the alleged violation.*

## III. THE MOTION SHOULD BE DENIED FOR SEVERAL ADDITIONAL REASONS

### A. Lead Plaintiff's Proposed Class Definition Is Significantly Overly Broad

The U.S. Court of Appeals for the Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *EQT Prod. Co.*, 764 F.3d at 358 (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir.1972)). Subject to certain limited exclusions, Lead Plaintiff moves to certify a class consisting of: "[a]ll persons and entities that were [TW] shareholders of record as of October 1, 2015, the record date for [TW] shareholders to be eligible to vote on the merger of [TW] and [Willis], and who were damaged thereby. . . ." Mot. at 2-3. This definition is overbroad because it includes certain categories of potential class members who are not entitled to recover in this action. Specifically, the Court, at a minimum, should narrow the class definition to exclude: (i) any TW stockholders as of October 1, 2015 who sold their shares prior to the closing of the Merger; (ii) any TW stockholders as of October 1, 2015 who were also Willis stockholders and whose gains (to the extent that there were any) on their Willis shares offset their alleged losses on their TW shares; and (iii) any TW stockholders as of October 1, 2015 who recover in connection with a related Delaware Court of Chancery action.

#### (1) TW Stockholders Who Sold Their Shares After The Record Date, But Before The Closing Of The Merger, Should Be Excluded

As indicated above, Lead Plaintiff's proposed class definition includes stockholders who held TW shares as of the record date, October 1, 2015, which Lead Plaintiff vaguely asserts "were damaged" by the Merger. In the event the Court were to grant the Motion, that overbroad definition should be limited to only those stockholders who held TW shares as of the record date and continued to hold those shares through the January 4, 2016 closing of the Merger and received

the Merger consideration (by which they were allegedly "damaged"). A plain reading of the Motion and supporting documents reveals that Lead Plaintiff did not intend to exclude potential class members who sold their TW shares after the record date, but before the Merger's closing. To be sure, Dr. Tabak calculates supposed class-wide damages by multiplying his damages figure of $6.57 per share by "all Towers shares outstanding," without excluding those TW stockholders who exited their investment after the record date but before the closing. PX14, Tabak Report ¶ 3.

It is axiomatic that "no class may be certified that contains members lacking Article III standing." *In re Deepwater Horizon*, 739 F.3d 790, 801 (5th Cir. 2014) (quoting *Denney v. Deutsche Bank* AG, 443 F.3d 253, 263-64 (2d Cir. 2006)). TW stockholders who sold their shares after the record date could not have suffered an injury-in-fact, a key standing requirement. *See Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) ("[n]o case or controversy exists without injury-in-fact, it is the '[f]irst and foremost' element of Article III standing") (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)); *see also*, *e.g.*, *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 237 (S.D.N.Y. 2012) (dismissing Section 14(a) claim for lack of standing where "Bricklayers has failed to proffer any facts showing that . . . it retained its Transocean shares after the corrective disclosures began"). In addition to loss causation generally, Section 14(a) requires "transaction causation," meaning that the supposed losses sought to be recovered must be tethered to the transaction which is the subject of the allegedly deficient proxy statement, *i.e.*, the merger itself.[13] However, stockholders who choose to sell their shares prior to the merger closing are harmed (if

[13] "Transaction causation" requires proving that "'the proxy solicitation . . . was an essential link in the accomplishment of the *transaction' that resulted in the economic loss*." *Hurtado v. Gramercy Prop. Tr.*, 425 F. Supp. 3d 496, 515 (D. Md. 2019) (emphasis added) (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970)). Because these stockholders sold their shares, the closing of the Merger could not have "caused" them to suffer an economic loss.

at all) by their independent decision to sell their shares, not by the closing of the merger which is the subject of the proxy solicitation. For example, Lead Plaintiff's proposed class would include holders who owned and sold TW stock before the allegedly misleading proxy materials were even issued.

Likely for this reason, a number of courts that have ruled on certification in the Section 14(a) context have been careful to adopt narrow class definitions to account for this precise concern. *See*, *e.g.*, *Azar v. Blount Int'l Inc.*, 2019 WL 7372658, at *3 (D. Or. Dec. 31, 2019) (class defined as "[a]ll persons who held Blount common stock *continuously* from March 4, 2016, the record date for voting on the Transaction, *through April 12, 2016, when the Transaction was completed*. . . .") (emphasis added).[14] In the event the Court were to grant the Motion, it should limit the class definition to exclude holders of TW stock as of the record date who sold their shares prior to the closing of the Merger. This is an important limitation because, as Professor Fischel explains, millions of TW shares changed hands between the record date and the closing, with an average daily trading volume of approximately 684,279 shares per day, Ex. 17, Fischel Report ¶ 62 n.127, which would drastically reduce the size of any class.

