**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| IN RE WILLIS TOWERS WATSON PLC PROXY LITIGATION | Civ. A. No. 1:17:cv-01338-AJT-JFA <br><br> <u>CLASS ACTION</u> |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION**
**<u>FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES. ........................................................................................ iii

I.      PRELIMINARY STATEMENT ................................................................... 1

II.     ARGUMENT ................................................................................................ 6

      A.      The Proposed Settlement Warrants Final Approval ............................ 6

            1.      Lead Plaintiff and Lead Counsel Have Adequately
                  Represented the Class ................................................................ 9

            2.      The Settlement Was Reached Through Arm's-Length
                  Negotiations Between Parties with Experienced Counsel
                  After Three Years of Hard-Fought Litigation and the
                  Completion of Extensive Fact and Expert Discovery .............. 10

                  a)      The Posture of the Action at the Time the
                        Settlement Was Reached Supports the Fairness of
                        the Settlement ................................................................ 10

                  b)      The Extensive Discovery Conducted Supports the
                        Fairness of the Settlement ............................................. 11

                  c)      The Circumstances Surrounding the Settlement
                        Negotiations Support the Fairness of the Settlement ... 13

                  d)      The Experience of Counsel in Securities Class
                        Action Litigation Supports the Fairness of the
                      Settlement ...................................................................... 15

            3.      The Relief that the Settlement Provides for the Class is
                    Adequate, Taking into Account the Costs and Risks of
                    Further Litigation and All Other Relevant Factors .................. 17

                    a)      The Risks of Establishing Liability and Damages
                        Support Approval of the Settlement ............................. 17

                            (1)      Risks to Proving Liability ................................. 18

                          (2)      Risks to Proving Damages ................................ 19

                  b)      The Settlement is Reasonable in Light of the Likely
                        Recoverable Damages .................................................... 20

                  c)      The Costs and Delays of Continued Litigation
                      Support Approval of the Settlement ............................. 21

i

d)     All Other Factors Set Forth in Rule 23(c)(2)(C) Support Approval of the Settlement ............................................. 22

4.    The Settlement Treats Class Members Equitably ..................................... 24

5.    The Reaction of the Class to Date Supports Approval of the Settlement ............................................................................................... 24

B.    The Plan of Allocation is Fair and Reasonable ...................................................... 24

C.    Notice to the Class Satisfied Rule 23 and Due Process ........................................ 26

III.    CONCLUSION .......................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) .................................................................................................9

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
   909 F. Supp. 2d 259 (S.D.N.Y. 2012) ...................................................................14

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) ...............................................................................24

*In re Biolase, Inc. Sec. Litig.*,
   No. 13-1300, 2015 WL 12720318 (C.D. Cal. Oct. 13, 2015) ................................21

*Deem v. Ames True Temper, Inc.*,
   2013 WL 2285972 (S.D. W.Va. May 23, 2013) ....................................................10

*Devine v. City of Hampton*,
   2015 WL 10793424 (E.D. Va. Dec. 1, 2015) ........................................................16

*Galloway v. Williams*,
   2020 WL 7482191 (E.D. Va. Dec. 18, 2020) ....................................................8, 20

*In re Genworth Fin. Sec. Litig.*,
   210 F. Supp. 3d 837 (E.D. Va. 2016) .............................................................*passim*

*Gonzalez v. O.J. Smith Farms, Inc.*,
   2021 WL 131263 (E.D.N.C. Jan. 13, 2021) ............................................................7

*Henley v. FMC Corp.*,
   207 F. Supp. 2d 489 (S.D.W. Va. 2002) ................................................................20

*Hicks v. Morgan Stanley*,
   2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ........................................................14

*In re Jiffy Lube Sec. Litig.*,
   927 F.2d 155 (4th Cir. 1991) .........................................................................*passim*

*Lomascolo v. Parsons Brinckerhoff, Inc.*,
   No. 08-cv-1310, 2009 WL 3094955 (E.D. Va. Sept. 28, 2009) ..............................7

*In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales
   Practices & Prod. Liab. Litig.*,
   952 F.3d 471 (4th Cir. 2020) ...................................................................................8

*In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg. Sales Practices*, 2018 WL 11203065 (E.D. Va. Oct. 9, 2018), *aff'd*, 952 F.3d 471 (4th Cir. 2020) .................................................................9

*In re Lumber Liquidators Holdings, Inc. Sec. Litig.*,
   2016 WL 9176736 (E.D. Va. Nov. 17, 2016)..........................................15

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
   233 F.R.D. 306 (E.D.N.Y. 2006) ..........................................................17

*In re MicroStrategy, Inc. Sec. Litig.*,
   148 F. Supp. 2d 654 (E.D. Va. 2001) .....................................13, 15, 24

*In re MicroStrategy, Inc. Securities Litigation*,
   172 F. Supp. 2d 778 (E.D. Va. 2001) ....................................................15

*In re Neustar, Inc. Sec. Litig.*,
   2015 WL 12819151 (E.D. Va. Sept. 22, 2015)........................................27

*In re NeuStar, Sec. Litig.*,
   2015 WL 5674798 (E.D. Va. Sept. 23, 2015)..........................................10

*In re NII Holdings, Inc.*,
   2016 WL 7045624 (E.D. Va. May 16, 2016) ...........................................26

*In re NII Holdings, Inc. Sec. Litig.*,
   2016 WL 11660702 (E.D. Va. Sept. 16, 2016)........................................15

*Robbins v. Koger Props., Inc.*,
   116 F.3d 1441 (11th Cir. 1997) ............................................................22

*In re SCANA Corp. Sec. Litig.*,
   2020 WL 4218398 (D.S.C. July 23, 2020) ..............................................26

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2020 WL 4196468 (S.D.N.Y. July 21, 2020) ..........................................23

*In re Snap Inc. Sec. Litig.*,
   2021 WL 667590 (C.D. Cal. Feb. 18, 2021)............................................21

*Solomon v. Am. Web Loan, Inc.*,
   2020 WL 3490606 (E.D. Va. June 26, 2020) ...........................................9

*In re The Mills Corp. Sec. Litig.*,
   265 F.R.D. 246 (E.D. Va. 2009) ................................................. *passim*