**(2) TW Stockholders Who Also Held Willis Shares Should Be Excluded To The Extent Of Their Overlapping Holdings**

In the event the Court were to grant the Motion, it should also exclude TW stockholders who realized an offsetting gain from the Merger through their simultaneous holding of Willis

[14] *See also Hurwitz*, 2018 WL 6804481, at *1 (Section 14(a) class defined as "[a]ll persons or entities: Holding LRR Energy, L.P. ('LRR') common units as of August 28, 2015 *through the October 5, 2015 close of Vanguard Natural Resources, LLC's ('Vanguard') acquisition of LRR* . . . .") (emphasis added); *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 294 (D. Del. 2003) (limiting Section 14(a) class to "all persons who exchanged shares of Chrysler Corporation ('Chrysler') for shares of DaimlerChrysler AG ('DaimlerChrysler') in connection with the November 1998 merger of Chrysler and Daimler–Benz AG into DaimlerChrysler").

shares (to the extent of their overlapping holdings) because they lack an injury-in-fact and, thus, standing. As explained above, the Securities Exchange Act limits any recovery to "actual damages" suffered as a result of the Merger. *See* 15 U.S.C. § 78bb(a)(1). This necessarily must take into account and offset any corresponding gains recognized as a result of the same transaction. *Cf. In re Refco Inc. Sec. Litig.*, 2013 WL 4078410, at *2 (S.D.N.Y. Aug. 2, 2013) ("As a general rule, plaintiffs cannot claim damages where the same fraud alleged to be the cause of a loss also permitted a countervailing gain") (quoting *Ostano v. Commerzanstalt Telewide Sys., Inc.*, 794 F.2d 763, 766 (2d Cir. 1986)); *see also Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 202 (S.D.N.Y. 2015) ("[W]here both a plaintiff's losses and gains derived from a single causal event, the losses it sustains are netted against all of that plaintiff's gains.") (quotation omitted).

Because the Merger was, in part, a stock transaction through which the stockholders of two publicly traded companies became stockholders of the combined company, those stockholders competed for their respective ownership share of the combined company. Thus, to the extent their TW shares suffered a loss (as Lead Plaintiff claims), their Willis shares correspondingly benefited (to the same extent of the alleged loss). [redacted]

Assuming damages on the TW side, any proposed class members who held *both* TW *and* Willis shares had any damages on their TW shares offset (to the extent of their overlapping holdings) by the corresponding gains on their Willis shares. Ex. 17, Fischel Report ¶¶ 63-64. Again, this is not merely a hypothetical issue: Professor Fischel estimates that almost 26 million TW shares held by institutional holders -- approximately 42% of the total TW shares outstanding -- were *not* damaged because of the offsetting gains on their Willis shares. *Id.* ¶ 64.

        **(3) Any Stockholders Who Recover in a Parallel Delaware Action Must Be Excluded from Any Class**

The proposed class should also exclude any stockholder who recovers in a breach of fiduciary duty action arising out of the same facts pending before the Delaware Court of Chancery, *In re Towers Watson & Co. Stockholders Litigation*, C.A. No. 2018-0132-KSJM. Lead Plaintiff itself attempted to become lead plaintiff in the parallel Delaware Action and argued that the classes were essentially identical. *See* Ex. 24, Mar. 9, 2018 Mot. for Consol. and Application for Appointment of Lead Plaintiff and Lead Counsel. A plaintiff cannot "double recover" on both federal and state law claims arising from the same facts and seeking identical relief. *See Sandberg v. Va. Bankshares, Inc.*, 979 F.2d 332, 340 n.5 (4th Cir. 1992), *vacated on other grounds*, 1993 WL 524680 (4th Cir. Apr. 7, 1993). Accordingly, any TW stockholders who recover in Delaware must be excluded from any class recovery here.