*Thorpe v. Walter Inv. Mgmt. Corp.*,
   2016 WL 10518902 (S.D. Fla. Oct. 17, 2016)........................................21

iv

*In re Veeco Instruments Inc. Sec. Litig.*,
2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ...........................................................................16

**STATUTES**

Private Securities Litigation Reform Act of 1995 ........................................................................11

**RULES**

Fed. R. Civ. P. 23(c)(2)(B) ..............................................................................................................26

Fed. R. Civ. P. 23(e)(2) ..................................................................................................1, 7, 8, 24

Fed. R. Civ. P. 23(e)(2)(A) ...............................................................................................................9

Fed. R. Civ. P. 23(e)(2)(B) .............................................................................................................10

Fed. R. Civ. P. 23(e)(2)(C) ...............................................................................................17, 22, 23

In accordance with Rule 23(e)(2) of the Federal Rules of Civil Procedure, Lead Plaintiff, The Regents of the University of California ("Lead Plaintiff" or "The Regents"), on behalf of itself and the Class, respectfully submits this motion for: (1) final approval of the proposed settlement resolving the Action in exchange for payment of $75 million in cash for the benefit of the Class (the "Settlement"), and (2) approval of the proposed plan of allocation of the proceeds of the Settlement.[1]

## MEMORANDUM OF LAW

### I.    PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiff has agreed to settle the Action in exchange for a cash payment of $75,000,000, which has been deposited into an escrow account.  Lead Plaintiff respectfully submits that the proposed Settlement is fair, reasonable, and adequate and satisfies all the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure.  As detailed in the accompanying Graziano Declaration and summarized below, the Settlement is an excellent result for the Class in light of the significant risks posed by ongoing litigation—including the substantial risks in proving the falsity and materiality of Defendants' statements and establishing loss causation and damages—and the maximum amount of potential damages that could likely be proven at trial.  ¶¶ 178-201.

The Settlement was reached after three years of hard-fought litigation, a full discovery process, and lengthy arm's-length settlement negotiations between experienced counsel, which

---

[1] Unless otherwise noted, capitalized terms shall have the meanings provided in the Stipulation and Agreement of Settlement dated January 15, 2021 (ECF No. 330-1) (the "Stipulation"), or in the Declaration of Salvatore J. Graziano in Support of (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Graziano Declaration" or "Graziano Decl."), filed herewith. In this memorandum, citations to "¶ __" refer to paragraphs in the Graziano Declaration and citations to "Ex. __" refer to exhibits to the Graziano Declaration.

included a mediation before former U.S. District Judge Layn Phillips, an experienced and highly respected class-action mediator, and continued settlement negotiations by the Parties following the mediation.  ¶¶ 174-76.

Before the Settlement was agreed to, Lead Counsel had (1) filed the initial complaint in the matter (¶ 19); (2) conducted an extensive investigation into the claims asserted in the Action, including a thorough review of relevant SEC filings, documents publicly filed in connection with the related Appraisal Action, analyst reports, press releases, company presentations, media reports and other public information (¶¶ 22-23); (3) drafted a detailed Amended Complaint (the "Complaint") based on this investigation (¶ 24); (4) successfully appealed the Court's initial order dismissing the Complaint to the Fourth Circuit (¶¶ 33-39); (5) successfully opposed Defendants' renewed motions to dismiss (¶¶ 40-55); (6) undertook substantial fact discovery efforts, which included obtaining and reviewing more than one million pages of documents produced by Defendants and third parties; preparing and responding to numerous interrogatories and requests for admission, and taking, defending, or participating in 12 fact depositions (¶¶ 76-130); (7) consulted extensively with experts concerning loss causation and damages, corporate governance, and executive compensation throughout the litigation, including preparing expert reports and conducting expert discovery, including six expert depositions (¶¶ 131-39); (8) successfully moved for class certification, and successfully opposed Defendants' Rule 23(f) petition for interlocutory appeal (¶¶ 141-55); and (9) filed extensive pretrial submissions distilling the entire discovery record, including a joint statement of uncontested facts, proposed exhibit list, and witness list; and motions to exclude three of Defendants' experts (¶¶ 162-64, 172).  As a result of these extensive efforts, Lead Plaintiff and Lead Counsel were very well informed about the strengths and risks of the case when the Settlement was reached.

Lead Plaintiff and Lead Counsel believe that the $75 million Settlement is an excellent result for the Class given the substantial risks of continued litigation. In agreeing to settle the Action, Lead Plaintiff and Lead Counsel made an informed evaluation of those risks. Lead Plaintiff respectfully submits that the Settlement appropriately balances Lead Plaintiff's objective of securing the greatest possible monetary recovery for the Class against the significant risk that the Class could receive a smaller recovery—or no recovery at all—had litigation continued. ¶¶ 178-201.

While Lead Plaintiff believes its claims had merit, it recognized that it faced substantial risks that it might not succeed on Defendants' motion for summary judgment (which was being briefed at time the Settlement was reached), or at trial, and that any verdict in favor of Lead Plaintiff might not be sustained on appeal. ¶¶ 181-90.

*First*, Lead Plaintiff faced risks in proving that the Proxy Materials concerning the Merger of Towers and Willis contained material misstatements or omissions. ¶¶ 181-86. Defendants had contended, and would have continued to argue, that they did not need to disclose the compensation proposal that Jeffrey Ubben (the CEO of ValueAct, a major shareholder of Willis) had discussed with John Haley (the CEO of Towers prior to the Merger, and CEO of the merged company, WTW) at a September 2015 meeting because no agreement on Haley's compensation was reached during the meeting, and Ubben did not have the authority at that time to negotiate on behalf of the future board of WTW. ¶ 182. Defendants could have supported those arguments with certain deposition testimony from Haley, Ubben, and Wendy Lane, the Chair of WTW's compensation committee, which supported, in part, Defendants' position. *Id*.

In addition, Defendants had contended, and would have continued to argue, that Haley's final compensation as the CEO of WTW differed in several material respects from the

compensation proposal from the September 2015 meeting and that his ultimate compensation as the CEO of WTW was less than the fair value of the compensation plan created by the Towers' board prior to the September 2015 meeting.   ¶¶ 183-84.   Defendants would argue that this supported their view that no agreement was reached at the September 2015 meeting, and that Haley's ultimate compensation was instead the byproduct of an extended and documented series of negotiations that occurred after the vote on the Merger was final.  ¶ 183.