**B. Lead Plaintiff Is Not Typical And Cannot Represent The Proposed Class**

The Court should decline to appoint Lead Plaintiff as the named representative of the proposed class because it is subject to unique and distracting defenses that render it "atypical" of other proposed class members. A proposed class representative's claim is "typical" when the class representative is "part of the class and possess[es] the same interest and suffer[s] the same injury as the class members." *Lienhart v. Dryvit Sys.*, 255 F.3d 138, 147 (4th Cir. 2001). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d. 331, 340 (4th Cir. 1998). But "even where a putative class representative's claim is 'typical,' 'class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'" *Shiring v. Tier Technologies, Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007). "[T]o defeat class certification it is not necessary that the unique defense asserted

against the putative class representative ultimately succeed. Instead, the presence of even an arguable defense peculiar to the named plaintiff may destroy the required typicality." *Id.* (internal alterations omitted).

**(1) Lead Plaintiff's Claims Are Time-Barred**

This Court originally dismissed this action under the one-year statute of limitations applicable to actions brought under Section 14(a). *See In re Willis Towers Watson plc Proxy Litig.*, 2018 WL 3423859, at *1 (E.D. Va. July 11, 2018), *rev'd*, 937 F.3d 297 (4th Cir. 2019). On appeal, Lead Plaintiff argued that the resolution of a statute of limitations defense was "inappropriate at the pleading stage," and that a motion to dismiss that "tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred." Ex. 25, Lead Plaintiff's Appellant Br. at 23 (citation omitted). The Court of Appeals reversed the dismissal, holding, *inter alia*, that, on a motion to dismiss, the Court is constrained to "accept the plaintiffs' well-pleaded factual allegations as true," and that there was "no allegation in the amended class action complaint that *class counsel* knew the material facts more than a year before November 2017. In fact, the complaint suggests that *counsel and class members* didn't know the material facts until discovery in the state court suit in 2017." *Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 308 (4th Cir. 2019) (emphasis added). However, the Court of Appeals "express[ed] *no opinion* on whether the defendants can prove, *after discovery*, that the suit is time barred." *Id.* at 304 (emphasis added). Thus, the Court of Appeals based its ruling entirely on the allegations of the Amended Complaint, which it was obligated to accept as true, that proposed class counsel, Bernstein Litowitz Berger & Grossman LLP ("BLBG"), did not have access to "the material facts" until 2017.

The one-year statute of limitations in this case began to run from the time "(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered,

'the facts constituting the violation' -- whichever comes first." *Id.* at 303 (quoting *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010)). Although the TW/Willis Defendants were limited at the motion to dismiss stage in their ability to raise facts outside of the pleadings, discovery has shown that BLBG did, in fact, have access to the vast majority of the documents that form the basis of the claims here more than a year before this action was filed in November 2017. In particular, prior to November 2016, BLBG received over 240,000 pages of documents, including many of the documents that are cited in the Amended Complaint and that specifically informed BLBG of the facts that formed the basis for the claims here.

, [15]

[15]



[16] .[17]

The Court of Appeals already recognized in the context of this case that "[u]nder principles of agency law, courts do sometimes impute to a client knowledge that a lawyer obtained before representing that client." *Willis Towers Watson*, 937 F.3d at 309 (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962)); *see also Stieberger v. Sullivan*, 738 F. Supp. 716, 726-27 (S.D.N.Y. 1990). An agent's knowledge gained prior to the principal-agent relationship is imputed to the principal when "that knowledge can reasonably be said to be present in the mind of the agent while acting for the principal, or where [the agent] had acquired it so recently as to raise the presumption that [the agent] still retained it in mind." *Nationwide Life Ins. Co. v. Attaway*, 254 F.2d 30, 36 (4th Cir. 1958) (quoting 2 Am. Jur. 294); *see also Bryan v. Land*, 215 B.R. 398, 404 (B.A.P. 8th Cir. 1997) (imputing attorney's knowledge gained prior to attorney-client relationship to client and

[16] . *See, e.g.*, Ex. 32, Pet'rs' Mot. Compel Discovery from Willis (filed Sept. 27, 2016). Consequently, BLBG had both constructive and actual knowledge of the facts underlying the claims here more than a year before the filing of this action.