In addition, Defendants would have continued to argue that Haley and Ubben's September 2015 meeting would not have been material information to investors.  ¶ 185.  Defendants argued that Towers shareholders would not have viewed the September 2015 meeting as important in deciding how to vote on the Merger because investors already knew that Haley would become the CEO of the larger combined company (WTW), and the proposal shown to Haley during the meeting aligned his interests with the interests of shareholders.  *Id*.  Defendants could also point to the fact that WTW's stock price did not move when Haley's actual WTW compensation plan was later publicly announced, and that the plan was ultimately approved his WTW shareholders. *Id*.

*Second*, Lead Plaintiff faced considerable risks in proving loss causation and damages. ¶¶ 191-98.  Defendants contended vigorously that Lead Plaintiff would not be able to prove loss causation or damages.   Lead Plaintiff argued that Class Members' damages were properly calculated based on the difference between the value of their Towers stock prior to the announcement of the Merger and the value of the Merger consideration they actually received. Defendants attacked Lead Plaintiff's loss causation and damages analysis as relying on a series of assumptions that Lead Plaintiff would not be able to prove.  ¶¶ 194-95.  For example, Defendants contended that Lead Plaintiff would not be able to prove that disclosure of Haley's alleged conflict

of interest in the Proxy Materials would have caused enough Towers shareholders to change their votes to reject the Merger; or that, assuming the Merger had been rejected, that Towers shares would have returned to their unaffected pre-Merger trading price; or that Towers and Willis would have renegotiated the terms of the Merger to provide additional compensation for Towers employees. ¶ 194. Indeed, the Court's discussion of related issues in its class certification decision indicated that the Court might likely be receptive to Defendants' arguments regarding Lead Plaintiff's damages theory at summary judgment, further increasing the seriousness of this risk. ¶ 160.

*Finally*, the Settlement is an excellent result in light of the best outcomes possible at trial (and on appeal). If Lead Plaintiff had defeated Defendants' motions for summary judgment and prevailed on all aspects of liability at trial, the absolute maximum damages that could be established for the Class would be approximately $377 million. ¶ 198. However, if plaintiffs were limited to measuring damages as the difference in value Towers shareholders received upon the close of the Merger and the value of Towers stock as of that time—as the Court had indicated it would view damages—the maximum damages would be approximately $172.5 million. *Id.*

Thus, the proposed $75 million Settlement represents approximately 20% of the maximum possible damages to 43% of the likely maximum damages that could likely be proven at trial. As discussed below, this is an excellent result for the Class given the significant risks that the Court might grant summary judgment or a jury might reject Lead Plaintiff's damages model or liability theory. Moreover, even if Lead Plaintiff were successful at each stage of litigation, it understood any such recovery would likely not be obtained for at least several years, allowing for the time for an appeal to be resolved.

The Settlement has the full support of the Court-appointed Lead Plaintiff, a sophisticated institutional investor that took an active role in supervising the litigation and participated in settlement negotiations.  *See* Declaration of Norman Hamill on behalf of The Regents (Ex. 2) ("Hamill Decl."), at ¶¶ 2-8.  Further, although the deadline to request exclusion from the Class or object to the Settlement has not yet passed, to date, no Class Members have objected to the Settlement and no requests for exclusion have been received.  ¶ 207; Miller Decl. (Ex. 1) at ¶ 12.

Given these considerations and the other factors discussed below, Lead Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court.  Additionally, Lead Plaintiff requests the Court approve the Plan of Allocation, which was set forth in the Notice mailed to potential Class Members.  The Plan of Allocation, which Lead Counsel developed in consultation with Lead Plaintiff's damages expert, provides a reasonable method for allocating the Net Settlement Fund among Class Members based on the number of eligible shares of Towers common stock they held.

## II.     ARGUMENT

The Graziano Declaration is cited to throughout this brief, and is an integral part of this submission. The Court is respectfully referred to it for a more detailed description of, among other things: the history of the Action (¶¶ 19-177); the nature of the claims asserted (¶¶ 12-18, 24); the negotiations leading to the Settlement (¶¶ 174-76); the risks and uncertainties of continued litigation (¶¶ 178-201); and the terms of the Plan of Allocation (¶¶ 208-13).

### A.     The Proposed Settlement Warrants Final Approval

Federal Rule of Civil Procedure 23(e) requires judicial approval of any compromise or settlement of class-action claims.  *See* Fed. R. Civ. P. 23(e).  A class-action settlement should be

approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 839 (E.D. Va. 2016).

Courts have long recognized that public and judicial policy favor the settlement of disputed claims among private litigants, particularly in class actions. *See Gonzalez v. O.J. Smith Farms, Inc.*, 2021 WL 131263, at *2 (E.D.N.C. Jan. 13, 2021) ("There is a strong judicial policy in favor of settlement."); *Lomascolo v. Parsons Brinckerhoff, Inc.*, No. 08-cv-1310, 2009 WL 3094955, at *10 (E.D. Va. Sept. 28, 2009) ("[T]here is an overriding public interest in favor of settlement, particularly in class action suits.").

Rule 23(e)(2), as amended on December 1, 2018, provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Historically, the Fourth Circuit has held that district courts should consider the factors set forth in *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991) in evaluating a class-action settlement. *See, e.g.*, *Genworth*, 210 F. Supp. 3d at 839-41; *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 253-54 (E.D. Va. 2009). These include four factors related to the "fairness" of the settlement, which focus on whether the proposed settlement was negotiated at arm's-length, and five factors related to the "adequacy" of the settlement, which focus on whether the consideration provided to the Class is sufficient. The *Jiffy Lube*'s "fairness" factors are:

> (1) the posture of the case at the time [the] settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the

negotiations, and (4) the experience of counsel in the area of securities class action litigation.

*Jiffy Lube*, 927 F.2d at 159.  The factors used to assess the adequacy of the settlement are:

> (1) The relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.

*Id*.

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the factors set forth in the amended Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."  Fed. R. Civ. P. 23(e)(2) Advisory Committee Notes to 2018 Amendments.