[17]

barring client from filing untimely motions).[18]

That is undoubtedly true here, where Lead Plaintiff's counsel revealed in discovery that an "ethical wall" was put in place only *the week before* the appraisal action was even dismissed so that BLBG could prepare to bring this lawsuit. *Compare* Ex. 33, June 29, 2020 Email from R. Boon to J. Amsel (representing "ethical wall" was put in place on September 11, 2017), *with* Ex. 34, Sept. 18, 2017 Stip. and Order of Dismissal. Discovery has also revealed that BLBG and Lead Plaintiff entered into a "Portfolio Monitoring Agreement" in 2012 through which BLBG has been monitoring Lead Plaintiff's security ownership for potential "opportunities" to bring fraud claims on behalf of Lead Plaintiff. Ex. 22, Hamill Tr. 63, 118-120; Ex. 5, Pl.'s Am. Interr. Resp. at 34-35. Given that BLBG had a contractual agreement and obligation to actively monitor Lead Plaintiff's portfolio at the time, BLBG's access to information underlying the claims in this suit should be imputed to Lead Plaintiff.

Lead Plaintiff argued in opposition to the TW/Willis Defendants' original motion to dismiss that BLBG's knowledge should *not* be imputed to Cambridge or Lead Plaintiff because BLBG received the emails and other documents underlying this case subject to a confidentiality order in the appraisal action that barred it from using those emails and other documents in any action other than the appraisal action. *See* Ex. 35, May 16, 2016 Protective Order. Although some cases have suggested that the knowledge of confidential information in the possession of a lawyer should not be imputed to his or her client, that does not apply here [redacted]

[redacted] Indeed,

[18] Although courts are hesitant to impute knowledge from class counsel to class members unless that counsel had previously represented those class members in related individual suits, *see Willis Towers Watson*, 937 F.3d at 308-09, BLBG's knowledge should be imputed to its own clients, Cambridge and Lead Plaintiff. *See, e.g.*, *Stieberger*, 738 F. Supp. at 726-27 (barring principal's participation in class action where attorney's prior knowledge was imputed to principal).

Lead Plaintiff did not even have the inkling to participate in this litigation until BLBG brought the potential "opportunity" to do so to Lead Plaintiff. *See id.* at 63. Moreover, and importantly, it was not another *client's* confidential information that the TW/Willis Defendants submit should be imputed from BLBG to Cambridge and Lead Plaintiff (which BLBG would have an ethical duty not to use in a subsequent suit) but, instead, the *TW/Willis Defendants'* confidential information. *See* Ex. 36, June 30, 2020 Letter from R. Boon to J. Amsel at 3 (arguing that BLBG had no ethical obligation not to bring this suit and was barred solely by a confidentiality agreement with the TW/Willis Defendants). Apparently, as a means of avoiding the confidentiality order in the appraisal action, BLBG filed a series of motions to which it attached dozens of confidential documents as exhibits. *See, e.g.,* Ex. 37, Aug. 11, 2017 Pet'rs' Mot. in Limine to Preclude Respondent from Arguing that Merger Terms are Indication of Fair Value. BLBG then filed a series of notices and motions challenging the confidential treatment of those documents. *See, e.g.,* Ex. 38, Aug. 24, 2017 Challenge to Confidential Treatment ¶ 4. This has become BLBG's "playbook" in recent cases, *see, e.g.*, *In re Appraisal of Columbia Pipeline Group, Inc.*, 2018 WL 4182207, at *1, 5 (Del. Ch. Aug. 30, 2018) (ruling on challenge to confidential treatment of exhibits and court filings in Delaware appraisal action in which respondents argued BLBG sought to use the previously confidential filings to bring a second action), which Lead Plaintiff's counsel does not deny. *See* Ex. 36, June 30, 2020 Letter from R. Boon to J. Amsel at 3 (citing *Columbia Pipeline* as justification for bringing this action and using previously confidential information obtained through challenges to confidential treatment).

In addition, in opposing the TW/Willis Defendants' original motion to dismiss, Lead Plaintiff represented to this Court, through an attorney declaration, that BLBG had instituted an "ethical wall" internally to prevent the sharing of information by the BLBG teams prosecuting the

appraisal action and this action. S. Graziano Decl., ECF No. 57-1. [redacted]

In short, given that BLBG (i) clearly received the confidential information more than one year before the filing of this action, (ii) has never been bound by any ethical duty not to use that confidential information in this action, and (iii) has indisputably been the driver of this litigation, as a matter of equity and fairness, its knowledge of the facts underlying this suit should be imputed, at a minimum, to its own clients (both Cambridge and Lead Plaintiff). And, because the one-year statute of limitations begins to run on a Section 14(a) claim when "a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation,'" this action would have had to have been initiated by August 2017 to be timely. The original complaint, however, was not filed until November 21, 2017, three months after the statute of limitations had run. *See* Compl., ECF No. 1. Although the Court of Appeals suggested that this theory of imputation may apply only to counsel's "individual clients," as opposed to all class members,[19] Lead Plaintiff, BLBG's individual client in this action, at a minimum, is subject to a "unique defense" that renders it