Accordingly, Lead Plaintiff will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the factors set forth in Rule 23(e)(2), but will also discuss the application of relevant *Jiffy Lube* factors.  *See Galloway v. Williams*, 2020 WL 7482191, at *4 (E.D. Va. Dec. 18, 2020) (reviewing final approval of class action settlement under both Rule 23(e)(2) and *Jiffy Lube* factors); *In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Practices & Prod. Liab. Litig.*, 952 F.3d 471, 484 n.8 (4th Cir. 2020) (noting that the *Jiffy Lube* "factors for assessing class-action settlements almost completely overlap with the new Rule 23(e)(2) factors").

All of the applicable factors strongly support approval of the Settlement here.

### 1. Lead Plaintiff and Lead Counsel Have Adequately Represented the Class

In evaluating a class action settlement, the Court should consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). The adequacy requirement is met when "(1) the named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are 'qualified, experienced, and generally able to conduct the litigation.'" *Solomon v. Am. Web Loan, Inc.*, 2020 WL 3490606, at *2 (E.D. Va. June 26, 2020); *accord In re Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg. Sales Practices*, 2018 WL 11203065, at *7 (E.D. Va. Oct. 9, 2018), *aff'd*, 952 F.3d 471 (4th Cir. 2020).

Here, in certifying the Class for purposes of the litigation, the Court previously found Lead Plaintiff and Lead Counsel have adequately represented the Class. *See* ECF No. 229 at 28-32 (Court's class certification order finding Lead Plaintiff and Lead Counsel adequate). Indeed, there is no antagonism or conflict between Lead Plaintiff and the proposed Class. Lead Plaintiff has claims that are typical of and coextensive with those of other Class Members, and has no interests antagonistic to the interests of other members of the Class. Lead Plaintiff and the other Class Members all held Towers common stock on the record date of the Merger and continued to hold those shares through the closing of the Merger, and all were allegedly damaged by the same alleged misleading statements and omissions in the Proxy Materials. If Lead Plaintiff proved its claims at trial, it would also prove the claims of the other Class Members. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (the investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions).

Moreover, Lead Plaintiff and Lead Counsel have adequately represented the Class in their vigorous prosecution of the Action and in the negotiation and achievement of the Settlement. Lead

Counsel BLB&G is highly qualified and experienced in securities litigation, as set forth in its firm resume (see Ex. 3A-3 to the Graziano Declaration) and was able to successfully conduct the litigation against skilled opposing counsel and obtain a favorable settlement.

> **2.      The Settlement Was Reached Through Arm's-Length Negotiations Between Parties with Experienced Counsel After Three Years of Hard-Fought Litigation and the Completion of Extensive Fact and Expert Discovery**

In weighing approval of a class action settlement, the Court must consider whether the settlement "was negotiated at arm's length."   Fed. R. Civ. P. 23(e)(2)(B).   This inquiry is comparable to the Fourth Circuit's traditional examination of a proposed settlement's "fairness," which is used to assess "whether the settlement was reached through good-faith bargaining at arm's length," *Jiffy Lube*, 927 F.2d at 158-59, and involves consideration of four factors:  "(1) the posture of the case at the time the settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of securities class action litigation."  *Id.*  Here, all of the circumstances strongly support a finding that the Settlement was reached through good-faith bargaining at arm's length.

> **a)      The Posture of the Action at the Time the Settlement Was Reached Supports the Fairness of the Settlement**

The first *Jiffy Lube* fairness factor assesses "how far the case has come from its inception." *Mills*, 265 F.R.D. at 254.  The Court considers whether the case has progressed far enough to dispel any wariness of "possible collusion among the settling parties."  *In re NeuStar, Sec. Litig.*, 2015 WL 5674798, at *10 (E.D. Va. Sept. 23, 2015) (quoting *Mills*, 265 F.R.D. at 254).  "Absent evidence to the contrary, the Court should presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion."  *Deem v. Ames True Temper, Inc.*, 2013 WL 2285972, at *2 (S.D. W.Va. May 23, 2013).

Here, as discussed in detail in the accompanying Graziano Declaration, the case was hard fought and extensively litigated.  By the time the Settlement was reached, the parties had completed fact and expert discovery, were briefing Defendants' summary judgment motions, and were preparing pre-trial motions to disqualify expert witnesses and other pre-trial filings.

Where, as here, "the parties had conducted all parts of the litigation other than final trial preparations," the extensive litigation conducted "demonstrates an adversarial process far exceeding 'arm's length' and demonstrates that each side entered negotiations with a strong understanding of the issues in the case." *Genworth*, 210 F. Supp. 3d at 840.

> **b)   The Extensive Discovery Conducted Supports the Fairness of the Settlement**

As set forth in extensive detail in the Graziano Declaration at paragraphs 22 through 23 and 76 through 139, Lead Counsel's investigative and discovery efforts were exhaustive, and ensured that Lead Plaintiff and Lead Counsel were fully informed of the relevant evidence.  First, to develop the facts necessary to sustain the Complaint, Lead Counsel  analyzed thousands of pages of SEC filings, documents made public in the related Appraisal Action, financial analyst reports, news articles, and statements made by Defendants in press releases and company presentations. ¶¶ 22-23.

From the inception of the case through the Court's order sustaining the Complaint on remand following the appeal, formal discovery was stayed pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  Once discovery commenced in February 2020, Lead Plaintiff undertook extensive and highly contested discovery efforts over the next six months under the novel circumstances of a global pandemic that required counsel to rapidly master new methods for conducting remote depositions and other forms of remote collaboration.  ¶¶ 76-139. During this period, Lead Plaintiff served subpoenas on eight third parties, including Towers and

Willis's financial advisors and external consultants, and multiple requests for documents on Defendants, which resulted in Lead Plaintiff obtaining and reviewing a total of over one million pages of documents.   ¶¶ 76-101.   The Parties engaged in extensive meet and confer processes throughout the COVID-19 pandemic and resolved many of their discovery disagreements, including disputes over the scope of documents to be produced. ¶ 77.   Lead Plaintiff also prepared and responded to numerous interrogatories and requests for admissions.   ¶¶ 113-30.