[19] *Willis Towers Watson*, 937 F.3d at 309 ("But that principle has developed in the context of individual clients, and we have reason to doubt that [imputation] should be applied in the same way for class actions.").

atypical and that threatens to become a focus of this litigation and the ultimate trial.

**(2) Additional Factors Render Lead Plaintiff Atypical**

Several other factors also render Lead Plaintiff differently situated than other proposed class members. First, as indicated above, Lead Plaintiff purchased more than 95% of its TW shares *after* the "stock drop" that principally forms the basis of the alleged class-wide damages. [REDACTED] Lead Plaintiff's divergent financial position vis-à-vis the rest of the proposed class renders Lead Plaintiff atypical, including because it did not suffer the same or similar injury as the proposed class it seeks to represent. As the Supreme Court has repeatedly held, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citation omitted). Courts routinely refuse to appoint those who profited off of the alleged fraud to serve as lead plaintiff because, where a plaintiff has made a profit during the class period, "[a]s he has not suffered a loss, his claim fails, and he is not a typical representative of the class." *See In re Organogenesis Sec. Litig.*, 241 F.R.D. 397, 403 (D. Mass. 2007); *Sonar*, 92 F. Supp. 3d at 205 (denying class certification because lead plaintiff was "subject to the potentially meritorious defense that he suffered no economic loss attributable to defendants' alleged wrongdoing"); *In re Cable & Wireless, PLC Sec. Litig.*, 217 F.R.D. 372, 378-79 (E.D. Va. 2003) (declining to appoint as lead plaintiff stockholders who sold their shares before the alleged corrective disclosure and also declining to appoint stockholder who profited off trades in the securities); *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173–74 (W.D.N.Y. 2007) (collecting cases), *opinion modified on denial of reconsideration*, 2007 WL 3197318 (W.D.N.Y.

Oct. 26, 2007).

Second, Lead Plaintiff is atypical from the proposed class that it seeks to represent because its external investment managers, to whom Lead Plaintiff conferred complete trading discretion, made numerous statements, internally, that are diametrically opposed to Lead Plaintiff's claims.

When these investment managers are called to testify at trial, their testimony will undercut any arguments Lead Plaintiff seeks to make on behalf of the class, due to Lead Plaintiff's inability to argue that its own, hand-selected investment advisors, who, again, possessed complete trading discretion, are not representative of what a "reasonable stockholder" would determine was important in determining how to vote on the Merger.

**CONCLUSION**

For the foregoing reasons, class certification should be denied.

Dated: July 13, 2020

Respectfully submitted,

*/s/ Johnathon E. Schronce*

Edward J. Fuhr (Va. Bar No. 28082)
Eric H. Feiler (Va. Bar No. 44048)
Johnathon E. Schronce
**HUNTON ANDREWS KURTH LLP**
951 East Byrd Street
Richmond, Virginia 23219-4074
Tel: (804) 788-8201
Fax : (804) 788-8218
efuhr@huntonAK.com
efeiler@huntonAK.com
jschronce@huntonAK.com

John A. Neuwirth (*pro hac vice*)
Joshua S. Amsel (*pro hac vice*)
Matthew S. Connors (*pro hac vice*)
Amanda K. Pooler (*pro hac vice*)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax: (212) 310-8007
john.neuwirth@weil.com
josh.amsel@weil.com
matthew.connors@weil.com
amanda.pooler@weil.com

*Counsel for the TW/Willis Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of July 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record. I also certify that on the 13th day of July 2020, counsel of record were served, via electronic mail, with an unredacted version of the foregoing, which was filed under seal.

*/s/ Johnathon E. Schronce*
Johnathon E. Schronce (Va. Bar No. 80903)
**HUNTON ANDREWS KURTH LLP**
951 East Byrd Street
Richmond, Virginia 23219-4074
Tel: (804) 788-8201
Fax: (804) 788-8218
jschronce@huntonAK.com

*Counsel for the TW/Willis Defendants*