Beginning in June 2020, Lead Plaintiff took or defended a total of 18 depositions in the Action, including, among others, (i) Defendant John Haley, the CEO of Towers and later WTW, whose communications with the ValueAct Defendants regarding his future compensation as the CEO of WTW, and alleged conflict during the Merger renegotiations, were central to Lead Plaintiff's claims; (ii) Defendant Jeffrey Ubben, the former CEO of ValueAct, who spearheaded ValueAct's compensation philosophy and conducted the September 2015 meeting with Haley; (iii) Wendy Lane; the chair of the WTW compensation committee that ultimately oversaw the approval of Haley's compensation agreement as the CEO of WTW; (iv) Alex Baum, a ValueAct partner, who was involved in the communications with Haley regarding his future compensation as the CEO of WTW; and (v) Dominic Casserly, the CEO of Willis during the Merger negotiations. ¶¶ 107-12.

In addition, Lead Counsel consulted extensively with experts throughout the Action and conducted full expert discovery.   ¶¶ 131-39.   Lead Plaintiff submitted expert reports from three highly qualified experts:   Dr. David Tabak, managing director at National Economic Research Associates, Inc., who opined on loss causation and damages; Professor Lawrence A. Hamermesh, an emeritus professor at the Widener University Delaware Law School, who opined on general practices in corporate governance; and Dr. Wayne Guay, professor of accounting at the Wharton

12

School of the University of Pennsylvania, who opined on executive compensation issues. ¶ 132. A significant portion of Lead Plaintiff's consultation with these experts occurred during the COVID-19 pandemic, requiring Lead Counsel to effectively share information, strategize, and coordinate with these experts in a remote environment.  ¶ 131.  Defendants responded with four experts of their own, including experts on loss causation and damages, corporate governance, and executive compensation, as well as Irish corporate law.  ¶ 133.  Lead Plaintiff worked with its experts to prepare three rebuttal reports and took or defended six expert depositions (Lead Plaintiffs' three experts and three of Defendants' four experts).  ¶¶ 137-38.

This extensive discovery provided Lead Plaintiff and Lead Counsel with a detailed assessment of the strengths and weaknesses of the case and more than sufficient information to evaluate the reasonableness of the $75 million settlement.

### c) The Circumstances Surrounding the Settlement Negotiations Support the Fairness of the Settlement

The third *Jiffy Lube* fairness factor requires the Court to evaluate the conditions and circumstances surrounding the settlement negotiations.  *See Mills*, 265 F.R.D. at 255.   "The objective of this factor is to ensure that counsel entered into settlement negotiations on behalf of their clients after becoming fully informed of all pertinent factual and legal issues in the case." *Id.* (citation omitted); *see also In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 665 (E.D. Va. 2001) ("Counsel for both sides of this lawsuit participated in numerous meetings and extensive and intensive discussions extending over a period of months, with plaintiffs' lead counsel pressing their belief in the strength of their case on the merits.").

In May 2020, in the midst of intense ongoing discovery, the Parties discussed the possibility of resolving the Action through settlement in a mediation before former United States District Judge Layn Phillips.  ¶ 174.  In advance of the mediation, the Parties exchanged and

produced to Judge Phillips detailed mediation statements addressing liability and damages.  *Id*. The mediation before Judge Phillips was held on May 21, 2020 and the participants included Lead Counsel, in-house counsel for Lead Plaintiff, counsel for Defendants, and counsel for the parties in the Delaware Action.  *Id*.  No agreement was reached during that mediation, and the Parties resumed their intense discovery and pretrial work.  *Id*.

In October 2020, as the Parties prepared their responses to the voluminous summary judgment motions and *Daubert* motions, they resumed settlement discussions and engaged in several weeks of back and forth negotiations.  ¶ 175.  On November 19, 2020, the Parties reached an agreement in principle to settle this Action for $75 million and the parties to the Delaware Action agreed to settle that action for $15 million, for a combined settlement of $90 million.  *Id*. In the ensuing weeks, the Parties negotiated the final terms of the Settlement and executed the final Stipulation on January 15, 2021.  ¶ 176.

The circumstances surrounding these settlement negotiations strongly support the fairness of the Settlement.  *See Genworth*, 210 F. Supp. 3d at 840-41 (the history of adversarial settlement negotiations over the course several month, including a mediation before Judge Phillips "demonstrate that the Settlement is fair and reasonable"); *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig*., 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (finding a settlement fair where the parties engaged in "arm's length negotiations," including mediation before Judge Phillips, "an experienced and well-regarded mediator of complex securities cases").

The fact that the Parties did not reach agreement at the initial mediation session, and required additional negotiations to do so, further demonstrates that the Settlement was the product of arm's-length negotiations.  *See, e.g.*, *Hicks v. Morgan Stanley*, 2005 WL 2757792, at *5

(S.D.N.Y. Oct. 24, 2005) ("A breakdown in settlement negotiations can tend to display the negotiation's arms-length and non-collusive nature.") (citation omitted).

**d)      The Experience of Counsel in Securities Class
Action Litigation Supports the Fairness of the Settlement**

"The final *Jiffy Lube* 'fairness' factor looks to the experience of Class Counsel in this particular field of law." *Mills*, 265 F.R.D. at 255-56.  This *Jiffy Lube* fairness factor is met where, as here, lead counsel for the class is "highly experienced in the field of securities class action litigation" and the decision to settle the action was the "product of thorough exploration and deliberation." *Mills*, 265 F.R.D. at 256.  *See also MicroStrategy*, 148 F. Supp. 2d at 665 ("it is 'appropriate for the court to give significant weight to the judgment of class counsel that the proposed settlement is in the interest of their clients and the class as a whole,' and to find that the proposed . . . settlement is fair").

Here, Lead Counsel has many years of experience in complex securities class actions and is one of the leading plaintiff firms practicing in that area.  ¶ 224 and Ex. 3A-3.  Lead Counsel has prosecuted and resolved dozens of complex securities cases, including many of the largest recoveries in securities class actions in the history of the Eastern District of Virginia.  *See Genworth*, 210 F. Supp. 3d at 842 ($219 million settlement); *Mills*, 265 F.R.D. at 246 ($202 million settlement); *In re Lumber Liquidators Holdings, Inc. Sec. Litig.*, 2016 WL 9176736, at *1 (E.D. Va. Nov. 17, 2016) ($45 million settlement in cash and stock); *In re NII Holdings, Inc. Sec. Litig.*, 2016 WL 11660702, at *1 (E.D. Va. Sept. 16, 2016) ($41.5 million settlement); and this Action.[2]

---

[2] In addition, Salvatore Graziano, the lead attorney on the case at BLB&G, was the lead attorney for the plaintiffs prosecuting *In re MicroStrategy, Inc. Securities Litigation*, 172 F. Supp. 2d 778 (E.D. Va. 2001) ($154 million settlement), while at a prior firm.

Liaison Counsel Susan Podolsky is also highly experienced in cases of this nature and has been involved in many of the most significant securities class action recoveries in this District.

Moreover, the Court-appointed Lead Plaintiff, The Regents, is sophisticated institutional investor that oversees billions of dollars in investments, and is experienced in securities class actions. *See* Hamill Decl. (Ex. 2) at ¶ 2. Lead Plaintiff retained Lead Counsel specifically because of its expertise and acumen in large complex securities matters like this one. Lead Plaintiff also closely supervised, carefully monitored, and was actively involved in all material aspects of the prosecution and settlement of the Action. For example, The Regents regularly communicated with Lead Counsel regarding the posture and progress of the case; reviewed significant pleadings and briefs filed in the Action; reviewed the Court's orders and discussed them with Lead Counsel; collected information for and assisted in preparing responses to discovery requests served by Defendants; searched for and collected documents for production; and two of The Regents' representatives and one former employee of The Regents sat for depositions. *See* Hamill Decl. ¶¶ 2-7. The Regents consulted with Lead Counsel regarding settlement negotiations; and evaluated and ultimately approved the proposed Settlement, and one of its representatives attended the mediation. *Id.* ¶ 7.

Accordingly, the Court should give considerable weight to Lead Plaintiff and Lead Counsel's judgment that the Settlement is in the best interests of the Class. The Court "is entitled to rely on the judgment of experienced counsel for the parties . . . and should hesitate to substitute its own judgment for that of counsel." *Devine v. City of Hampton*, 2015 WL 10793424, at \*2 (E.D. Va. Dec. 1, 2015). The fact that Lead Plaintiff is a sophisticated institutional investor, of the type favored by Congress when it passed the PSLRA, strengthens the force of its recommendation that the Settlement be approved. *See In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at

*5 (S.D.N.Y. Nov. 7, 2007) ("[A] settlement reached . . . under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness….'") (citation omitted).

>  **3.**     **The Relief that the Settlement Provides for**
>  **the Class is Adequate, Taking into Account the Costs**
>  **and Risks of Further Litigation and All Other Relevant Factors**

In determining whether a settlement is "fair, reasonable, and adequate," the Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C).[3]   Courts have recognized that securities class actions are "notably difficult and notoriously uncertain." *Mills*, 265 F.R.D. at 255. Accordingly, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

As discussed in detail in the Graziano Declaration and below, continued litigation of the Action presented a number of significant risks to Lead Plaintiff and the Class.

>  **a)**     **The Risks of Establishing Liability and**
>  **Damages Support Approval of the Settlement**

While Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious, they recognize the substantial risks they would face in overcoming Defendants' motions for summary judgment, in establishing liability and damages at trial, and in prevailing on any appeals after trial.   At each of these stages, Lead Plaintiff faced challenges in

---

[3] This factor under Rule 23(e)(2)(C) encompasses four of the five factors of the traditional *Jiffy Lube* adequacy analysis: "(1) The relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, [and] (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment." *Jiffy Lube*, 927 F.2d at 159.

proving that the Proxy contained materially false or misleading statements or omissions and in proving loss causation and damages.

### (1)     Risks to Proving Liability

First, Lead Plaintiff faced substantial risks in establishing that Haley had a true conflict of interest that required disclosure in the Proxy Materials.  ¶¶ 181, 186.  Lead Plaintiff alleged that Haley had a conflict of interest as a result of a September 10, 2015 meeting at which ValueAct and Ubben presented Haley with a written compensation proposal that showed Haley could make up to five times more at the post-Merger entity, WTW.  ¶ 24.  Defendants would contend that they did not need to disclose this compensation proposal in the Proxy Materials because Haley and Ubben never reached an agreement on Haley's compensation during the meeting, and because Ubben did not have the authority to negotiate on behalf of the future board of WTW.  ¶ 182.  This argument was supported by Haley and Ubben's deposition testimony concerning the meeting and other discovery.  *Id*.  In addition, Defendants could point to the fact that Haley's ultimate compensation at WTW was far less than the compensation proposal discussed at the meeting. ¶¶ 183-84.

In addition, Lead Plaintiff would have faced additional substantial risks in showing that the September 10, 2015 meeting was a material fact, the omission of which rendered the Proxy Materials misleading.  ¶ 185.  Defendants argued that the proposal shown to Haley during the meeting aligned his interests with the interests of shareholders, highlighting the fact that WTW's stock price did not move when Haley's actual WTW compensation plan was publicly announced, and that shareholders ultimately approved his WTW compensation plan.  *Id*.

**(2)      Risks to Proving Loss Causation and Damages**

In addition to the risks of establishing a materially misleading omission, Lead Plaintiff would also have faced significant additional challenges in proving "loss causation" and damages. ¶¶ 191-98. As an initial matter, Defendants would argue that the Merger announcement on June 30, 2015 simply signaled to the market that Towers stock was previously overvalued, and thus investors were not damaged by Defendants' subsequent alleged misstatements or non-disclosures. ¶¶ 192-94.

Defendants had a number of other potentially serious challenges to Lead Plaintiff's theory of damages. ¶¶ 193-97. Lead Plaintiff argued that Class members' damages were properly calculated based on the difference between the value of their Towers stock prior to the Merger's announcement and the value of the Merger consideration they actually received. However, Defendants contended that Lead Plaintiff's expert's damages analysis relied on a series of assumptions that Lead Plaintiff would not be able to prove. ¶¶ 194-96. For example, Defendants contended that Lead Plaintiff would not be able to prove that disclosure of Haley's alleged conflict of interest would have caused enough Towers shareholders to change their votes to reject the Merger; or that if the Merger had been rejected, Towers shares would have returned to their unaffected pre-Merger trading price; or Towers and Willis would have renegotiated the terms of the Merger to provide additional compensation for Towers employees. ¶ 194. These risks were enhanced by the fact that the Court's discussion of related issues in its class certification decision indicated that the Court might likely be receptive to Defendants' arguments concerning Lead Plaintiff's damages theory at summary judgment. ¶ 160.

Moreover, with respect to all of these issues, Lead Plaintiff would have to prevail at several stages—on Defendants' pending motion for summary judgment, at trial, and if they prevailed on

those, in the appeals that would likely follow—which could take years to resolve.  The Settlement avoids these risks and will provide a prompt, substantial, and certain benefit to the Class rather than the mere possibility of a recovery after additional years of litigation and appeals.[4]

**b)  The Settlement is Reasonable in Light
of the Likely Recoverable Damages**

Assuming that Lead Plaintiff defeated Defendants' motions for summary judgment and prevailed on all aspects of liability at trial, the maximum Class-wide damages would be approximately $377 million.  ¶ 198.  However, if plaintiffs were limited to measuring damages as the difference between the consideration Towers shareholders received upon the close of the Merger and the true value of Towers stock as of that date—which is how the Court had indicated it would view damages in this case—then the maximum Class-wide damages would be approximately $172.5 million.  *Id.*

Thus, the proposed $75 million Settlement represents approximately 20% of the maximum possible damages and 43% of the maximum damages that could likely be proven at trial in light of the Court's views.[5]  This is an excellent result for the Class given the significant risks present here.

---

[4] In appraising the adequacy of the settlement under *Jiffy Lube*, courts in the Fourth Circuit also consider "the solvency of the defendants and the likelihood of recovery on a litigated judgment" as additional relevant circumstances.  *See Jiffy Lube*, 927 F.2d at 159.  Here, WTW is a solvent company and Lead Plaintiff did not anticipate any significant risks in being able to recover on a litigated judgment.  However, in light of the other significant risks in the litigation, this factor is of limited importance.  *See Galloway*, 2020 WL 7482191, at *9 (finding, in similar circumstances, "this factor has no bearing on the Court's adequacy analysis"); *Henley v. FMC Corp.*, 207 F. Supp. 2d 489, 494 (S.D.W. Va. 2002) ("The Court has no doubt FMC would be able to satisfy any judgment entered against it. That consideration, however, is largely beside the point given the other factors weighing in favor of a negotiated resolution.").

[5] In addition, ***all*** members of the Class in this Action will also be eligible to receive payment from the parallel $15 million Delaware Settlement.  ¶ 198 n.4.  The proceeds of the Delaware Settlement will be distributed to all shareholders of Towers common stock on January 4, 2016, when the

Courts have routinely approved securities class action settlements with substantially lower percentage recoveries than obtained here.  *See, e.g.*, *In re Snap Inc. Sec. Litig.*, 2021 WL 667590, at *1 (C.D. Cal. Feb. 18, 2021) (approving settlement "represent[ing] approximately 7.8% of the class's maximum potential aggregate damages" and noting that it is "similar to the percent recovered in other court-approved securities settlements"); *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902 at *3 (S.D. Fla. Oct. 17, 2016) (approving settlement representing 5.5% of the maximum damages and noting that the settlement is "an excellent recovery, returning more than triple the average settlement in cases of this size"); *In re Biolase, Inc. Sec. Litig.*, No. 13-1300, 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (settlement recovery of 8% of estimated damages "equals or surpasses the recovery in many other securities class actions").

  **c)**  **The Costs and Delays of Continued Litigation Support Approval of the Settlement**

Achieving a litigated verdict in the Action would have required substantial additional litigation and costs.  In the absence of the Settlement, achieving a recovery for the Class would have required (i) completing briefing of Defendants' summary judgment motions and the *Daubert* motions; (ii) completing other pre-trial motion practice, including motions *in limine*; (iii) a trial involving substantial fact and expert testimony; and (iv) post-trial motions.  ¶ 229.  Moreover, the ongoing COVID-19 pandemic created a risk that a jury trial might be substantially delayed.  *Id*.

Finally, whatever the outcome at trial, it is virtually certain that appeals would be taken from any verdict.  ¶ 199.  At each step of the way, the risks in the case could have materialized.  For example, Courts of Appeals have vacated plaintiffs' trial verdicts in securities class actions

---

Merger closed.  *Id*.  Lead Plaintiff's expert estimates, based on his modeling of the trading in Towers common stock, that 83% the Towers shares held on January 4, 2016 were held by the same person or entity on October 1, 2015 (and thus are eligible to participate in the Settlement of this Action), and just 17% were held by persons or entities who purchased after October 1, 2015.  *Id*.

after many years of litigation.  *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1145-49 (11th Cir. 1997) (reversing jury verdict on appeal after seven years of litigation).  Even assuming success at all these stages, such a protracted process would pose substantial expense to the class and delay any recovery for years.

*   *   *

In sum, Lead Plaintiff respectfully submits that, considering the substantial risks of continued litigation and the additional time and expense to prosecute the action through a trial and possible appeals, the $75 million Settlement represents an excellent recovery that is in the best interests of the Class.  In contrast to costly, lengthy, and uncertain continued litigation, the Settlement provides an immediate, significant, and certain recovery.

### d)  All Other Factors Set Forth in Rule 23(c)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)."  Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv).  Each of these factors supports approval here.

First, the procedures for processing Class Members' claims and distributing the proceeds of the Settlement are equitable and effective.  The proceeds of the Settlement will be distributed to Class Members by the Court-appointed Claims Administrator, A.B. Data, Ltd., an independent company with extensive experience handling the administration of securities class actions.  Consistent with well-established methods that have been widely used in securities class action litigation, Class Members will be required to submit Claim Forms with documentation to A.B. Data.  A.B. Data will review and process the claims, provide claimants with an opportunity

to cure any deficiencies in their claims or request review by the Court, and will then mail or wire eligible Claimants their *pro rata* share of the Net Settlement Fund (as calculated under the Plan of Allocation) upon approval of the Court.  ¶¶ 209-11.  This type of claims processing is standard in securities class actions and has long been found to be effective.

Second, the Settlement is also adequate when the terms of the proposed award of attorneys' fees are taken into account.  As discussed in the accompanying Fee Memorandum, the requested attorneys' fees of 16% of the Settlement Fund, to be paid upon approval by the Court, are reasonable in light of the significant efforts of Plaintiffs' Counsel and the substantial risks in the litigation.  Indeed, the percentage fee request is below the range of percentage fees typically awarded in cases of this nature and the fee requested represents a substantial discount from Plaintiffs' Counsel's lodestar.  Most importantly, approval of attorneys' fees is entirely separate from approval of the Settlement, and no party has the right to terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees.  *See* Stipulation ¶ 17.

Lastly, Rule 23 asks the court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3).  *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).  Here, the only such agreement (other than the Stipulation itself) is the Parties' confidential Supplemental Agreement, which sets forth the conditions under which Defendants may terminate the Settlement if the requests for exclusion from the Class reach a certain threshold.  *See* Stipulation ¶ 41.  "This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement."  *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020).

### 4. The Settlement Treats Class Members Equitably

The proposed Settlement treats members of the Class equitably relative to one another. As discussed below in Part II.B, pursuant to the Plan of Allocation, eligible claimants will receive their *pro rata* share of the recovery based on the number of shares of Towers common stock they held as of October 1, 2015, the record date of the Merger, and continued to hold as of the close of trading on January 4, 2016, when the Merger was consummated. Lead Plaintiff will receive the same level of *pro rata* recovery under the Plan of Allocation as all other Class Members.

### 5. The Reaction of the Class to Date Supports Approval of the Settlement

The final factor considered by the Fourth Circuit is "the degree of opposition to the settlement." *Jiffy Lube*, 927 F.2d at 159. Under the Preliminary Approval Order, the deadline for Class Members to exclude themselves from the Class or object to the Settlement is April 15, 2021. ¶ 207. To date, no requests for exclusion and no objections to the proposed Settlement have been received. *Id*.; Miller Decl. (Ex. 1) at ¶ 12. Lead Plaintiff will file a reply brief by May 14, 2021 that will address any requests for exclusion or objections that may be received.

In sum, all of factors to be considered under Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

### B. The Plan of Allocation is Fair and Reasonable

In addition to seeking final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation for the Settlement proceeds. Approval of a plan of allocation is governed by the same standards of fairness and reasonableness applicable to the settlement as a whole. *See, e.g.*, *Genworth*, 210 F. Supp. 3d at 842 ("To warrant approval, the plan of allocation must also meet the standards by which the . . . settlement was scrutinized—namely, it must be fair and adequate."); *MicroStrategy*, 148 F. Supp. 2d at 668 (same). "The proposed allocation need

24

not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis." *Mills*, 265 F.R.D. at 258.

The proposed Plan of Allocation is set forth in the Notice mailed to potential Class Members.  *See* Miller Decl., Ex. A at p. 20-22.  The Plan provides for the *pro rata* distribution of the Net Settlement Fund based on the number of Towers shares held by each Claimant that are eligible to participate in the Settlement ("Federal Eligible Shares").  *See* Plan ¶¶ 10-14.  Consistent with the Court's rulings in the Action, the number of Federal Eligible Shares for each Claimant is the number of shares of Towers common stock that the Claimant held as of the close of trading on October 1, 2015, the record date for voting on the Merger, that were still held as of the close of trading on January 4, 2016, when the Merger closed.  *See* Plan ¶ 12.  The distribution amount that will be sent to each eligible Claimant will be the Claimant's number of Federal Eligible Shares divided by the total number of Federal Eligible Shares of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.  *See* Plan ¶ 14.

In sum, the Plan of Allocation is designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Class Members based on the number of eligible Towers shares they held.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.  As of March 30, 2021, more than 69,000 copies of the Notice, which sets forth the Plan of Allocation and advises Class Members of their right to object to the proposed Plan of Allocation, had been sent to potential members of the Class.  *See* Miller Decl. ¶ 8.  To date, no objections to the proposed Plan of Allocation have been received.

## C.       Notice to the Class Satisfied Rule 23 and Due Process

The Notice to the Class satisfied the requirements of Rule 23, which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  The Notice also satisfies Rule 23(e)(1)(B), which requires a court to "direct notice in a reasonable manner to all class members who would be bound" by the proposed settlement.

Both the substance of the Notice and the method of its dissemination to potential members of the Class satisfied these standards.  In addition, the Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7).  In accordance with the Court's Preliminary Approval Order, A.B. Data began mailing copies of the Notice and Claim Form to potential Class Members on February 12, 2021. *See* Miller Decl. (Ex. 1) at ¶¶ 3-5.  As of March 30, 2021, A.B. Data had disseminated 69,179 copies of the Notice Packet to potential Class Members and nominees.  *See id.* ¶ 8.  In addition, Lead Counsel caused the Summary Notice to be published in *The Wall Street Journal* and over the *PR Newswire* on March 1, 2021.  *See id.* ¶ 9.  The Notice and Claim Form were also published on a website established for the Settlement and on Lead Counsel's website.  *See id.* ¶ 11; Graziano Decl. ¶ 206.  This combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented by publication in a relevant, widely circulated newspaper, over a newswire, and via website, was the best notice practicable under the circumstances.  *See In re SCANA Corp. Sec. Litig.*, 2020 WL 4218398, at *2-3 (D.S.C. July 23, 2020) (finding similar notice "constituted the best notice practicable under the circumstances" and "constituted due, adequate, and sufficient notice to all persons and entities entitled to receive notice of the proposed Settlement"); *In re NII Holdings, Inc.*, 2016 WL 7045624, at *2 (E.D. Va. May 16, 2016)

(approving of similar notice program in securities class action); *In re Neustar, Inc. Sec. Litig.*, 2015 WL 12819151, at *3 (E.D. Va. Sept. 22, 2015) (same).

## III.    CONCLUSION

Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

Dated: March 31, 2021                              Respectfully submitted,

*/s/ Susan R. Podolsky*
**LAW OFFICES OF SUSAN R. PODOLSKY**

Susan R. Podolsky (Va. Bar No. 27891)
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (571) 366-1702
Facsimile: (703) 647-6009
spodolsky@podolskylaw.com

*Local Counsel for Lead Plaintiff and*
*Court-Appointed Class Representative*
*The Regents of the University of California*

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

Salvatore J. Graziano (*pro hac vice*)
John Rizio-Hamilton (*pro hac vice*)
Rebecca E. Boon (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
johnr@blbglaw.com
rebecca.boon@blbglaw.com

*Counsel for Lead Plaintiff and Court-Appointed*
*Class Representative The Regents of the*
*University of California, and Class Counsel for*
*the Class*

#3008276

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 31st day of March 2021, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all counsel of record.

*/s/ Susan R. Podolsky*_____

Susan R. Podolsky (Va. Bar No. 27891)
